**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC | |
| Plaintiff, | CIVIL ACTION NO. ___1:26-cv-3684___ |
| v. | Jury Trial Demanded |
| Alan Ware | **COMPLAINT** |
| Defendant. | |

## <u>COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES</u>

Plaintiff Guidepoint Global, LLC ("Plaintiff," "Guidepoint," or the "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Defendant Alan Ware ("Defendant" or "Ware") seeking preliminary injunctive relief, permanent injunctive relief, and monetary damages.

## <u>PRELIMINARY STATEMENT</u>

1.      Guidepoint brings this action against Defendant Alan Ware, a former senior executive, who has violated his binding contractual obligations, participated in a coordinated raid on Guidepoint's workforce, misappropriated its proprietary and trade secret information, and is now, upon information and belief, poised to launch a competing business using Guidepoint's proprietary assets.

2.      Ware joined Guidepoint in March 2023 and rose to become Director of Research and Global Head of its Technology, Media, and Telecommunications ("TMT") group—a key subject-matter group within one of Guidepoint's most valuable business units. In that role, Ware was entrusted with Guidepoint's proprietary and trade secret information, including its pricing models, contract structures, client intelligence, sales strategies, and expert networks. In

consideration of Ware's employment, he executed an Employment Agreement expressly prohibiting him from competing with Guidepoint, soliciting its employees, interfering with its client relationships, or retaining or using its proprietary information after his departure.

3.      Ware repaid that trust with betrayal. Beginning as early as February 2026, more than two months before his resignation in April—Ware was quietly planning his exit and researching the legal risks of violating his non-solicitation obligations. By late March and into April 2026, five members of Guidepoint's TMT team resigned in rapid succession. When Guidepoint confronted Ware about the departures, he acknowledged knowing that his former reports had left to join a start-up (the "Start-Up") but feigned ignorance of the details concerning the Start-Up. He resigned the very next day to join that Start-Up. Ware and at least one other former TMT team member subsequently updated their LinkedIn profiles to reflect employment at a deliberately opaque entity operating under the name "Stealth Startup."

4.      To ensure the Start-Up's head start, shortly before he resigned, **Ware also emailed himself Guidepoint's proprietary and trade secret information, including transcripts with industry experts and compensation information for the very team that resigned.** These materials included proprietary transcripts of calls with industry experts that would be useful for Ware in his new role, including samples of his team's Guidepoint work product, and information Guidepoint considers confidential to its business such as TMT members' salaries and key performance metrics and client lists. Guidepoint now faces the irreparable harm of having its proprietary information exploited by a competitor. Guidepoint brings this action to enforce its contractual rights, protect its trade secrets, and obtain the injunctive and monetary relief necessary to remedy Ware's misconduct.

## PARTIES

5.      Plaintiff Guidepoint Global, LLC is a limited liability company organized under the laws of the State of New York.

6.      Defendant Alan Ware is a resident of the state of Connecticut. He was employed by Guidepoint until April 22, 2026. Upon information and belief, Ware resides at 16 Shoreview Lane, Danbury, CT 06811.

## JURISDICTION AND VENUE

7.      This Court maintains subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Guidepoint asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA").

8.      This Court has supplemental jurisdiction over Guidepoint's pendent state law claims under 28 U.S.C. § 1367. These pendent state law claims derive from a common nucleus of operative facts and are so related to the federal law claims that they form part of the same case or controversy.

9.      Venue in this district is appropriate for several reasons. First, in the Employment Agreement, Ware irrevocably and unconditionally consented to the exclusive jurisdiction of the federal courts in the City of New York for any action arising from the Employment Agreement. Second, a substantial part of the events or omissions giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.      Plaintiff Guidepoint Global, LLC

10.      Founded in 2003 and headquartered in New York City, Guidepoint is a leading global expert network and research services firm that connects institutional investors, consultants,

3

and corporate clients with industry experts to gain in-depth insights and market intelligence to support strategic, operational, and investment decisions. It serves as an intermediary, connecting professionals seeking industry expertise with advisors possessing specialized knowledge.

