UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Guidepoint Global, LLC<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, Inquire Network, Inc., and DL Software, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-03684-VEC<br><br>Jury Trial Demanded<br><br>**VERIFIED SECOND AMENDED COMPLAINT** |

## VERIFIED SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

Plaintiff Guidepoint Global, LLC ("Plaintiff," "Guidepoint," or the "Company"), by and through its undersigned counsel, hereby brings the following Verified First Amended Complaint against Defendants Alan Ware, Sheetal Duggal, Kirang Gohil, and Christiana (aka Tiana) Eng, Inquire Network, Inc., and DL Software, Inc. seeking preliminary injunctive relief, permanent injunctive relief, and monetary damages.

### PRELIMINARY STATEMENT

1.      This case involves brazen and widespread theft of Guidepoint's proprietary and confidential information by a group of employees and consultants who resigned within days of each other and who now work for a new competing business in violation of their restrictive covenants. Even before discovery, the evidence of Defendants' willful misconduct is overwhelming and indisputable. Without this Court's immediate intervention, Guidepoint faces irreparable harm based on the misconduct described herein.

1

2.     Guidepoint is a leading global expert network and research services firm that connects institutional investors, consultants, and corporate clients with industry experts to gain in-depth insights and market intelligence to support strategic, operational, and investment decisions. It generates content and serves as an intermediary, connecting professionals seeking industry expertise with advisors possessing specialized knowledge. Its Technology, Media, and Telecommunications ("TMT") group is a key subject-matter group within one of Guidepoint's most valuable business units.

3.     Guidepoint brings this action against former Guidepoint employees and consultants who—in breach of their respective contractual and fiduciary obligations—launched a competing business and have misappropriated Guidepoint's confidential and proprietary information in furtherance of that new venture, Inquire Network, Inc.

4.     Guidepoint also brings this action against DL Software Inc. ("DL Software"), which received Guidepoint's trade secrets and provided the technical infrastructure for the competing venture.

5.     Ware, Duggal, Gohil, and Eng (the "Individual Defendants") resigned over a three-week period starting in March and continuing through April 24. By the time Ware resigned, almost all members of Guidepoint's TMT group had left. As they resigned, most of the Individual Defendants were coy or circumspect about their next role. For example, when Guidepoint confronted Ware about the departures, he acknowledged knowing that his former reports had left to join a startup but feigned ignorance of the details concerning the startup. He resigned the very next day to join that startup. Ware and at least one other former TMT team member—Gohil—subsequently updated their LinkedIn profiles to reflect employment at a deliberately opaque entity operating under the name "Stealth Startup."

6.      As they raided Guidepoint's TMT workforce, the Individual Defendants began exfiltrating Guidepoint proprietary and confidential information to use at Inquire Network.

7.      To ensure Inquire Network's head start, and shortly before their resignations, **the Individual Defendants emailed themselves or downloaded thousands of pages of Guidepoint's proprietary and trade secret information, including *more than one hundred proprietary transcripts with industry experts; compensation information for the very team that resigned; detailed information concerning a long list of experts in Guidepoint's proprietary network, and a comprehensive internal Guidepoint working document that reflects a snapshot of Guidepoint's past and prospective teleconference pipeline and identifies the Advisors scheduled to participate in such teleconferences including internal notes.** These materials constitute Guidepoint work product, and information that Guidepoint identifies as proprietary to it in its agreements with its employees and independent contractors.

8.      This information would be immensely valuable to any competitor hoping to get a leg up and avoid startup costs. Guidepoint now faces the irreparable harm of having its proprietary information exploited by its own former employees who are violating their agreements with Guidepoint to compete with it. Guidepoint brings this action to enforce its contractual rights, protect its trade secrets, and obtain the injunctive and monetary relief necessary to remedy the Individual Defendants' misconduct.

9.      According to its website, and as its name suggests, Inquire Network offers: "Expert engagements, management meetings, AI-generated content;" "expert conversations, management calls, and live events;" "industry specialist engagements and management conversations;" and "expert calls, meetings, and interactions live in one system, fully captured, transcribed, and structured for retrieval."

10.     In other words, Inquire Network intends to provide the same services Guidepoint has provided for decades.

11.     But instead of building Inquire Network through its own efforts, it and the Individual Defendants have stolen Guidepoint's confidential and proprietary information and raided its workforce. Forensic evidence confirms that, before their separations, the Individual Defendants used Guidepoint devices to work on the new company's behalf and access documents during their last days of employment to presumably take to the new company.

12.     DL Software is not a passive bystander. It received a list of over 2,000 Guidepoint advisors, offered to import those advisors into an application, and discussed triggering registration emails to those advisors. Its employee—Daniel Dietzel ("Dietzel")—holds email addresses at both dl.software and inquire.network—reflecting the intertwined relationship between the two companies. The technical infrastructure for inquire.network appears to run, at least in part, through systems connected to dl.software.

13.     When Guidepoint demanded DL Software provide answers to basic questions about its role in this misconduct—such as what it did with the list of more than 2,000 Guidepoint advisors and the nature of DL Software's relationship with Inquire Network—DL Software did not bother to substantively respond.

14.     Without this Court's immediate intervention to grant narrow injunctive relief, Inquire Network, DL Software, and the Individual Defendants will capitalize on their unlawful conduct by building a competitive entity using Guidepoint's proprietary and confidential information.

**PARTIES**

15.     Plaintiff Guidepoint Global, LLC is a limited liability company organized under the laws of the State of New York.

16.     Defendant Alan Ware is a resident of the state of Connecticut. He was employed by Guidepoint until April 22, 2026. Upon information and belief, Ware resides at 16 Shoreview Lane, Danbury, CT 06811.

17.     Defendant Sheetal Duggal is a resident of the state of New York. He was a contractor for Guidepoint until April 14, 2026. Upon information and belief, Duggal resides at 217 W 57th #43C NY, NY 10019.

18.     Defendant Kirang Gohil is a resident of the state of New Jersey. He was employed by Guidepoint until April 22, 2026. Upon information and belief, Gohil resides at 6 Jacobs Landing Secaucus, NJ 07094.

19.     Defendant Christiana (aka Tiana) Eng is a resident of the state of New Jersey. She was employed by Guidepoint until March 31, 2026. Upon information and belief, Eng resides at 17 Woodmere Court Old Bridge, NJ 08857.

20.     Defendant Inquire Network, Inc. is a corporation incorporated under the laws of the state of Delaware with its principal place of business in the state of New York. Inquire Network, Inc.'s registered agent is located at 131 Continental Drive, Suite 305, Newark, Delaware, 19713.

21.     Defendant DL Software, Inc. is a corporation incorporated under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in the state of New York. DL Software, Inc.'s registered agent is located at 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

22. This Court maintains subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Guidepoint asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA").

23. This Court has supplemental jurisdiction over Guidepoint's pendent state law claims under 28 U.S.C. § 1367. These pendent state law claims derive from a common nucleus of operative facts and are so related to the federal law claims that they form part of the same case or controversy.

24. Venue in this district is appropriate for several reasons. First, in their respective agreements with Guidepoint, the Individual Defendants irrevocably and unconditionally consented to the exclusive jurisdiction of the federal courts in the City of New York for any action arising from the respective agreements. Second, a substantial part of the events or omissions giving rise to these claims occurred in this district. Third, according to its purported website, Inquire Network's sole physical location is within this district and, according to its purported website and LinkedIn profile, DL Software's sole physical location is within this district as well.

## FACTUAL ALLEGATIONS

### A.  Plaintiff Guidepoint Global, LLC

25. Founded in 2003 and headquartered in New York City, Guidepoint is a leading global expert network and research services firm that connects institutional investors, consultants, and corporate clients with industry experts to gain in-depth insights and market intelligence to support strategic, operational, and investment decisions. It serves as an intermediary, connecting professionals seeking industry expertise with advisors possessing specialized knowledge.

26.     In a separate business unit from its expert network, the Insights business unit, Guidepoint generates content that it provides to its clients through live teleconferences in which Guidepoint moderators conduct interviews with experts in Guidepoint's network.  Guidepoint also offers as a product to its clients a library of transcripts of such teleconferences.  Unique among expert networks, Guidepoint's moderators are almost exclusively former buy-side or sell-side analysts who are able to anticipate and develop topics that are important to Guidepoint's institutional clients.  For that reason, while some other expert networks also generate content, Guidepoint is known for the high quality of its content, which is largely due to the quality of the moderators who choose the teleconference topics, choose the experts, and conduct the interviews.

27.     Guidepoint's business is built on long-standing relationships with its clients, advisors, and moderators, as well as on proprietary systems and processes for sourcing, onboarding, pricing, and servicing those relationships.