11.    In a separate business unit from its expert network, the Insights business unit, Guidepoint generates content that it provides to its clients through live teleconferences in which Guidepoint moderators conduct interviews with experts in Guidepoint's network.  Guidepoint also offers as a product to its clients a library of transcripts of such teleconferences.  Unique among expert networks, Guidepoint's moderators are almost exclusively former buy-side or sell-side analysts who are able to anticipate and develop the topics that are important to Guidepoint's institutional clients.  For that reason, while some other expert networks also generate content, Guidepoint is known for the high quality of its content, which is largely due to the quality of the moderators who choose the teleconference topics, choose the experts, and conduct the interviews.

12.    Guidepoint's business is built on long-standing relationships with its clients, experts, advisors, and moderators, as well as on proprietary systems and processes for sourcing, onboarding, pricing, and servicing those relationships.

13.    Guidepoint's competitive position depends on protecting its confidential client information, internal processes, strategies, and industry know-how from disclosure to competitors.

14.    Guidepoint operates globally and provides services to a global client base. Across four continents, it maintains 19 global offices; employs 1,700+ employees; provides services to more than 5,000 client organizations; and offers access to advisors spanning more than 300 industries.

15.    In the Americas, Guidepoint maintains offices in Hawaii, California, Arizona, Massachusetts, New York, and Toronto.

**B.      Guidepoint's Confidentiality Policies and Protection of its Confidential Information and Trade Secrets**

16.      Guidepoint entrusts certain employees, particularly senior executives like Ware, with access to confidential, proprietary, and trade secret information essential to its business ("Trade Secrets"). Such Trade Secrets include, but are not limited to:

      A.  Client-specific pricing, discounting, and contract structures;

      B.  Client onboarding processes and compliance requirements;

      C.  Internal training materials;

      D.  Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

      E.  Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

      F.  Knowledge of client preferences, sensitivities, and complaints.

17.      Guidepoint maintains policies and contractual protections requiring employees to safeguard this confidential information and prohibiting unauthorized use, disclosure, or retention of such information during and after employment.

18.      As part of these protections, Guidepoint requires employees to access its internal systems through company-issued devices and restricts access to non-public systems, documents, and databases to authorized personnel only.

19.      Guidepoint requires its employees to use multi-factor authentication to access much of its databases and requires employees access many databases only from Guidepoint-owned and Guidepoint-controlled devices.

20.     Moreover, Guidepoint requires its employees—including Ware—to agree to and acknowledge strict confidentiality policies governing their use of and access to Guidepoint's confidential and trade secret information.

21.     Guidepoint further protects its confidential information through written confidentiality and restrictive covenant agreements, which expressly prohibit employees from misusing Guidepoint's proprietary information or using such information to benefit themselves or a competitor.

22.     Guidepoint's confidential information derives independent economic value from not being generally known or readily ascertainable by competitors and could be used to unfairly compete against Guidepoint if disclosed.

**C.     Ware's Employment at Guidepoint**

23.     Guidepoint hired Ware in March 2023. Ware's original position at Guidepoint was a "Strategist" on Guidepoint's Technology, Media, and Telecommunications ("TMT") team within the Insights business unit.

24.     The TMT group is a specialized research and content team that produces industry-specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on TMT topics.

25.     During his tenure, Ware rose through the ranks to Director of Research and Global Head of the TMT team.



Director of Research/ Global Head, TMT
Guidepoint
Mar 2023 - Apr 2026 · 3 yrs 2 mos
New York, United States

26.     Ware was among Guidepoint's most senior team members. He oversaw Guidepoint's entire Insights TMT team such that all employees at Guidepoint who generated TMT content reported to Ware.

27.     Content generated by Ware and his TMT team was marketed to all of Guidepoint's clients, many of which operate nationally or globally.

28.     Ware was also provided access to Guidepoint's Trade Secrets, including pricing models, contract structures, client feedback, onboarding requirements, sales strategies, internal training materials, moderator networks, and other non-public client intelligence.

**D.      Ware Executes Employment Agreement with Guidepoint**

29.     As a condition of his employment, on or about March 21, 2023, Ware executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("2023 Agreement" attached hereto as **Exhibit A**).

30.     On August 2, 2023, Ware executed an amendment to the 2023 Agreement, acknowledging and reaffirming his post-employment obligations ("Amendment"). Together, the 2023 Agreement and Amendment constitute Ware's Employment Agreement ("Employment Agreement" attached hereto as **Exhibit B**). Ware and Guidepoint entered into the Amendment to "further define and set forth the terms and conditions of the employment of [Ware] by [Guidepoint]." (*Id.* at 1.)