28.     Guidepoint's competitive position depends on protecting its confidential client information, internal processes, strategies, and industry knowhow from disclosure to competitors.

29.     Guidepoint operates globally and provides services to a global client base. Across four continents, it maintains 19 global offices; employs 1,700+ employees; provides services to more than 5,000 client organizations; and offers access to Guidepoint's experts who have joined its network ("Advisors") spanning more than 300 industries.

30.     In the Americas, Guidepoint maintains offices in Hawaii, California, Arizona, Massachusetts, New York, and Toronto.

**B.      Guidepoint's Confidentiality Policies and Protection of its Confidential Information and Trade Secrets**

31.      Guidepoint entrusts certain employees, particularly senior executives like Ware, with access to confidential, proprietary, and trade secret information essential to its business ("Trade Secrets"). Such Trade Secrets include, but are not limited to:

A.   Client-specific pricing, discounting, and contract structures;

B.   Client onboarding processes and compliance requirements;

C.   Internal training materials and employee metrics and compensation information;

D.   Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

E.   Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

F.   Knowledge of client identities, preferences, sensitivities, and feedback.

32.      Guidepoint maintains policies and contractual protections requiring employees to safeguard this confidential information and prohibiting unauthorized use, disclosure, or retention of such information during and after employment.

33.      As part of these protections, Guidepoint requires employees to access its internal systems through company-issued devices and restricts access to non-public systems, documents, and databases to authorized personnel only.

34.      Guidepoint requires its employees to use multi-factor authentication to access much of its databases and requires its employees to access many of its databases only from Guidepoint-owned and Guidepoint-controlled devices.

35.    Moreover, Guidepoint requires its employees and consultants to agree to and acknowledge strict confidentiality policies governing their use of and access to Guidepoint's confidential and trade secret information.

36.    Guidepoint further protects its confidential information through written confidentiality and restrictive covenant agreements, which expressly prohibit employees from misusing Guidepoint's proprietary information or using such information to benefit themselves or a competitor.

37.    Guidepoint's confidential information derives independent economic value from not being generally known or readily ascertainable by competitors and could be used to unfairly compete against Guidepoint if disclosed.

**C.    The Individual Defendants' Employment and Consultancy at Guidepoint**

38.    The TMT group is a specialized research and content team that produces industry-specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on TMT topics.

39.    Guidepoint hired Ware in March 2023. Ware's original position at Guidepoint was a "Strategist" on Guidepoint's Technology, Media, and Telecommunications ("TMT") team within the Insights business unit.

40.    During his tenure, Ware rose through the ranks to Director of Research and Global Head of the TMT team. Ware was among Guidepoint's most senior team members. He oversaw Guidepoint's entire Insights TMT team such that all employees at Guidepoint who generated TMT content reported to Ware.

41.    Duggal began working as a Guidepoint consultant on or about August 1, 2023.

42.     Gohil began working as a Guidepoint consultant on or about March 9, 2020. He started working as an employee in the role of TMT Strategist, Guidepoint Insights, on or about January 1, 2024.

43.     Eng began working as a Guidepoint employee on or about February 14, 2022. By the time she resigned, her title was Operations Team Lead.

44.     Content generated by Ware and his TMT team was marketed to clients in all of Guidepoint's client segments, many of which operate nationally or globally.

45.     The Individual Defendants were also provided access to Guidepoint's Trade Secrets, including information concerning experts in Guidepoint's network, client identities, preferences and feedback, expert recruiting and client sales and marketing strategies, internal training materials, teleconference operations and client attendance and other non-public strategic intelligence.

**D.     Ware, Gohil, and Eng Execute Agreements with Guidepoint**

46.     As a condition of their employment or continued employment, Ware, Gohil, and Eng executed Employment Agreements containing identical confidentiality, non-interference, and employee non-solicitation provisions.

47.      On or about March 21, 2023, Ware executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("2023 Agreement" attached hereto as **Exhibit A**).

48.     On August 2, 2023, Ware executed an amendment to the 2023 Agreement, acknowledging and reaffirming his post-employment obligations ("Ware Amendment"). Together, the 2023 Agreement and Amendment constitute Ware's Employment Agreement ("Ware Employment Agreement" attached hereto as **Exhibit B**). Ware and Guidepoint entered into the

Amendment to "further define and set forth the terms and conditions of the employment of [Ware] by [Guidepoint]." (*Id.* at 1.)

49.     On or about April 1, 2023, Ware signed an Equity Incentive Agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Ware Equity Incentive Agreement" attached hereto as **Exhibit C**).

50.     As a condition of his employment, on or about January 1, 2024, Gohil executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Gohil Employment Agreement" attached hereto as **Exhibit D**).

51.     On or about April 1, 2024, Gohil signed an Equity Incentive Agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Gohil Equity Incentive Agreement" attached hereto as **Exhibit E**).

52.     As a condition of her employment, on or about February 14, 2022, Eng executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Eng 2022 Employment Agreement" attached hereto as **Exhibit F**).

53.     On August 2, 2023, Eng executed an amendment to the Eng 2022 Agreement, acknowledging and reaffirming her post-employment obligations ("Eng Amendment"). Together, the 2023 Agreement and Amendment constitute Eng's Employment Agreement ("Eng Employment Agreement" attached hereto as **Exhibit G**). Eng and Guidepoint entered into the Amendment to "further define and set forth the terms and conditions of the employment of [Eng] by [Guidepoint]." (*Id.* at 1.)

54.     Section 4(a) of the Ware, Eng, and Gohil Employment Agreement contains a non-competition provision that prohibits Ware, Eng, and Gohil from working or providing services for

11

certain "Competing Businesses" for a limited period of six months following the termination of their employment (the "EA Non-Competition Provision"). The Employment Agreement defined "Competing Businesses" to specifically identify certain entities Guidepoint deemed directly competitive and any "other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content."

55.    Section 4(b) of the Ware, Eng, and Gohil Employment Agreement describes Ware's, Eng's, and Gohil's employee non-solicitation obligations (the "EA Employee Non-Solicitation Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee will not, directly or indirectly, solicit or recruit any employee, independent contractor or agent of the Company to resign from the Company or to accept employment or other engagement with Employee or with any other person or company.

56.    Section 4(c) of the Ware, Eng, and Gohil Employment Agreement describes their non-interference obligations (the "Non-Interference Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee shall not, directly or indirectly, attempt to interfere with, impair, or adversely affect any contractual relationship or business relationship between the Company and any client, customer, expert, advisor or other person or entity engaged by or doing business with the Company, including without limitation engaging with any business that is a client of the Company and with which Employee had contact through Employee's work at the Company, on any matter that relates to the Company.

57.    Section 5 of the Ware, Eng, and Gohil Employment Agreement prohibits them from disclosing, using, or retaining Guidepoint's proprietary information (the "Confidentiality Provision"), both during and after their employment.

58.    The "Disclosure and Use" section the Ware, Eng, and Gohil Employment Agreement provides that:

12

At all times during Employee's employment **and thereafter**, Employee will (i) hold Proprietary Information in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any Proprietary Information, (iii) **not access or use for personal benefit or for the benefit of anyone other than the Company any Proprietary Information**, and (iv) not copy any documents, records, files or other media containing Proprietary Information **or remove any such documents, records files or media from the premises or control of the Company**, except, in each case, as required in connection with Employee's authorized employment duties to the Company or with the prior express authorization of an officer of the Company.

(emphasis added).

59.    The "Assignment and Return" in the Ware, Eng, and Gohil Employment Agreement provides that:

Employee hereby irrevocably assigns to the Company any rights Employee may have or acquire in such Proprietary Information and recognizes that all Proprietary Information is and will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Employee shall return to the Company all Proprietary Information then in Employee's possession.

(*Id*. § 5(c).)

60.    The Ware, Eng, and Gohil Employment Agreement defines "Proprietary Information" as:

[A]ny and all confidential and/or proprietary knowledge, data or information of the Company and its affiliates (the "Company Group") and/or the Company Group's customers, clients, vendors, employees, agents and contractors. By way of illustration but not limitation, Proprietary Information includes (i) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, techniques and research; (ii) information regarding the Company Group's organization or structure, plans for research and development, new products or services, marketing, advertising, and other business plans, budgets and financial data, licenses, pricing and costs, and suppliers; (iii) the identity of current and prospective clients of the Company Group and the Company Group's current and prospective contracts, policies, standards, procedures and practices; (iv) any and all information regarding the experts contracted by the Company Group, the Company Group's business model incorporating the use of such experts and the technology and trade secrets in connection with the utilization of such business model; and (v) information regarding the skills and compensation of the Company Group's employees. Proprietary Information also shall include any information that

13

is provided to or obtained by the Company Group from third parties and is subject to obligations of confidentiality.