31.     Section 4(a) of the Employment Agreement contains a non-competition provision that prohibits Ware from working or providing services for certain "Competing Businesses" for a limited period of six months following the termination of his employment (the "Non-Competition Provision"). (*See* Ex. B at § 4(a).) The Employment Agreement defined "Competing Businesses" to specifically identify certain entities Guidepoint deemed directly competitive and any "other

7

company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content." (*Id.*)

32.     Section 4(b) of the Employment Agreement describes Ware's non-solicitation obligations (the "Non-Solicitation Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee will not, directly or indirectly, solicit or recruit any employee, independent contractor or agent of the Company to resign from the Company or to accept employment or other engagement with Employee or with any other person or company.

33.     Section 4(c) of the Employment Agreement describes Ware's non-interference obligations (the "Non-Interference Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee shall not, directly or indirectly, attempt to interfere with, impair, or adversely affect any contractual relationship or business relationship between the Company and any client, customer, expert, advisor or other person or entity engaged by or doing business with the Company, including without limitation engaging with any business that is a client of the Company and with which Employee had contact through Employee's work at the Company, on any matter that relates to the Company.

34.     Section 5 of the Employment Agreement prohibits Ware from disclosing, using, or retaining Guidepoint's proprietary information (the "Confidentiality Provision"), both during and after his employment.

35.     The "Disclosure and Use" section provides that:

> At all times during Employee's employment and thereafter, Employee will (i) hold Proprietary Information in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any Proprietary Information, (iii) not access or use for personal benefit or for the benefit of anyone other than the Company any Proprietary Information, and (iv) not copy any documents, records, files or other media containing Proprietary Information or remove any such documents, records files or media from the premises or control of the Company, except, in each case, as required in connection with Employee's authorized employment duties to the Company or with the prior express authorization of an officer of the Company.

(*Id*. § 5(b).)

36. The "Assignment and Return" section provides that:

Employee hereby irrevocably assigns to the Company any rights Employee may have or acquire in such Proprietary Information and recognizes that all Proprietary Information is and will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Employee shall return to the Company all Proprietary Information then in Employee's possession.

(*Id*. § 5(c).)

37. "Proprietary Information" is defined as:

[A]ny and all confidential and/or proprietary knowledge, data or information of the Company and its affiliates (the "Company Group") and/or the Company Group's customers, clients, vendors, employees, agents and contractors. By way of illustration but not limitation, Proprietary Information includes (i) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, techniques and research; (ii) information regarding the Company Group's organization or structure, plans for research and development, new products or services, marketing, advertising, and other business plans, budgets and financial data, licenses, pricing and costs, and suppliers; (iii) the identity of current and prospective clients of the Company Group and the Company Group's current and prospective contracts, policies, standards, procedures and practices; (iv) any and all information regarding the experts contracted by the Company Group, the Company Group's business model incorporating the use of such experts and the technology and trade secrets in connection with the utilization of such business model; and (v) information regarding the skills and compensation of the Company Group's employees. Proprietary Information also shall include any information that is provided to or obtained by the Company Group from third parties and is subject to obligations of confidentiality.

(*Id*. § 5(a).)

38. Ware also agreed that:

Employee acknowledges that Employee has carefully considered the nature and extent of these restrictions, and acknowledges that the same are reasonable in time and territory, are designed to eliminate competition that would otherwise be unfair to the Company, do not stifle the inherent skill and experience of Employee, would not operate as a bar to Employee's means of support, are fully required to protect the legitimate interests of the Company, and do not confer a benefit upon the Company disproportionate to the detriment to Employee. Employee further acknowledges that the Company's business is international in scope and that

9

therefore, the global scope of the restrictions imposed by this Agreement is appropriate.

*Id.* at § 4(d).

### E.    Ware Resigns From Employment at Guidepoint

39.    Beginning in March 2026, members of Guidepoint's TMT team began resigning in quick succession. Approximately five members of Guidepoint's TMT team have resigned since March 31, 2026.

40.    Tatiana Eng, Operations Lead, resigned effective March 31, 2026.

41.    Alex Telo, an Associate on Guidepoint's TMT team, resigned effective April 22, 2026.

42.    Sheetal Duggal, a Guidepoint consultant, resigned prior to Alan Ware's resignation.

43.    Kirang Gohil, a Strategist on Guidepoint's TMT team, also resigned effective April 22, 2026.

44.    John Elliot, a Consultant on Guidepoint's TMT team, resigned effective April 24, 2026.

45.    A member of Guidepoint's legal department spoke with Ware on or about April 21, 2026. During that conversation, Ware acknowledged that he knew TMT team members had left to join a Start-Up, but he claimed he did not know details about the Start-Up, such as its name or who provided the funding for the startup.