(*Id.* § 5(a).)

61.     Ware, Eng, and Gohil also agreed that each:

carefully considered the nature and extent of these restrictions, and acknowledges that the same are reasonable in time and territory, are designed to eliminate competition that would otherwise be unfair to the Company, do not stifle the inherent skill and experience of Employee, would not operate as a bar to Employee's means of support, are fully required to protect the legitimate interests of the Company, and do not confer a benefit upon the Company disproportionate to the detriment to Employee. Employee further acknowledges that the Company's business is international in scope and that therefore, the global scope of the restrictions imposed by this Agreement is appropriate.

*Id.* at § 4(d).

### E.     Duggal Executes Consultant Agreement with Guidepoint

62.     On or about August 1, 2023, Duggal signed an Independent Consultant Agreement with Guidepoint containing confidentiality provisions in favor of Guidepoint ("Duggal Independent Consultant Agreement" attached hereto as **Exhibit H**). It states that:

At all times during the term of this Agreement and thereafter, Consultant will (i) hold the Company's Proprietary Information (defined below) in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any of the Company's Proprietary Information, and (iii) not access, or use for personal benefit, or for the benefit of anyone other than the Company, any of the Company Group's Proprietary Information, or copy any documents, records, files or other media containing Proprietary Information, or remove any such documents, records, files or media from the premises or control of the Company, except, in each case, as required in connection with Consultant's authorized duties to the Company, or with the prior express authorization of an officer of the Company. Consultant hereby irrevocably assigns to the Company any rights Consultant may have or acquire in such Proprietary Information and recognizes that all Proprietary Information will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Consultant shall return to the Company all Proprietary Information then in his or her possession.

**Exhibit H** § 5(a).

63.     The Duggal Independent Consultant Agreement's confidentiality provision survives the agreement's termination. *Id.* § 7.

**F.     The Individual Defendants and Other TMT Group Members Resign En Masse**

64.     Beginning in March 2026, members of Guidepoint's TMT team began resigning in quick succession. Approximately six members of Guidepoint's TMT team have resigned since March 31, 2026.

65.     Eng, the Operations Lead, resigned effective March 31, 2026. In her exit interview, Eng reported she was going to work at a small tech startup (employing approximately 10 people) in operations and administration.

| Name | Position | Date of Separation from Guidepoint |
|---|---|---|
| Eng | Operations Lead | March 31, 2026 |
| Duggal | TMT Consultant | April 14, 2026 |
| Alex Telo | TMT Associate | April 22, 2026 |
| Gohil | TMT Strategist | April 22, 2026 |
| Ware | Director of Research and Global Head of the TMT | April 22, 2026 |
| John Elliott[1] | TMT Consultant | April 24, 2026 |

66.     A member of Guidepoint's legal department spoke with Ware on or about April 21, 2026. During that conversation, Ware acknowledged that he knew TMT team members had left to join a startup, but he claimed he did not know details about the startup, such as its name or who provided the funding for the startup.

67.     Ware resigned from Guidepoint the next day.

68.     Ware acknowledged that he was resigning to join the other TMT employees who

---

[1] Guidepoint continues to investigate Elliott's conduct and compliance with respect to his Independent Consultant Agreement.

resigned.

69.     Shortly after he resigned, Ware updated his LinkedIn profile, which now cryptically

states: "[s]omething new is coming soon....."



70.     It also shows that Ware is the co-founder of "Stealth Startup."



71.     At least one other former TMT team member, Gohil, also changed his LinkedIn to

show "Stealth Mode"—which is, upon information and belief, affiliated with "Stealth Startup"—

as his current employer.

16



72.    Upon information and belief, Ware is the founder or co-founder of Inquire Network.

73.    Upon information and belief, while still employed by Guidepoint and after he resigned, Ware solicited the Guidepoint TMT team members he supervised to leave Guidepoint and join him at Inquire Network.

74.    On or about February 11, 2026—two months before he resigned—Ware asked Guidepoint's AI chatbot "**what percentage of firms sue for non-solicitation**." (emphasis added).

75.    Together, the cascading timing of the TMT team members' resignations, Ware's acknowledgement that those employees left to join a startup, Ware's denial that he knew key

details about that startup, Ware's subsequent and immediate resignation in which he admitted that he was leaving to join that startup, Ware's collaboration with at least one other former Guidepoint employee to list "Stealth Startup" on LinkedIn, and Ware's communications with "inquire.network" (discussed in greater detail below) support an inference that Ware and the other former Guidepoint employees are working together at a startup—Inquire Network—and that they do not want Guidepoint to know the startup's true identity.

76.    Inquire Network offers services similar to the services Guidepoint offers and, upon information and belief, Ware and Gohil are employed by or provide services to Inquire Network.

77.    Upon information and belief, Ware solicited Guidepoint's TMT team to work at Inquire Network in order to replicate the services Guidepoint's TMT team provided and compete with Guidepoint.

### G.    Ware Emails Himself Guidepoint's Confidential, Proprietary, and Trade Secret Information to Compete With Guidepoint

78.    Ware also improperly emailed himself Guidepoint's proprietary, confidential, and Trade Secret information. Upon information and belief, Ware did so because he was planning and preparing to compete with Guidepoint.

79.    Beginning in November 2025, Ware began emailing Guidepoint documents to his personal email address.

80.    On November 12, 2025, Ware forwarded an email from Alex Telo, a TMT team member, from his work email to his personal email. Telo had sent Ware an email that day with the subject line "PDFs."

```
From:           Alan Ware <aware@guidepoint.com>
Sent:           Wednesday, November 12, 2025 3:57 PM EST
To:             Alan Ware <ajwareny@gmail.com>
Subject:        Fw: PDFs
Attachments:    Jared August.pdf, Andrew August.pdf


Get Outlook for iOS
From: Alex Telo <atelo@guidepoint.com>
Sent: Wednesday, November 12, 2025 3:52:13 PM
To: Alan Ware <aware@guidepoint.com>
Subject: PDFs


Alex Telo | Associate - TMT, Guidepoint Insights p: +1 212 842 6663




Alex Telo              |    Associate - TMT, Guidepoint Insights
p: +1 212 842 6663
```

81.    Attached to the email were two of Guidepoint's transcripts of meetings Ware moderated with two subject matter experts in August 2025. The documents are both stamped "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

82.    Several days later, on November 18, 2025, Ware forwarded an email from Rahul Motwani, a Research Associate on the TMT team, from his work email to his personal email address. Motwani had sent Ware an email that day with a transcript of a meeting Guidepoint moderated with a subject matter expert from September 4, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

83.    On January 6, 2026, Ware forwarded another email from Telo to his personal email address. Telo had sent Ware an email that day with a Guidepoint call transcript with an expert, this one dated October 14, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

```
From:           Alan Ware <aware@guidepoint.com>
Sent:           Tuesday, January 6, 2026 4:36 PM EST
To:             Alan Ware <ajwareny@gmail.com>
Subject:        Fw: Sid Oct Call
Attachments:    6c08c2fc-fe65-43e6-a4a5-a03611f0b48e.pdf

Get Outlook for iOS
From: Alex Telo <atelo@guidepoint.com>
Sent: Tuesday, January 6, 2026 4:02:08 PM
To: Alan Ware <aware@guidepoint.com>
Subject: Sid Oct Call


Alex Telo | Associate - TMT, Guidepoint Insights p: +1 212 842 6663



Alex Telo              |    Associate - TMT, Guidepoint Insights
p: +1 212 842 6663
```

84.     On January 13, 2026, Ware forwarded another email to his personal email address. Telo had sent Ware an email that day with a transcript, also dated October 14, 2025, from a call Ware had with a Guidepoint industry consultant. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

85.     On January 31, 2026, Ware forwarded to his personal email an Excel spreadsheet that included TMT team members' individual performance metrics and salaries ("Team Metrics"). This Excel spreadsheet listed the (1) salary; (2) bonus amount; (3) key performance metrics for the entire TMT group; and (4) revenue/financial data from the TMT group.

86.     On February 9, 2026, Ware forwarded to himself another email with two more transcripts, dated November 6 and 7, 2025, and from calls Ware moderated with industry experts. Both documents had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

| | |
|---|---|
| From: | Alan Ware <aware@guidepoint.com> |
| Sent: | Monday, February 9, 2026 10:29 AM EST |
| To: | Alan Ware <ajwareny@gmail.com> |
| Subject: | transcripts |
| Attachments: | ██████████████████████.pdf |

87.    On April 15, 2026, Ware forwarded himself another email with a transcript, dated January 9, 2026, and from a call Ware moderated with an expert. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

88.    No legitimate business reason existed for Ware to email to his personal email address these transcripts, which Guidepoint considers proprietary.