46.    Ware resigned from Guidepoint the next day.

47.    Ware acknowledged that he was resigning to join the other TMT employees who resigned.

48.    Shortly after he resigned, Ware updated his LinkedIn profile, which now cryptically states: "[s]omething is coming soon....."

10



49.    It also shows that Ware is the co-founder of "Stealth Startup."



50.    At least one other former TMT team member, Kirang Gohil, also changed his LinkedIn to show "Stealth Mode"—which is, upon information and belief, affiliated with "Stealth Startup"—as his current employer.



51. Upon information and belief, Ware is the founder or co-founder of the Start-Up.

52. Upon information and belief, while still employed by Guidepoint and after he resigned, Ware solicited the Guidepoint TMT team members he supervised to leave Guidepoint and join him at the Start-Up. On or about February 11, 2026—two months before he resigned—Ware asked Guidepoint's AI chatbot "**what percentage of firms sue for non-solicitation**." (emphasis added).

53. Together, the cascading timing of the TMT team members' resignations, Ware's acknowledgement that those employees left to join a start-up, Ware's denial that he knew key details about that Start-Up, Ware's subsequent and immediate resignation in which he admitted

that he was leaving to join that startup, and Ware's collaboration with at least one other former Guidepoint employee to list "Stealth Startup" on LinkedIn support an inference that Ware and the other former Guidepoint employees are working together at the Start-Up and that they do not want Guidepoint to know the Start-Up's true identity. The most plausible explanation for this conduct is that the Start-Up is going to compete with Guidepoint or that the Start-Up will offer services similar to the services the TMT team offered during their Guidepoint employment.

54.     Upon information and belief, Ware solicited Guidepoint's TMT team to work at the Start-Up in order to replicate the services Guidepoint's TMT team provided and compete with Guidepoint.

**F.      Ware Emails Himself Guidepoint's Confidential, Proprietary, and Trade Secret Information to Compete With Guidepoint**

55.     Ware also improperly emailed himself Guidepoint's proprietary, confidential, and Trade Secret information. Upon information and belief, Ware did so because he was planning and preparing to compete with Guidepoint at the Start-Up.

56.     Beginning in November 2025, Ware began emailing Guidepoint documents to his personal email address.

57.     On November 12, 2025, Ware forwarded an email from Alex Telo, a TMT team member, from his work email to his personal email. Telo had sent Ware an email that day with the subject line "PDFs."

13

58.    Attached to the email were two of Guidepoint's transcripts of meetings Ware moderated with two subject matter experts in August 2025. The documents are both stamped "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

59.    Several days later, on November 18, 2025, Ware forwarded an email from Rahul Motwani, a Research Associate on the TMT team, from his work email to his personal email address. Motwani had sent Ware an email that day with a transcript of a meeting Guidepoint moderated with a subject matter expert from September 4, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

60.    On January 6, 2026, Ware forwarded another email from Telo to his personal email address. Telo had sent Ware an email that day with a Guidepoint call transcript with an expert, this one dated October 14, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

| From: | Alan Ware <aware@guidepoint.com> |
| Sent: | Tuesday, January 6, 2026 4:36 PM EST |
| To: | Alan Ware <ajwareny@gmail.com> |
| Subject: | Fw: Sid Oct Call |
| Attachments: | 6c08c2fc-fe65-43e6-a4a5-a03611f0b48e.pdf |

Get Outlook for iOS
From: Alex Telo <atelo@guidepoint.com>
Sent: Tuesday, January 6, 2026 4:02:08 PM
To: Alan Ware <aware@guidepoint.com>
Subject: Sid Oct Call

**Alex Telo** | Associate - TMT, Guidepoint Insights p: +1 212 842 6663

**Alex Telo**            |    Associate - TMT, Guidepoint Insights
p: +1 212 842 6663

61.    On January 13, 2026, Ware forwarded another email to his personal email address. Telo had sent Ware an email that day with a transcript, also dated October 14, 2025, from a call Ware had with a Guidepoint industry consultant. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

62.    On January 31, 2026, Ware forwarded to his personal email an Excel spreadsheet that included the TMT team members' individual performance metrics and salaries ("Team Metrics"). This Excel spreadsheet listed the (1) salary; (2) bonus amount; (3) key performance metrics for the entire TMT group; and (4) revenue/financial data from the TMT group.