89.    No legitimate business reason existed for Ware to email to his personal email address the TMT group members' compensation structure and TMT team revenue metrics.

90.    Upon information and belief, Ware forwarded himself this information to use the confidential, proprietary, and Trade Secret information they contain to compete with Guidepoint at Inquire Network.

91.    On April 18, 2026—a Saturday—Ware emailed to his personal email address four attachments that identified names of attendees at certain dinners Guidepoint hosted for a particular client months or years prior. These lists contain the names of both experts and clients that could be helpful to Ware in starting a new business. Ware had no legitimate reason to email himself these four attachments shortly before he separated from employment.

92.    Two minutes later that same day—Saturday, April 18—Ware emailed himself Guidepoint's New Hire Orientation-2023. The document is labelled "Confidential & Proprietary." It includes a stamp that states: "This document is for the private and confidential use of the addressee exclusively. This document may not be circulated, published or in any other manner

21

distributed without the express written consent of Guidepoint Global, LLC." Less than a week before his departure from Guidepoint, Ware had no legitimate purpose in emailing a Guidepoint new hire orientation to his personal email address.

### H.    Duggal Emails Himself Guidepoint's Confidential, Proprietary, and Trade Secret Information

93.    Duggal has improperly exfiltrated dozens of Guidepoint's proprietary transcripts to his personal email address, sheetal.duggal@gmail.com. For example, on February 13, 2026, about two months before he separated, Duggal emailed his personal email address ten transcripts of calls with various Advisors regarding a particular company.

| From: | Sheetal Duggal <sduggal@guidepoint.com> |
|---|---|
| Sent: | Friday, February 13, 2026 12:30 PM EST |
| To: | Sheetal Duggal <sheetal.duggal@gmail.com> |
| Subject: | |
| Attachments: | Bloom 10.pdf, Bloom 9.pdf, Bloom 8.pdf, Bloom 7.pdf, Bloom 6.pdf, Bloom 5.pdf, Bloom 4.pdf, Bloom 3.pdf, Bloom 2.pdf, Bloom 1.pdf, ded9ec38-6454-4dce-881a-8eb125ee7b7d.txt |

94.    About a week prior—on February 6—Duggal emailed five moderated transcripts regarding another particular company to himself. These moderated calls had occurred, in some instances, months prior to February 6.

95.    Like each of the transcripts Ware sent to his personal email, the transcripts Duggal sent himself were conspicuously marked "CONFIDENTIAL" and included (in all caps) "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

96.    All told, Duggal emailed to his personal email dozens of confidential transcripts. He has not returned the transcripts.

97.    On January 27, 2026, Duggal also sent to his personal email address a spreadsheet—filename "export (93).csv"—containing a list of approximately 207 events that included the Advisor name; the attached clients; the total RSVP; and information about the billing related to that event.

I.    **Ware Directs Gohil to Exfiltrate and Ingest Spreadsheet with Guidepoint's Proprietary Information to DL Software**

98.    Although the Individual Defendants worked hard to avoid detection, they were not completely successful. On March 27, 2026—before the resignations became effective—Ware emailed Gohil and asked him to provide Daniel Dietzel "with access to the file of Advisors we have[.]" A true and correct copy of the email is attached hereto as **Exhibit I.** Ware sent this email to Gohil, Eng, and Dietzel.

99.    The "file" of Advisors—with the filename "TMT+Fintech Advisors 2025.xlsx"—did not belong to the Individual Defendants: it belonged to Guidepoint. The file contained a list of more than 2,000 Advisors that were recruited by Guidepoint and are experts in Guidepoint's proprietary network. The file contains a column with numbers associated with each Advisor. Those numbers are unique expert identifiers that Guidepoint has assigned to each Advisor in its network that confirm this list belongs to Guidepoint and was created from proprietary Guidepoint data. The filename itself references "TMT"—Guidepoint's internal designation for the very team the Individual Defendants were staffed on. And the file contains unique AdvisorID numbers Guidepoint assigns to each Advisor. The presence of these identifiers in a file transmitted by individuals who Dietzel knew were currently employed at Guidepoint confirmed that the file originated from Guidepoint's internal systems—not from any publicly available source.

100.    Dietzel's address is fatcat@dl.software. According to LinkedIn, Dietzel works as an Engineering Lead – Frontend for Godel Terminal. Godel Terminal purports to be "a

professional web-based financial terminal software offering comprehensive financial and investment data." Dietzel's actions described herein were, on information and belief, done in furtherance of either DL Software or Inquire Network and on their behalf.

101.    DL Software "owns and operates the Godel Terminal . . . ." https://www.dl.software/news.

102.    DL Software was co-founded by Martin Shkreli ("Shkreli").

103.    On January 5, 2026, Ware received a LinkedIn invitation to connect from Shkreli.



104.    According to Godel Terminal's LinkedIn page, "Godel Terminal is a next-generation market data terminal for financial professionals. Godel Terminal provides users with real time prices, news, data, and ***networking***." (emphasis added). (As a reminder, Guidepoint is a leading global expert network firm.)

24



105.    The connection between Godel Terminal and Inquire Network remains unknown, but it appears Mr. Dietzel has a role with both entities because Inquire Network has an email address for fatcat as well.



106.    On April 6, 2026, Eng apparently organized a call from her tiana@inquire.network email address. Ware appears to have joined using his Guidepoint account

([aware@guidepoint.com](mailto:aware@guidepoint.com)). Dietzel appears to have joined from [fatcat@inquire.network](mailto:fatcat@inquire.network). The call lasted approximately 12 minutes.

107.    On April 20, 2026, Eng organized another video call. Upon information and belief, Ware joined using his Guidepoint credentials. Dietzel seems to have joined from his inquire.network address. A conference room identified as "DL Conference Room" also joined the call. This call lasted approximately 25 minutes.

| | |
|---|---|
| Subject: | Meeting (RecurringMeeting)/Thread Id: 19:meeting_NjEyMmYwNjgtM2I4MS00ODVlLThkOWMtMWJhMWM4ZGNIM2My@thread.v2/Communication Id: 9dd0a183-ffda-4852-8b25-4ee3eb4a255a/Daniel Dietzel,Alan Ware,d21c50bb9bdc97f0,DL Conference Room |
| Start: | Monday, April 20, 2026 12:02 PM EDT |
| End: | Monday, April 20, 2026 12:27 PM EDT |
| Show Time As: | Busy |
| Organizer: | Christiana Eng |
| Attendees: | Daniel Dietzel, Alan Ware, d21c50bb9bdc97f0, DL Conference Room |

Start Time (UTC): 4/20/2026 4:02:53 PM
End Time (UTC): 4/20/2026 4:27:59 PM
Duration: 00:25:05.7790946

[4/20/2026 4:03:42 PM (UTC)] fatcat@inquire.network joined.
[4/20/2026 4:05:41 PM (UTC)] fatcat@inquire.network left.
[4/20/2026 4:02:53 PM (UTC)] aware@guidepoint.com joined.
[4/20/2026 4:03:39 PM (UTC)] aware@guidepoint.com left.
[4/20/2026 4:06:08 PM (UTC)] fatcat@inquire.network joined.
[4/20/2026 4:27:54 PM (UTC)] fatcat@inquire.network left.
[4/20/2026 4:05:23 PM (UTC)] d21c50bb9bdc97f0 joined.
[4/20/2026 4:27:51 PM (UTC)] d21c50bb9bdc97f0 left.
[4/20/2026 4:03:44 PM (UTC)] DL Conference Room joined.
[4/20/2026 4:27:59 PM (UTC)] DL Conference Room left.

108.    Ware attended both calls while he remained a Guidepoint employee, using Guidepoint-issued credentials, to advance the interests of a competing venture. DL Software provided its own conference room for the April 20th call. And Dietzel—presumably using the email "fatcat@inquire.network"—participated in both calls under inquire.network credentials.

109.    Dietzel's response discussed the need to import advisors and alluded to the ability to correct errors, "once they are in the app." He offered to import Guidepoint's 2,000+ Advisors into an application and warned that "adding them will trigger a registration email for them." Upon information and belief, Defendants are in the process of using Guidepoint's stolen trade secret

information to launch a competitive business application that will directly solicit Guidepoint's Advisors and customers.

110.    After Dietzel informed Gohil and Ware that "adding them [presumably the list of Advisors] will trigger a registration email for them," Ware responded as follows:

| | |
|---|---|
| **From:** | Alan Ware <ajwareny@gmail.com> |
| **Sent:** | Monday, March 30, 2026 11:23 AM EDT |
| **To:** | Daniel Dietzel <fatcat@dl.software> |
| **CC:** | Kirang Gohil <kirang.gohil@gmail.com>; Tiana Eng <teng@guidepoint.com> |
| **Subject:** | Re: advisors |

Well, cant trigger for awhile then. We will put a few guys on eventually
Sent from my iPhone

111.    No legitimate reason existed for Ware and Gohil to exchange work-related information via their personal email addresses. Nor did Ware and Gohil have authorization to share the list of 2000+ Advisors with DL Software.