63.    On February 9, 2026, Ware forwarded himself another email with two more transcripts, dated November 6 and 7, 2025, and from calls Ware moderated with industry experts. Both documents had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

| | |
|---|---|
| From: | Alan Ware <aware@guidepoint.com> |
| Sent: | Monday, February 9, 2026 10:29 AM EST |
| To: | Alan Ware <ajwareny@gmail.com> |
| Subject: | transcripts |
| Attachments: | ███████████████.pdf |

64.     On April 15, 2026, Ware forwarded himself another email with a transcript, dated January 9, 2026, and from a call Ware moderated with an expert. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

65.     No legitimate business reason existed for Ware to email to his personal email address these transcripts, which Guidepoint considers proprietary.

66.     No legitimate business reason existed for Ware to email to his personal email address these the TMT group members' compensation structure.

67.     Upon information and belief, Ware forwarded himself this information to use the confidential, proprietary, and Trade Secret information they contain to compete with Guidepoint at the Start-Up.

68.     On April 18, 2026—a Saturday—Ware emailed to his personal email address four attachments that identified names of attendees at certain dinners Guidepoint hosted for a particular client months or years prior. These lists contain the names of individuals that would be helpful for Ware in starting a new business. Ware had no legitimate reason to email himself these four attachments shortly before he separated from employment.

69.     Two minutes later that same day—April 18—Ware emailed himself Guidepoint's New Hire Orientation-2023. The document is labelled "Confidential & Proprietary." It includes a stamp that states: "This document is for the private and confidential use of the addressee

16

exclusively. This document may not be circulated, published or in any other manner distributed without the express written consent of Guidepoint Global, LLC."

### G. Guidepoint Faces Irreparable Harm Absent Injunctive Relief

70. Guidepoint has invested substantial time, money, and resources in developing its Insights business unit, including the TMT group, the policies and procedures attendant to that business, its relationships with experts and its strategies in recruiting new experts and its client relationships.

71. Ware possesses intimate knowledge of Guidepoint's most sensitive Trade Secret information, including sensitive client information and operational business strategies.

72. Ware's continued unauthorized possession of Guidepoint's trade secrets creates an ongoing risk that those secrets will be disclosed to or exploited by the Start-Up.

73. Upon information and belief, Ware has or will disclose Guidepoint's Trade Secrets to the Start-Up, giving it an unfair competitive advantage against Guidepoint.

74. Monetary damages alone are insufficient to remedy the ongoing and future harm caused by Ware's misconduct.

75. Ware agreed and acknowledged that violations of Sections 4 and 5 (the restrictive covenant and confidentiality provisions of the Employment Agreement) would irreparably injure Guidepoint. (*See* Ex. B at § 10.) For that reason, Guidepoint "**shall be entitled to an injunction** restraining [Ware] from **any actual** or **threatened** breach" of those Section without the need for a bond. (*Id.*) (emphases added).

76. Unless restrained by this Court, Ware will continue to benefit from his breaches, and Guidepoint will suffer loss of longstanding business and clientele, client goodwill, competitive advantage, and the value and benefit of its hard-earned and protected Trade Secrets.

77.     In addition to the irreparable harm Guidepoint faces, Guidepoint faces significant damages in an amount that likely will exceed more than $10 million.

**<u>COUNT I</u>**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836(b))**

78.     Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

79.     The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836.

80.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

81.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret

18

or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

82.     Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

83.     Guidepoint has an advantage over its competitors based, in part, on the Trade Secrets it has developed and implemented in its business efforts.

84.     Guidepoint owns and possesses certain confidential, proprietary, and trade secret information as alleged above. Guidepoint has made reasonable efforts under the circumstances to preserve the confidentiality of its Trade Secrets.

85.     As described with more particularity above, Guidepoint's Trade Secrets include:

   A. Client-specific pricing, discounting, and contract structures;

   B. Client onboarding processes and compliance requirements;

   C. Internal training materials;

   D. Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

   E. Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

   F. Knowledge of client preferences, sensitivities, and complaints.

86. Guidepoint's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who can obtain economic value from their disclosure or use. Accordingly, the above-described Trade Secrets constitute "trade secrets" under the DTSA.