112.    Dietzel and DL Software knew or had reason to know that the advisor file originated from Guidepoint and that Ware and Gohil were under a duty to not disclose Guidepoint information. And DL Software used the file despite this knowledge. The file bore Guidepoint's internal "TMT" team name. It contained over 2,000 Advisors with Guidepoint's unique AdvisorID identifiers. It was sent by individuals Dietzel knew worked at Guidepoint. And Ware's instruction to delay activation signaled that the data could not yet be used openly because of ongoing employment obligations to Guidepoint. No explanation exists for why a file bearing Guidepoint's internal team name and containing Guidepoint's proprietary Advisor data, would be shared with DL Software.

113.    Ware apparently encountered technical difficulties with Inquire Network's technical features. So, he contacted Charlie Watters for assistance.

114.    In an email chain, Ware forwarded to Daniel Dietzel at dl.software and Eng at her Guidepoint email address—but *after* she separated from Guidepoint employment—a technical analysis from a third party named Charlie Watters regarding the email and DNS configuration of a domain called "inquire.network," which appears to be a newly registered domain hosted on Cloudflare using Microsoft Office 365 for email. The analysis addresses technical issues with outbound SMTP email delivery, DKIM and SPF authentication settings, and MX record configurations for both the inquire.network and dl.software domains, suggesting that Ware and Dietzel are involved in setting up or troubleshooting the email infrastructure for what appears to be a new venture operating under the inquire.network domain. A true and correct copy of the email is attached hereto as **Exhibit J**.

115.    Watters analyzed the MX records for both inquire.network and dl.software side by side and sent his findings to Ware, who forwarded them to Dietzel's dl.software email. The analysis appears to have treated both domains as components of a single infrastructure. The Charlie Watters email chain reflects the involvement of DL Software's corporate technical infrastructure and the interconnectivity of DL Software and Inquire Network, not merely Dietzel's personal technical knowledge.

### J.    Individual Defendants' Browser and File Activity History Confirm Exfiltration and Breach of Duties of Loyalty

116.    The Individual Defendants worked in furtherance of Inquire Network before resigning and while each had access to Guidepoint's proprietary information.

117.    For example, Eng repeatedly visited websites associated with Dl.software beginning March 13 and continuing through March 24. She also visited a website associated with Godelterminal days before her departure:

| | | |
|---|---|---|
| March 23, 2026 12:12:12 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/signup |
| March 23, 2026 12:12:12 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/signup |
| March 23, 2026 12:27:07 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/login |
| March 23, 2026 12:27:08 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/login |

118.    Gohil visited inquire.ai's website on at least two occasions, once on March 11 and another time on March 27.

119.    In addition, Gohil's file activity reports reveal he downloaded to his personal devices a document called TMT Pipeline Sheet.xlsx—including on April 21, 2026 at 5:21 p.m. EST—the day before his resignation.

| Time (EST) | Operation | Filename | Device Name | DeviceOS | Browser |
|---|---|---|---|---|---|
| 4/21/2026, 8:39:33.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 8:50:41.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:04:11.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:21:43.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:34:46.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/202, 5:21:30.000 PM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | Kirang's iPhone | Ios 26.3.1 | Mobile Safari 18.7 |

120.    TMT Pipeline Sheet.xlsx is a comprehensive internal Guidepoint working document that tracks, in granular detail, the company's Advisor recruitment and vetting pipeline across multiple business units and strategists, containing the names, LinkedIn profiles, CRM links, contact history, and status of hundreds of current and former employees of major technology

companies who were being cultivated as potential expert advisors for Guidepoint's research products. The spreadsheet also contains Guidepoint's internal call scheduling and planning information, including completed and planned client-facing research calls, the Advisors used or being considered for those calls, the specific investment research topics being explored for institutional investor clients, and detailed notes reflecting the strategists' assessments of individual Advisors' knowledge, willingness to participate, and suitability for particular calls.

### K.    Duggal Incorporates Inquire Network, and It Is Launched

121.    The certificate of incorporation for Inquire Network was filed on April 6, 2026. A true and correct copy of the certificate is attached hereto as **Exhibit K**.

122.    The Certificate of Incorporation is signed by the incorporator: Duggal.

By: /s/ Sheetal Duggal
Incorporator

Name: Sheetal Duggal
Print or Type

123.    According to Inquire Network's website—https://inquiregroup.ai/#comparison—it is an "AI-Native Investment Research Built for Decision Speed." It purports to offer the ability to "Turn industry specialist engagements and management conversations into structured decision-grade intelligence." A true and correct copy of the website https://inquiregroup.ai/ is attached as **Exhibit L**.

124.    It even attempts to explain what differentiates it from "expert networks"—such as Guidepoint.



125.    Inquire Network's website boasts that "All expert calls, meetings, and interactions live in one system, fully captured, transcribed, and structured for retrieval."

126.    It promotes its services to: Investment Professionals (for hedge funds, long-only investors, and private capital); Strategic & Corporate Leaders (for executives and strategy teams shaping market direction); and Decision Teams (for cross-functional teams responsible for action).

**L.      DL Software's Relationship With Inquire Network and Individual Defendants And Its Refusal To Provide Basic Information**

127.    Dietzel—presumably using the "fatcat" email—holds email addresses at both dl.software and inquire.network, using the same username, "fatcat," at each. The fatcat email address (from both domains) communicated with the Individual Defendants during the relevant period.

128.    DL Software's conference room appeared as a participant in the April 20, 2026 call that Eng organized from her inquire.network address. The Charlie Watters email chain analyzed

the MX records and DNS configurations of both dl.software and inquire.network side by side, treating them as components of a single email infrastructure.

129.    Ware's March 27, 2026 email directing Gohil to share Guidepoint's advisor file was sent directly to Dietzel at his dl.software address.

130.    Upon information and belief, DL Software provides the engineering and infrastructure resources that power Inquire Network's platform. DL Software received Guidepoint's misappropriated Advisor data through Dietzel and, upon information and belief, was acting in concert with the Individual Defendants and Inquire Network and prepared to exploit that data to build a competing business.

131.    On May 14, 2026, Guidepoint sent DL Software a letter asking it to preserve relevant information; providing a copy of the First Amended Verified Complaint; and seeking basic information. A true and correct copy of the letter (excluding the Exhibits) is attached hereto as **Exhibit N.** Guidepoint posed the following questions and sought a response by May 18:

A.    Describe in full Dietzel's role and responsibilities at DL Software, including any work performed on behalf of or in connection with Inquire Network or any of the Individual Defendants.

B.    Describe the nature of DL Software's relationship with Inquire Network, including any agreements, understandings, or arrangements (whether formal or informal) between DL Software and Inquire Network, and identify all services DL Software has provided or agreed to provide to Inquire Network.

C.    Describe what DL Software did with the file titled "TMT+Fintech Advisors 2025.xlsx" (or any derivative thereof), including whether the data contained therein was imported into any application, platform, or system; whether any

32

communications were sent to any individuals listed in that file; and identify all persons who accessed, viewed, or processed the file or its contents.

132.    DL Software's attorney—with the law firm Taylor Dykema PLLC—acknowledged receipt of the letter on May 18, 2026. But as of May 27, 2026, DL Software has not substantively responded to these questions.

133.    On May 26, 2026, Taylor Dykema PLLC—the same law firm representing DL Software—appeared on behalf of each Individual Defendant and Inquire Network, replacing prior counsel.

134.    Based on these actions, Guidepoint reasonably believes DL Software is acting in concert with Inquire Network.

**M.    Guidepoint Faces Irreparable Harm Absent Injunctive Relief**

135.    Guidepoint has invested substantial time, money, and resources in developing its Insights business unit, including the TMT group, the policies and procedures attendant to that business, its relationships with experts and its strategies in recruiting new experts and its client relationships.

136.    The Individual Defendants possess intimate knowledge of Guidepoint's most sensitive Trade Secret information, including sensitive client information and operational business strategies.

137.    The Individual Defendants' continued unauthorized possession of Guidepoint's trade secrets creates an ongoing risk that those secrets will be disclosed to or exploited by Inquire Network.

138.    Upon information and belief, the Individual Defendants have and will disclose Guidepoint's Trade Secrets to Inquire Network, giving it an unfair competitive advantage against Guidepoint.