87. Guidepoint's former and current employees are under a duty to keep its trade secrets secret and not use or disclose such information except for the benefit of Guidepoint. In taking Guidepoint's Trade Secrets from Guidepoint—namely the Team Metrics and Transcripts—Ware improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy.

88. The Team Metrics contain Guidepoint's confidential, proprietary, and Trade Secret information about employees' salaries; performance metrics; bonus structures; and compensation plans.

89. The transcripts contain Guidepoint's proprietary and Trade Secret information of interviews with subject-matter experts.

90. Ware violated the DTSA by misappropriating Guidepoint's Trade Secrets used in, or intended for use in, interstate or foreign commerce.

91. Ware misappropriated Guidepoint's Trade Secrets by emailing confidential, proprietary Trade Secret information to his personal email address before the termination of his employment, without authorization by Guidepoint, and, upon information and belief, to compete with Guidepoint and to use the information in ways that Guidepoint policies prohibited.

92. Upon information and belief, Ware has used or intends to use Guidepoint's Trade Secrets for his own benefit and to Guidepoint's detriment without the express or implied consent of Guidepoint.

93.     Ware's misappropriation was willful and malicious.

94.     As a direct result of Ware's misappropriation of Guidepoint's Trade Secrets, Guidepoint has suffered and, if Ware's conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law. Guidepoint has suffered and continues to suffer damages that will be proven at trial.

95.     The DTSA specifically authorizes courts to award injunctive relief to prevent the actual *or threatened* misappropriation of trade secrets. Guidepoint seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Guidepoint's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

96.     Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

### COUNT II
**Breach of Contract (the Employment Agreement)**

97.     Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

98.     Ware continues to be bound by the Employment Agreement, for which he received adequate consideration.

99.     The Employment Agreement includes multiple restrictive covenants, including the Non-Competition Provision, Non-Solicitation Provision, Non-Interference Provision, and Confidentiality Provision.

100.    Upon information and belief, Ware violated the Non-Solicitation Provision by soliciting four of Guidepoint's TMT team to leave Guidepoint and work for the Start-Up instead. Ware's conduct violated § 4(b) of the Employment Agreement because he solicited and recruited

Guidepoint employees "to resign from the Company or to accept employment or other engagement with Employee or with any other person or company."

101.    Upon information and belief, Ware violated the Non-Competition Provision by creating (or preparing to create) a Start-Up designed to provide similar services to Guidepoint and directly compete with Guidepoint in a business that charges customers fees in exchange for access to an online library of primary research, which is prohibited by § 4(a) of the Employment Agreement.

102.    Ware violated the Confidentiality Provision by forwarding and not returning upon separation the Team Metrics and seven Transcripts to his personal email address.

103.    Ware was not authorized to forward the Team Metrics and Transcripts to his personal email address, nor did he have a legitimate business purpose for doing so.

104.    Ware's actions of emailing himself the Team Metrics and Transcripts violated § 5(c) of the Employment Agreement which required Ware to return Guidepoint's Proprietary Information in his possession upon termination of his employment. To date, Ware has not returned any of the Guidepoint documents he forwarded himself.

105.    Upon information and belief, Ware's actions of emailing himself the Team Metrics and Transcripts violated § 5(b) of the Employment Agreement, which prohibits Ware from accessing or using Guidepoint's Proprietary Information for personal benefit or for the benefit of a company other than Guidepoint and from copying or removing documents containing Guidepoint's Proprietary Information from Guidepoint's control. Ware removed the Team Metrics and Transcripts from Guidepoint's control when he forwarded them to his personal email address. Upon information and belief, Ware is using the Team Metrics and Transcripts to benefit both himself and the Start-Up.

106.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT III
### Tortious Interference with Contract

107.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

108.    Upon information and belief, Ware has interfered with Guidepoint's contractual relationship with its employees and consultants.

109.    Guidepoint has valid and enforceable Employment Agreements with its employees, which Ware knows because he signed one.

110.    Upon information and belief, despite his knowledge, Ware solicited members of the TMT group away from the company and, upon information and belief, to join a competitor.