139.    Monetary damages alone are insufficient to remedy the ongoing and future harm caused by Defendants' misconduct.

140.    Ware, Eng, and Gohil agreed and acknowledged that violations of the restrictive covenant and confidentiality provisions of their respective Employment Agreements would irreparably injure Guidepoint. (*See* Ex. B; Ex. D; Ex. G at § 10.) For that reason, Guidepoint "**shall be entitled to an injunction** restraining [Ware, Eng, and Gohil] from **any actual** or **threatened** breach" of those Sections without the need for a bond. (*Id.*) (emphases added).

141.    Unless restrained by this Court, the Individual Defendants will continue to benefit from their breaches, Inquire Network will reap unfair benefits by having access to Guidepoint's trade secrets, and Guidepoint will suffer loss of longstanding business and clientele, client goodwill, competitive advantage, and the value and benefit of its hard-earned and protected Trade Secrets.

142.    In addition to the irreparable harm Guidepoint faces, Guidepoint faces significant damages in an amount that likely will exceed more than $10 million but that is impossible to quantify presently.

**COUNT I**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836(b))**
**(All Defendants)**

143.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

144.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836.

145.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

146.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know

35

that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

147. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

148. Guidepoint has an advantage over its competitors based, in part, on the Trade Secrets it has developed and implemented in its business efforts.

149. Guidepoint owns and possesses certain confidential, proprietary, and trade secret information as alleged above. Guidepoint has made reasonable efforts under the circumstances to preserve the confidentiality of its Trade Secrets.

150. As described with more particularity above, Guidepoint's Trade Secrets include:

    A. Client-specific pricing, discounting, and contract structures;

    B. Client onboarding processes and compliance requirements;

    C. Internal training materials and employee metrics and compensation information;

    D. Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

    E. Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

    F. Knowledge of client identities, preferences, sensitivities, and feedback.

151. Guidepoint's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or

entities who can obtain economic value from their disclosure or use. Accordingly, the above-described Trade Secrets constitute "trade secrets" under the DTSA.

152.    Guidepoint's former and current employees are under a duty to keep its trade secrets secret and not use or disclose such information except for the benefit of Guidepoint. In taking Guidepoint's Trade Secrets from Guidepoint—namely the Team Metrics, Transcripts, and Advisor lists—the Individual Defendants improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy.

153.    The Team Metrics contain Guidepoint's confidential, proprietary, and Trade Secret information about employees' salaries; performance metrics; bonus structures; and compensation plans.

154.    The transcripts contain Guidepoint's proprietary and Trade Secret information of interviews with subject-matter experts and constitute the very product that Guidepoint sells to its clients.

155.    The Advisor list and pipeline spreadsheet contain Guidepoint's proprietary and Trade Secret information because it includes the names of Guidepoint's Advisors and data regarding their qualifications and services.

156.    The Defendants violated the DTSA by misappropriating Guidepoint's Trade Secrets used in, or intended for use in, interstate or foreign commerce.

157.    The Individual Defendants misappropriated Guidepoint's Trade Secrets by emailing confidential, proprietary Trade Secret information to their personal email address before they resigned, without authorization by Guidepoint, and, upon information and belief, to compete with Guidepoint and to use the information in ways that Guidepoint policies prohibited.

158.    Inquire Network misappropriated Guidepoint's Trade Secrets because it acquired Guidepoint's Trade Secrets without authorization or knew or should have known they were acquired by improper means.

159.    DL Software misappropriated Guidepoint's Trade Secrets because it knew or had reason to know the information was acquired by improper means and contained Guidepoint's Trade Secrets. The file bore Guidepoint's internal "TMT" team designation in its filename and contained Guidepoint's proprietary information. It was transmitted by individuals Dietzel knew or should have known to be Guidepoint employees. And Ware's instruction to delay activation signaled that the data was subject to ongoing confidentiality restrictions. DL Software, through Dietzel, obtained the data and offered to import this stolen data into an application and discussed triggering registration emails to Guidepoint's Advisors. DL Software thus acquired and used Guidepoint's trade secrets knowing or having reason to know they were obtained through a breach of duty to maintain secrecy.

160.    The Defendants have used or intend to use Guidepoint's Trade Secrets for their own benefit and to Guidepoint's detriment without the express or implied consent of Guidepoint.

161.    Defendants' misappropriation was willful and malicious.

162.    As a direct result of Defendants' misappropriation of Guidepoint's Trade Secrets, Guidepoint has suffered and, if Defendants' conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law. Guidepoint has suffered and continues to suffer damages that will be proven at trial.

163.    The DTSA specifically authorizes courts to award injunctive relief to prevent the actual *or threatened* misappropriation of trade secrets. Guidepoint seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret

38

information and to protect other legitimate business interests. Guidepoint's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

164. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

**COUNT II**
**Breach of Contract (Employment Agreement's Confidentiality Provision (§ 5))**
**(Against Ware, Gohil, and Eng)**

165. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

166. Ware, Eng, and Gohil continue to be bound by their respective employment agreements, for which they received adequate consideration.

167. The operative employment agreements include multiple restrictive covenants, including the Non-Competition Provision, Non-Solicitation Provision, Non-Interference Provision, and Confidentiality Provision.

168. The operative employment agreements for Ware, Eng, and Gohil contain identical confidentiality provisions that state:

> At all times during Employee's employment and thereafter, Employee will (i) hold Proprietary Information in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any Proprietary Information, (iii) not access or use for personal benefit or for the benefit of anyone other than the Company any Proprietary Information, and (iv) not copy any documents, records, files or other media containing Proprietary Information or remove any such documents, records files or media from the premises or control of the Company, except, in each case, as required in connection with Employee's authorized employment duties to the Company or with the prior express authorization of an officer of the Company.

169. Ware violated the Confidentiality Provision by forwarding and not returning upon separation the Team Metrics and seven Transcripts to his personal email address.

170. Ware was not authorized to forward the Team Metrics and Transcripts to his personal email address, nor did he have a legitimate business purpose for doing so.

39

171.    Gohil and Eng violated the Confidentiality Provision by, among other things, sharing with a non-party an Excel file listing more than 2,000 Advisors.

172.    Guidepoint's investigation to date and the evidence it has amassed are necessarily limited. The investigation is based on searching the Individual Defendants' Guidepoint mailboxes and data from their Guidepoint devices and electronic databases. Guidepoint cannot, at this point, know the full extent of what the Individual Defendants took from Guidepoint until it conducts full discovery and a forensic investigation is conducted.

173.    Upon information and belief, the Individual Defendants have worked in tandem to exfiltrate Guidepoint's proprietary information to use collectively in furtherance of the new startup.

174.    The actions of Ware, Gohil, and Eng violated § 5(c) of their respective Employment Agreements, which required them to return Guidepoint's Proprietary Information in their possession upon termination of their employment. To date, Ware, Gohil, and Eng have not returned any of the Guidepoint documents.

175.    The actions of Ware, Gohil, and Eng violated § 5(b) of the Employment Agreement, which prohibits them from accessing or using Guidepoint's Proprietary Information for personal benefit or for the benefit of a company other than Guidepoint and from copying or removing documents containing Guidepoint's Proprietary Information from Guidepoint's control. Ware, Gohil, and Eng removed the Team Metrics and Transcripts and a list of Advisors from Guidepoint's control.

176.    Upon information and belief, Ware, Gohil, and Eng are using Guidepoint's Proprietary Information in furtherance of Inquire Network.

177.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT III
### Breach of Contract (Employment Agreement's Non-Compete Provision (§ 4(a)) (Against Ware, Gohil, and Eng)

178.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

179.    Ware, Eng, and Gohil continue to be bound by their respective employment agreements, for which they received adequate consideration.

180.    Section 4(a) of the employment agreement included a reasonable non-competition provision that prohibited Ware, Eng, and Gohil from providing services for any Competing Business for a period of six months following their resignation. Competing Business is defined to include a number of specific companies and "any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content."

181.    Eng has an email address associated with Inquire Network, tiana@inquire.network.

182.    Eng—using her inquire.network email address—invited Ware to a call on or about April 20, suggesting Ware also works for Inquire Network. In addition, Ware reported that he was resigning from Guidepoint to join the other TMT employees at a startup.

183.    Gohil has facilitated the exchange of information to inquire.network and dl.software and thus also likely works for Inquire Network.

184.    Inquire Network is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content.

41

**Living Research System**

Knowledge compounds over time. Signals, narratives, and theses continuously evolve within a single system.

https://inquiregroup.ai/

185.    Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

<u>COUNT IV</u>
**Breach of Contract (Employment Agreement's Non-Interference Provision (§ 4(c))
(Against Ware, Gohil, and Eng)**

186.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

187.    Ware, Eng, and Gohil continue to be bound by their respective employment agreements, for which they received adequate consideration.