111.    Upon information and belief, Ware willfully and intentionally interfered with the agreements of John Elliott, Kirang Gohil, Alex Telo, Sheetal Duggal, and Tatiana Eng, without privilege to do so, by aiding, abetting, and assisting them in breaching their contractual obligations to Guidepoint, including, but not limited to, their obligations to not: (1) disclose Guidepoint's Trade Secret information; (2) work or perform services for a "Competitive Business" for six months following the termination of their employment with Guidepoint; (3) improperly use Guidepoint's Trade Secrets to aid a competitor in its unlawful and anti-competitive activities; (4) solicit Guidepoint's clients; and/or (5) use or disclose Guidepoint's Trade Secrets for their own benefit or outside the scope of their employment with Guidepoint.

112.    Upon information and belief, Ware's misconduct is independently tortious and unlawful because Ware induced John Elliott, Kirang Gohil, Alex Telo, Sheetal Duggal, and Tatiana Eng to breach their obligations under agreement in order to unfairly compete against

23

Guidepoint. Upon information and belief, John Elliott, Kirang Gohil, Alex Telo, Sheetal Duggal, and Tatiana Eng all did in fact breach their respective agreements as a result of Ware's actions.

113.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

## COUNT IV
### Breach of Fiduciary Duty

114.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

115.    Ware, as a Guidepoint employee, owed a duty to, among other things, put the welfare and best interests of Guidepoint above his own personal or other business interests.

116.    Ware breached his fiduciary duties to Guidepoint by engaging in the actions described herein while still employed by Guidepoint, including accessing and sharing Guidepoint information for him to retain post-employment and for use at the Start-Up.

117.    These actions constitute a breach of Ware's fiduciary duties to Guidepoint.

118.    Ware's conduct was intentional, willful, and outrageous, and was undertaken with reckless indifference to the rights of Guidepoint.

119.    Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## JURY DEMAND

Guidepoint hereby requests and demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Guidepoint respectfully requests that the Court enter judgment in its favor and an order against Ware that grants the following relief:

A.    Declaring that Ware breached his Employment Agreement with Guidepoint;

B.    Declaring that Ware misappropriated Guidepoint's Trade Secrets;

24

C.      Declaring that Ware tortiously interfered with Guidepoint's contracts and violated his fiduciary duty to Guidepoint;

D.      Enjoining Ware, and all those acting in active concert or participation with him, from further breaches of the Employment Agreement, namely an injunction that:

1)      Preliminarily, prospectively, and permanently enjoins Ware, and all persons and/or entities acting for his benefit, or in active concert or participation with him, from working as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity, for any company identified in § 4(a) of the Employment Agreement and any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content.

2)      Preliminarily, prospectively, and permanently enjoins Ware, and all persons and/or entities acting for his benefit, or in active concert or participation with him, from attempting to interfere with, impair, or adversely affect any contractual relationship or business relationship between Guidepoint and any client with which Ware had contact through Ware's work at Guidepoint, on any matter that relates to Guidepoint; and

3)      Preliminarily, prospectively, and permanently enjoins Ware, and all persons and/or entities acting for his benefit, or in active concert or participation with him, from disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information.

4)      Requires Ware to immediately account for and return all Guidepoint Proprietary Information.

E.      Pursuant to Section 4(g) of the Employment Agreement, extending the time periods stated in Section 4 by the duration of the time of the breach and during which the violation has not been cured;

F.      Enjoining Ware, and all those acting in active concert or participation with him, from misappropriating Guidepoint's Trade Secrets and Proprietary Information;

G.      Awarding actual, incidental, compensatory, and consequential damages in an amount to be proven at trial, an amount that Guidepoint estimates will exceed $10 million;

H.      Awarding punitive damages in an amount to be proven at trial due to Ware's willful and malicious conduct;

I.      Awarding costs and expenses incurred herein, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) or any other applicable law;

J.      Awarding pre-judgment and post-judgment interest; and

K.      Awarding all other relief as the Court may deem just, equitable and proper.

Dated:  May 4, 2026                              Respectfully submitted,

*/s/ Jason D. Burns*
Jason D. Burns
Shira M. Poliak
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9294
Jason.Burns@gtlaw.com
Shira.Poliak@gtlaw.com

Justin K. Victor (*phv forthcoming*)
Jacob R. Dean (*phv forthcoming*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
(678) 553-2100

Victorj@gtlaw.com
Deanj@gtlaw.com

*Counsel for Plaintiff Guidepoint Global, LLC*