188.    Section 4(c) of the employment agreement included a reasonable non-interference provision that prohibited Ware, Eng, and Gohil from attempting to interfere with, impairing, or adversely affecting any contractual relationship or business relationship between Guidepoint and any client, customer, expert, **Advisor** or other person or entity engaged by or doing business with Guidepoint, including without limitation engaging with any business that is a client of Guidepoint and with which Ware, Eng, or Gohil had contact through their work at Guidepoint, on any matter that relates to Guidepoint.

189.    Ware, Eng, and Gohil have breached this provision by, among other things, providing a list of 2,000+ Advisors to Dietzel, a third party that would trigger a registration for them. Ware memorialized his commitment to breaching this provision by writing to Mr. Dietzel that "We will put a few guys on eventually." **Exhibit I.**

42

190.    Some of the Individual Defendants took client information, too, which raises the specter the Individual Defendants will use the information exfiltrated to communicate with Guidepoint clients on behalf of the new venture.

191.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

### COUNT V
**Breach of Contract (Employment Agreement's Employee Non-Solicit (§ 4(b))
(Against Ware, Gohil, and Eng)**

192.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

193.    Ware, Eng, and Gohil continue to be bound by their respective employment agreements, for which they received adequate consideration.

194.    Section 4(b) of the employment agreement included a reasonable employee non-solicitation provision prohibiting each from soliciting or recruiting any employee, independent contractor or agent of Guidepoint to resign from Guidepoint or to accept employment or other engagement with Ware, Eng, and Gohil or with any other person or company.

195.    Upon information and belief, Ware, Gohil and Eng violated the Employment Agreement Non-Solicitation Provision by soliciting Guidepoint's TMT team members to leave Guidepoint and work for Inquire Network instead. Ware, Gohil, and Eng's conduct violated § 4(b) of the Employment Agreement because they solicited and recruited Guidepoint employees "to resign from the Company or to accept employment or other engagement with Employee or with any other person or company."

196.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT VI
**Breach of Contract (Equity Incentive Agreement's Confidentiality Provision (§ 6(b))
(Against Ware and Gohil)**

197.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

198.    Ware and Gohil continue to be bound by their Equity Incentive Agreements, for which they received adequate consideration.

199.    Section 6(b) of the Equity Incentive Agreement included a reasonable confidentiality provision that provided that Ware and Gohil would "hold in strictest confidence and will not disclose, use, lecture upon or publish in any manner whatsoever any of the Company Group's Proprietary Information."

200.    The Equity Incentive Agreement defined Proprietary Information to include the following items: customer, client and vendor lists; customer, client and vendor data and information; customer, client and vendor referral bases; financial and sales information; service/product costing and profit margin information; planning, advertising and marketing information; Company Group research and development; pending projects and proposals; scientific information, production know how, production data, or proprietary production processes (including, without limitation, product formulas); technical data and technical prototypes; and vendor pricing and products. *Id.* § 6(e)(iv).

201.    Ware violated the Equity Incentive Agreement's Confidentiality Provision by forwarding and not returning upon separation the Team Metrics and seven Transcripts to his personal email address.

202.    Ware was not authorized to forward the Team Metrics and Transcripts to his personal email address, nor did he have a legitimate business purpose for doing so.

44

203.    Gohil violated the Equity Incentive Agreement's Confidentiality Provision by, among other things, sharing with a non-party an Excel file of more than 2,000 Advisors.

204.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT VII
### Breach of Contract (Equity Incentive Agreement's Non-Competition Provision (§ 6(b)) (Against Ware and Gohil)

205.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

206.    Ware and Gohil continue to be bound by their Equity Incentive Agreements, for which they received adequate consideration.

207.    Section 6(a) of the Equity Incentive Agreement includes a reasonable non-competition provision:

Employee acknowledges that the Company Group's relationship with its customers, clients, consultants, vendors, employees and other Persons are valuable business assets, and that there is a significant likelihood that if Employee directly or indirectly competes with the Company Group from time to time, it would result in the unauthorized use or disclosure of Proprietary Information or interfere with the Company Group's relationship with its customers, clients, consultants, vendors, employees, and other Persons. Accordingly, during the period of Employee's employment with the Company Group, and for a period of two (2) years following the termination of Employee's employment with the Company Group for any reason whatsoever, Employee shall not anywhere in the world where the Company Group does business: (i) directly or indirectly, either through any form of direct or indirect ownership (other than owning an investment of not more than 5%), or as a director, officer, principal, agent, employee, independent contractor, employer, advisor, consultant, shareholder, partner, member or in any other capacity, either for Employee's benefit or the benefit of any other person or entity, be employed by or otherwise engage in or be interested or involved in a Competitive Business; or (ii) use in or disclose to any Competitive Business any Work Product.

208.    "'Competitive Business' means any business in competition with the Company Group from time to time (or by which the Company Group is proposing to operate) including, without limitation, any entity which charges customers fees for providing research by a firm that employs or

45

contracts a Network of Experts anywhere the Company Group has operations, customers or such Experts." § 6(e)(i).

209.    Eng—using her inquire.network email address—invited Ware to a call on or about April 20, suggesting Ware also works for inquire.network.

210.    Gohil has facilitated the exchange of information to inquire.network and dl.software and thus also likely works for Inquire Network.

211.    Inquire Network offers expert calls and expert conversations and is, therefore, a Competitive Business.

212.    Gohil and Ware have breached Section 6(a) of the Equity Incentive Agreement by providing services to and working for Inquire Network.

213.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT VIII
### Breach of Contract (Consultant Agreement)
### Duggal

214.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

215.    Duggal continues to be bound by the Independent Consultant Agreement, for which he received adequate consideration.

216.    The Consultant Agreement includes a Confidentiality Provision, which states:

At all times during the term of this Agreement and thereafter, Consultant will (i) hold the Company's Proprietary Information (defined below) in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any of the Company's Proprietary Information, and (iii) not access, or use for personal benefit, or for the benefit of anyone other than the Company, any of the Company Group's Proprietary Information, or copy any documents, records, files or other media containing Proprietary Information, or remove any such documents, records, files or media from the premises or control of the Company, except, in each case, as required in connection with Consultant's authorized duties to the Company, or with the prior express authorization of an officer of the Company. Consultant hereby irrevocably assigns to the Company any rights Consultant may have or acquire in

such Proprietary Information and recognizes that all Proprietary Information will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Consultant shall return to the Company all Proprietary Information then in his or her possession.

217.    The Consultant Agreement defines "Proprietary Information" as:

any and all confidential and/or proprietary knowledge, data or information of the Company Group. By way of illustration but not limitation, "Proprietary Information" includes (i) any and all information contained in or related to the Company's CRM platform, trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, techniques and research; (ii) information regarding the Company's organization or structure, plans for research and development, new products, marketing, selling, advertising, and other business plans, budgets and financial data, licenses, pricing and costs, and suppliers; (iii) the identity of current and prospective clients of the Company, and Company's current and prospective contracts, policies, standards, procedures and practices; (iv) any and all information regarding the experts contracted by the Company, the Company's business model incorporating the use of such experts and the technology and trade secrets in connection with the utilization of such business model; and (v) information regarding the skills and compensation of other consultants or employees of the Company. Proprietary Information also shall include any information that is provided to or obtained by the Company Group from third parties and is subject to obligations of confidentiality.

218.    Duggal violated the Confidentiality Provision by forwarding to his personal email address and not returning upon separation dozens of proprietary transcripts.

219.    Duggal violated the Confidentiality Provision by forwarding to his personal email address and not returning upon separation the spreadsheet containing a list of approximately 207 events that included the Advisor name; the attached clients; the RSVP clients; and information about the billing related to that event.

220.    Duggal was not authorized to forward the transcripts and the spreadsheet containing advisors' names and event information to his personal email address. Nor did he have a legitimate business purpose for doing so.

221.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT IX
### Tortious Interference with Contract
### (All Defendants)

222.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

223.    Defendants interfered with Guidepoint's contractual relationship with its employees and consultants, including Ware, Gohil, Duggal, and Eng.

224.    Guidepoint has valid and enforceable Employment and Independent Consultant Agreements with its employees and contractors, which Defendants know because they signed one or both agreements.

225.    Upon information and belief, despite this knowledge, the Defendants solicited members of the TMT group away from Guidepoint and, upon information and belief, to join a competitor, Inquire Network.

226.    Upon information and belief, Defendants willfully and intentionally interfered with the agreements of Kirang Gohil, Alex Telo, Sheetal Duggal, and Tiana Eng, without privilege to do so, by aiding, abetting, and assisting them in breaching their contractual obligations to Guidepoint, including, but not limited to, their obligations to not: (1) disclose Guidepoint's Trade Secret information; (2) work or perform services for a "Competitive Business" for six months following the termination of their employment with Guidepoint; (3) improperly use Guidepoint's Trade Secrets to aid a competitor in its unlawful and anti-competitive activities; (4) solicit Guidepoint's clients; and/or (5) use or disclose Guidepoint's Trade Secrets for their own benefit or outside the scope of their employment with Guidepoint.

227.    A true and correct copy of Telo's Employment Agreement is attached hereto as **Exhibit M**.

228.    Upon information and belief, Defendants misconduct is independently tortious and unlawful because they induced Kirang Gohil, Alex Telo, Sheetal Duggal, and Tiana Eng to breach their obligations under each persons' agreement in order to unfairly compete against Guidepoint. Upon information and belief, Kirang Gohil, Alex Telo, Sheetal Duggal, and Tatiana Eng all did in fact breach their respective agreements as a result of Defendants' actions.

229.    Pursuant to Section 4(f) of Ware, Gohil, and Eng's employment agreement, each was required to notify Inquire Network—their new employer—of their obligations under the employment agreement before accepting or commencing employment.

230.    DL Software tortiously interfered with Guidepoint's contractual relationships by knowingly receiving and preparing to exploit Guidepoint's proprietary advisor information in furtherance of a competing venture. DL Software knew or should have known that the Individual Defendants owed contractual obligations to Guidepoint. Dietzel communicated directly with Ware and Gohil about importing Guidepoint's Advisor data into an application. Ware's statement that he "cant trigger for awhile" [sic] put Dietzel and DL Software on notice that the data was subject to restrictions. DL Software nonetheless agreed to import the data and discussed triggering registration emails to Guidepoint's Advisors—conduct that would directly interfere with Guidepoint's contractual relationships.

231.    Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

49

## COUNT X
### Breach of Fiduciary Duty
### (Against Ware, Gohil, and Eng)

232.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

233.    Ware, Gohil, and Eng, as Guidepoint employees, owed a duty to, among other things, put the welfare and best interests of Guidepoint above their own personal or other business interests.

234.    Ware, Gohil, and Eng breached their fiduciary duties to Guidepoint by engaging in the actions described herein while still employed by Guidepoint, including accessing and sharing Guidepoint information to retain post-employment and for use at Inquire Network and by providing a list of 2,000+ Advisors.

235.    Ware, Gohil, and Eng violated their fiduciary duties by working for and providing services to Inquire Network while being paid by Guidepoint. Ware, Gohil, and Eng also violated their fiduciary duties by providing Guidepoint's confidential information to Inquire Network and DL Software.

236.    These actions constitute a breach of Ware's, Gohil's, and Eng's fiduciary duties to Guidepoint.

237.    Ware's, Gohil's, and Eng's conduct was intentional, willful, and outrageous, and was undertaken with reckless indifference to the rights of Guidepoint.

238.    Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT XI
### Aiding And Abetting Breach of Fiduciary Duty
### (Against Inquire Network and DL Software)

239.    Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

50

240.    Ware, Gohil, and Eng, as Guidepoint employees, owed a duty to, among other things, put the welfare and best interests of Guidepoint above their own personal or other business interests.

241.    Ware, Gohil, and Eng breached their fiduciary duties to Guidepoint by engaging in the actions described herein while still employed by Guidepoint, including accessing and sharing Guidepoint information to retain post-employment and for use at Inquire Network and by providing a list of 2,000+ Advisors.

242.    Ware, Gohil, and Eng violated their fiduciary duties by working for and providing services to Inquire Network while being paid by Guidepoint. Ware, Gohil, and Eng also violated their fiduciary duties by providing Guidepoint's confidential information to Inquire Network and DL Software.

243.    Ware attended video calls organized by Inquire Network domains on April 6, 2026 and April 20, 2026—using his Guidepoint credentials—while still employed by Guidepoint. Ware thus used Guidepoint resources to advance a competitor's interests during his employment.

244.    These actions constitute a breach of Ware's, Gohil's, and Eng's fiduciary duties to Guidepoint.

245.    Inquire Network and DL Software knowingly induced and participated in Ware, Gohil, and Eng's above-described breaches.

246.    As an example, Dietzel—with knowledge of Ware's and Gohil's breaches—actively participated and rendered substantial assistance to both Ware and Gohil by ingesting the list of advisors onto either Inquire Network's or DL Software's platform. Dietzel is an employee of DL Software and knew that both Ware and Gohil remained employed by Guidepoint.

247.    DL Software and Inquire Network facilitated and participated in these breaches by accepting the advisor list and ingesting them. Dietzel responded to Ware by writing: "Alan let me know when you want to import these, adding them will trigger a registration email for them. We'll most likely need to push the entire thing live first so it's not behind a cloudflare pages block." **Ex. I.**

248.    DL Software's substantial assistance to the Individual Defendants' breach of fiduciary duty extended well beyond receipt of a single file. DL Software also participated in at least two calls with some of the Individual Defendants—on April 6, 2026 and April 20, 2026—during which, upon information and belief, the parties discussed the buildout of Inquire Network or DL Software's platform and the use of Guidepoint's misappropriated data.

249.    Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## JURY DEMAND

Guidepoint hereby requests and demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Guidepoint respectfully requests that the Court enter judgment in its favor and an order that grants the following relief:

A.    Declaring that Defendants misappropriated Guidepoint's Trade Secrets;

B.    Declaring that Ware, Gohil, and Eng breached their Employment Agreement with Guidepoint;

C.    Declaring that Ware and Gohil breached their Equity Incentive Unit Agreements with Guidepoint;

D.    Declaring that Defendants tortiously interfered with Guidepoint's contracts;

E.    Declaring that Ware, Gohil, and Eng and violated their fiduciary duty to Guidepoint;

F.    Enjoining Ware, Gohil, and Eng, and all those acting in active concert or participation with them, from further breaches of the Employment Agreement, namely an injunction that:

1)    Preliminarily and prospectively enjoins Ware, Gohil, and Eng and all persons and/or entities in active concert or participation with them, from working as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity, for any company identified in § 4(a) of the Employment Agreement and any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content.

2)    Preliminarily and prospectively enjoins Ware, Gohil, and Eng, and all persons and/or entities acting in active concert or participation with them, from attempting to interfere with, impair, or adversely affect any contractual relationship or business relationship between Guidepoint and any client or expert with which Ware, Gohil, and Eng had contact through Ware, Gohil, and Eng's work at Guidepoint, on any matter that relates to Guidepoint; and

3)    Preliminarily and prospectively enjoins Ware, Gohil, and Eng, and all persons and/or entities acting in active concert or participation with them, from disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information.

53

       4)      Requires Ware, Gohil, and Eng to immediately account for and return all Guidepoint Proprietary Information.

G.      Pursuant to Section 4(g) of the Employment Agreement, extending the time periods stated in Section 4 by the duration of the time of the breach and during which the violation has not been cured;

H.      Enjoining Duggal, and all those acting in active concert or participation with him, from further breaches of the Independent Consultant Agreement, namely an injunction that:

       1)      Preliminarily, prospectively, and permanently enjoins Duggal, and all persons and/or entities acting in active concert or participation with him, from disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information.

       2)      Requires Duggal to immediately account for and return all Guidepoint Proprietary Information

I.      Enjoining Defendants, and all those acting in active concert with them, from misappropriating Guidepoint's Trade Secrets and Proprietary Information;

J.      Awarding actual, incidental, compensatory, and consequential damages in an amount to be proven at trial, an amount that Guidepoint estimates will exceed $10 million but that is not capable of quantification at this time;

K.      Awarding punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

L.      Awarding costs and expenses incurred herein, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) or any other applicable law or contract;

M.      Awarding pre-judgment and post-judgment interest; and

54

N.      Awarding all other relief as the Court may deem just, equitable and proper.

Dated:  June 1, 2026                              Respectfully submitted,


                                                  /s/ Jacob R. Dean
                                                  Jason D. Burns
                                                  Daniel Filor
                                                  Shira M. Poliak
                                                  GREENBERG TRAURIG, LLP
                                                  One Vanderbilt Avenue
                                                  New York, NY 10017
                                                  (212) 801-9294
                                                  Jason.Burns@gtlaw.com
                                                  Filord@gtlaw.com
                                                  Shira.Poliak@gtlaw.com

                                                  Justin K. Victor (*phv*)
                                                  Jacob R. Dean (*phv*)
                                                  GREENBERG TRAURIG, LLP
                                                  3333 Piedmont Road NE, Suite 2500
                                                  Atlanta, GA 30305
                                                  (678) 553-2100
                                                  Victorj@gtlaw.com
                                                  Deanj@gtlaw.com

                                                  *Counsel for Plaintiff Guidepoint Global, LLC*