**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, Inquire Network, Inc., and DL Software, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-03684-VEC-HJR<br><br>Jury Trial Demanded<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF GUIDEPOINT GLOBAL, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ORDER OF CONTEMPT AGAINST DEFENDANTS ALAN WARE, KIRANG GOHIL, AND THOSE IN ACTIVE CONCERT WITH THEM**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........ 1
II. FACTUAL BACKGROUND ........ 3
A. Guidepoint's Business ........ 3
B. The Consent Orders Were Negotiated, Entered, and Remain Binding ........ 4
C. Duggal's Deposition Indicates Post-Injunction Misconduct Forcing Additional Targeted Discovery By Guidepoint ........ 5
D. Following Duggal's Deposition, Guidepoint Aggressively Seeks Discovery into Defendants' Conduct ........ 6
E. RealTime Advisory ........ 8
F. Defendants' Counsel Confirms Breaches of the Stipulated Injunction ........ 10
III. GOVERNING LAW ........ 11
IV. ARGUMENT ........ 12
A. The Orders Are Unambiguous, And Defendants Concede As Much ........ 12
B. Proof Of Ware's And Gohil's Noncompliance Is Clear And Convincing ........ 13
i. Ware and Gohil Violated the Stipulated Injunctions by Returning to Work for Inquire and DL Software. ........ 13
ii. Defendants Violated the Non-Solicit and Non-Interference Paragraphs ........ 17
C. Defendants Made No Diligent Effort to Comply ........ 18
D. The Court Should Hold In Contempt Those In Active Concert With Ware And Gohil ........ 19
E. The Court should Impose Contempt Remedies To Coerce Future Compliance and Remedy Past Non-Compliance ........ 21
V. CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
154 F.3d 1345 (Fed. Cir. 1998)........................................................................16

*Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*,
438 F. Supp. 3d 203 (S.D.N.Y. 2020)................................................................12

*Aquavit Pharmacueticals, Inc. v. U-Bio Med, Inc.*,
No. 19CV3351VECRWL, 2021 WL 4312579 (S.D.N.Y. July 16, 2021),
*report and recommendation adopted as modified sub nom.* 2021 WL 3862054
(S.D.N.Y. Aug. 30, 2021) ....................................................................................22

*Atl. Recording Corp. v. BCD Music Grp., Inc.*,
No. 08 CIV. 5201 (WHP), 2009 WL 1390848 (S.D.N.Y. May 7, 2009) ..............................13

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
814 F.3d 91 (2d Cir. 2016)..................................................................................11

*City of New York v. Loc. 28, Sheet Metal Workers' Int'l. Ass'n*,
170 F.3d 279 (2d Cir. 1999)................................................................................11

*Cordius Trust v. Kummerfeld*,
2009 WL 3416235 (S.D.N.Y. Oct. 23, 2009) ......................................................21

*Forschner Grp., Inc. v. New Trends, Vrolixs J.-C.*,
No. CIV. A. No. B-89-531(JAC), 1994 WL 708129 (D. Conn. Aug. 10, 1994)..............16, 20

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)................................................................................21

*IME Watchdog, Inc. v. Gelardi*,
732 F. Supp. 3d 224 (E.D.N.Y. 2024) ................................................................16

*Kosowski v. Nassau Cnty.*,
350 F.R.D. 346 (E.D.N.Y. 2025) ........................................................................22

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949)............................................................................................11

*Medina v. Buther*,
No. 15-CV-1955(LAP), 2019 WL 581270 (S.D.N.Y. Feb. 13, 2019) ..................................19

*N.Y. State Nat'l Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989)..........................................................................11, 12

*N.Y. State Nat. Org. for Women v. Terry*,
952 F. Supp. 1033 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998) ....................................22

*Nat'l Research Bureau, Inc. v. Kucker*,
481 F. Supp. 612 (S.D.N.Y. 1979)....................................19

*NML Capital, Ltd. v. Republic of Argentina*,
727 F.3d 230 (2d Cir. 2013)....................................19

*People of State of N.Y. by Vacco v. Operation Rescue Nat.*,
80 F.3d 64 (2d Cir. 1996) ....................................16, 20

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
673 F.2d 53 (2d Cir. 1982)....................................21

*Powell v. Ward*,
487 F. Supp. 917 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981) ....................................19

*Regal Knitwear Co. v. N.L.R.B.*,
324 U.S. 9 (1945)....................................20

*Shady Records, Inc. v. Source Enterprises, Inc.*,
351 F. Supp. 2d 64 (S.D.N.Y. 2004)....................................13

*Stephens v. Props.*,
No. 11-CV-2575 (JG), 2014 WL 11460469 (E.D.N.Y. Feb. 4, 2014), *aff'd sub nom.*, 589 F. App'x 37 (2d Cir. 2015) ....................................20

*Vuitton et Fils S.A. v. Carousel Handbags*,
592 F.2d 126 (2d Cir. 1979)....................................20

*Weitzman v. Stein*,
98 F.3d 717 (2d Cir. 1996)....................................22

**Other Authorities**

Rule 65(d)(2)....................................19

Plaintiff Guidepoint Global, LLC submits this memorandum in support of its Motion for an Order of Contempt Against Defendants Alan Ware and Kirang Gohil, and those in active concert with them, for violating the Consent Orders and Stipulated Injunctions entered against them ("Motion"). Dkts. 37 and 42.

## I. PRELIMINARY STATEMENT

In May 2026, after each Defendant agreed to a Stipulated Injunction, this Court observed that, "We have a TRO in place so everybody is standing down."[1] The Stipulated Injunctions entered against Ware and Gohil prohibit each from (1) working for ***Inquire Network*** and any company that is in the business or intends to enter the business of charging customers fees in exchange for access to an online library of primary research content; (2) soliciting any independent contractor of Guidepoint to accept engagement with any other person or company; and (3) interfering or attempting to interfere with any contractual or business relationship between Guidepoint and its clients or advisors.

Through computer forensics Guidepoint is receiving on a rolling basis,[2] it has just recently come to light to Guidepoint that Defendants Alan Ware and Kirang Gohil did not stand down and have continued working in breach of the non-compete, non-solicit, and non-interference restrictions within their employment agreements, and more important for purposes of this Motion, the Court's Stipulated Injunctions. The computer forensics also confirmed that DL Software fits the description of companies from which Defendants are enjoined by the Stipulated Injunction

---

[1] May 15, 2026 Conference Hearing Transcript 5:3–4.

[2] Defendants are producing documents via the Court-ordered forensic protocol on a rolling basis, and a substantial document production is forthcoming. It is therefore likely that additional evidence of misconduct and contempt may be revealed in the forthcoming production(s).

non-compete restrictions because it is "in the business or intends to enter the business of charging customers fees in exchange for access to an online library of primary research content."

When Guidepoint confronted Defendants with this misconduct, the response by Defendants' counsel only confirmed the need for this Motion. On August 14, 2026, Defendants' counsel informed Guidepoint that it was their position that the Stipulated Injunctions in place were "too onerous as drafted, no longer tenable, and unfair to Defendants."

The breaches by Ware and Gohil are numerous, pervasive, and continuing in nature.

To dance around the Stipulated Injunctions, Inquire Network and DL Software directed Ware to incorporate a new entity RealTime Advisory, Inc. ("RealTime Advisory"). RealTime Advisory is merely a shell entity for Inquire Network and DL Software. In addition to sharing the same offices and resources, RealTime Advisory's foundational business plans were drafted by Inquire Network.

Message

**From:** Alex Telo [alex@inquiregroup.ai]
**Sent:** 6/24/2026 5:37:49 PM
**To:** maggie@dl.software
**Subject:** Re: PPT for Real Time Advisors

Hey Maggie,

Please let me know if this link works!

RealTimeAdvisors_Pitch (1).pptx

Alex Telo
Analyst

917.694.3168
alex@inquiregroup.ai
inquiregroup.ai

**Exhibit 1**, TD_0343522.

Further, DL Software controls, supports, and operates key parts of RealTime Advisory's financial functions, including the ability to be paid for services rendered to clients.

[redacted]

**Exhibit 2**, TD_0343866. Rather than comply with the Stipulated Injunctions, Defendants collectively created another entity ***after*** Defendants' devices were collected for computer forensics analysis. Further, as discussed below, both Ware and Gohil violated the non-solicit and non-interference paragraphs by contacting Guidepoint advisors to facilitate engagement with RealTime Advisory.

Guidepoint did everything possible to avoid bringing this motion and gave Defendants every opportunity to comply with the Stipulated Injunctions. Due to their blatant and deliberate non-compliance, Guidepoint respectfully requests that the Court hold Ware, Gohil, Duggal, Inquire Network, and DL Software in contempt, bar Defendants from continuing the disputed conduct covered by the Stipulated Injunctions, and award Guidepoint its fees and costs.

## II. FACTUAL BACKGROUND

### A. Guidepoint's Business

Guidepoint is a leading global expert network and research services firm that connects institutional investors, consultants, and corporate clients with industry experts to gain in-depth insights and market intelligence to support strategic, operational, and investment decisions. Verified Second Amended Complaint ("Complaint") ¶ 25. Its TMT Group—for which most of the Individual Defendants worked—is a specialized research and content team that produces industry specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on TMT topics. *Id.* ¶ 38. The Guidepoint Insights business unit generates content that it provides to its clients through live teleconferences in which Guidepoint moderators conduct interviews with experts in Guidepoint's network. Guidepoint also offers as a product to its clients a library of transcripts of such teleconferences. *Id.* ¶ 26. Guidepoint's "library" consists of the written transcripts or recorded versions of an expert interview, presentation, or content.

**B. The Consent Orders Were Negotiated, Entered, and Remain Binding**

After Guidepoint filed a Motion for a Temporary Restraining Order, each Defendant agreed to a Court-entered unambiguous injunction proscribing certain employment, contact, and use of confidential information. *See* Dkts. 37, 41, 42, 46, 76. Every Stipulated Injunction entered was negotiated by counsel. When the Court entered the injunctions, separate counsel and law firms represented each Individual Defendant (Ware, Gohil, Eng, and Duggal).

Ware and Gohil's Stipulated Injunctions are relevant here. They provide in relevant part:

| Prohibited Conduct & Paragraph | Stipulated Injunctions' Text |
|---|---|
| Further trade secret misappropriation and breach of confidentiality provision<br><br>Dkt. 37 ¶ 1; Dkt. 42 ¶ 1. | As of the date of this order, Alan Ware/Kirang Gohil is enjoined from using, printing, copying, distributing, disclosing, or examining any information taken from or belonging to Guidepoint whether or not in original form, including without limitation, Guidepoint's technical and business information and data, or other Guidepoint trade secret, confidential and/or proprietary information. This |

| Prohibited Conduct & Paragraph | Stipulated Injunctions' Text |
|---|---|
| | includes, but is not limited to, any copies of transcripts of moderated calls belonging to Guidepoint, lists of advisors, and documents containing Guidepoint's current or prospective business opportunities or clients, such as the document that includes the filename Pipeline Sheet. |
| Non-compete<br>Dkt. 37 ¶ 2; Dkt. 42 ¶ 2. | As of the date of this order, Alan Ware/Kirang Gohil is enjoined from working as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity, for Inquire Network . . . and any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content. |
| Agent and employee non-solicit<br>Dkt. 37 ¶ 3; Dkt. 42 ¶ 3. | As of the date of this order, Alan Ware/Kirang Gohil is enjoined from directly or indirectly soliciting or recruiting any employee, independent contractor or agent of Guidepoint to resign from Guidepoint or to accept employment or other engagement with Alan Ware/Kirang Gohil or with any other person or company. |
| Interference with business relationship<br>Dkt. 37 ¶ 4; Dkt. 42 ¶ 4. | As of the date of this order, Alan Ware/Kirang Gohil is enjoined from directly or indirectly attempting to interfere with, impair, or adversely affect any contractual relationship or business relationship between Guidepoint and any client, customer, expert, advisor or other person or entity engaged by or doing business with Guidepoint, including without limitation engaging with any business that is a client of Guidepoint and with which [Ware or Gohil] had contact through [Ware's/Gohil's] work at Guidepoint, on any matter that relates to Guidepoint. |

### C. Duggal's Deposition Indicates Post-Injunction Misconduct Forcing Additional Targeted Discovery By Guidepoint

Guidepoint deposed Duggal on June 24, 2026. His testimony started to reveal the transition from compliance to breaches of Stipulated Injunctions by Ware and Gohil. After the Court entered the Stipulated Injunctions, according to Duggal, Ware "never came to the office again and he never conducted any business with us." Sheetal Duggal Deposition Transcript ("Duggal Dep.") 96:7–17.[3] Further, Duggal testified that at first he ceased communicating with Ware after Guidepoint

[3] Sheetal Duggal Deposition Transcript excerpts are attached as **Exhibit 3**.

sued Ware based on the TRO and "just advice of counsel and to be extra cautious . . . ." *Id.* 101:2–10. Duggal and others "thought it made sense for him to step away, alongside Mr. Gohil." *Id.* 101:5–10.

That changed on June 10. *Id.* 101:19–22. Whereas between when the TRO was entered and June 10, Duggal and Ware barely spoke, they now spoke "regularly"—"daily," in Duggal's words. *Id.* 102:2–15. What do they discuss? They have "conversations about -- the projects that we think we should be able to do, ***about things that we can do for Inquire***, places that they can help with work as we settle and resolve this very interesting litigation." *Id.* 102:5–12 (emphasis added). After June 10, Ware and Gohil resumed coming back to Inquire's office, visiting twice weekly, an entity they both stipulated they would not consult, work for, or support. *Id.* 104:22–105:20. He explained that DL Software and Inquire **share the same office space**, and that once there, Ware was "primarily working with Martin and Nick on projects with DL Software, including financial data products." *Id*. at 105:16–19. On the dates when Gohil and Ware do not physically come to the office, Duggal assumes Ware and Gohil work for DL Software. *Id.* 107:19–108:2. Duggal testified that Ware and Gohil were using their expertise to make DL Software's financial-data product "more palatable, more compelling, and more attractive to Godel's existing investors," and that he speaks with Ware daily, including about "things that [they] can do for Inquire." *Id.* 102:2–12; 110:7–19.

### D. Following Duggal's Deposition, Guidepoint Aggressively Seeks Discovery into Defendants' Conduct

The day after Duggal's deposition, Guidepoint sent Defendants a letter demanding information about Defendants' conduct. *See* **Exhibit 4**, 2026.06.25 J. Dean Letter to Defendants' Counsel. Defendants' counsel replied the next day, claiming that RealTime Advisory

"will provide live content that is neither available in an online library nor intended to be available in an online library." **Exhibit 5**, 2026.06.26 E. Paltzik Ltr. to J. Dean.

On July 2, 2026, Guidepoint propounded targeted discovery aimed to uncover the extent of non-compliance and information related to RealTime Advisory. **Exhibit 6**, 2026.07.02 Guidepoint's RFPs and ROGS to Individual Defendants. Guidepoint counsel implored Defendants' counsel to respond quickly to the discovery, encouraging Defendants' counsel to serve early responses to assuage Guidepoint's concerns about noncompliance and avoid motions practice.

Defendants did not timely respond. Rather than respond early to discovery, Defendants failed to timely respond to the Requests for Production—responding more than a week late. Defendants have yet to respond to Guidepoint's Second Set of Interrogatories. **Exhibit 14**, 2026.08.10 Letter. The reason for Defendants' stonewalling on discovery is now obvious. Having to respond to the discovery will further expose Defendants' breaches of the Stipulated Orders.

Guidepoint's efforts to timely investigate and seek enforcement of the Stipulated Injunctions are depicted below:

| Event | Date |
|---|---|
| Duggal deposed | June 24, 2026 |
| Guidepoint counsel sends letter to Defendants' counsel regarding violations | June 25, 2026 |
| Defendants' counsel responds to letter, revealing RealTime Advisory | June 26, 2026 |
| Guidepoint propounds discovery targeting compliance | July 2, 2026 |
| Guidepoint receives access to 122,000+ documents revealing that RealTime Advisory is just a shell/pass through entity for Inquire Network and DL Software | August 3, 2026 |

| | |
|---|---|
| Counsel conduct meet and confer regarding discovery noncompliance and violation of Stipulated Injunctions | August 14, 2026 |

**E. RealTime Advisory**

Barred from working for Inquire and DL Software, Ware and Gohil did not stop competing. They just rebranded. The ***day after*** Duggal's deposition revealed Ware and Gohil's post-TRO conduct, Ware incorporated another entity: RealTime Advisory, Inc. **Exhibit 7**, RealTime Advisory, Inc. Certificate of Incorporation. These actions were calculated and deliberate.

In addition to Ware, who else is behind setting up RealTime Advisory? DL Software and Inquire Network.

[redacted]

**Exhibit 2**, TD_0343866. As the initial computer forensics production makes clear, there is no light between RealTime Advisory, DL Software, and Inquire Network. It is not in serious dispute that all three entities share the same office space, the employees all work together on projects, and utilize the same funding and resources (including Defendants' counsel in this matter). *See, e.g.*, **Exhibit 8**, DL00001–13, Letter of Intent, ¶ 1.4. For example, when Ware needed to facilitate payments for his new entity, he asked DL Software employee Nick Longo to assist and indicated

co-defendant Christiana Eng was already reaching out to assist. **Exhibit 9**, TD_0343854–55. And DL Software's co-founder has touted calls that RealTime Advisory hosts:




A presentation drafted by a Guidepoint-turned-Inquire employee describes RealTime Advisory as an expert-driven, investor-facing market-intelligence business built around advisor conversations and recurring programming, and it names Ware, Gohil, and Duggal, alongside Martin Shkreli, as its team. *See* RealTime Advisory PowerPoint, attached hereto as **Exhibit 10**.

Additional limited discovery reveals that RealTime Advisory is actively producing content —the foundation of a research library. In a June 22 email Ware exchanged with Longo and Shkreli, he informed them that he was looking for "a production guy today for podcast." **Exhibit 2**, TD_0343866. In other words, Ware would host calls with experts (research content), which would be available on a podcast (online library). Any expert call—recorded in written or oral form—constitutes the creation of a library or research content.

RealTime Advisory has also been interfering with Guidepoint's advisor and client relationships. On or about August 7, 2026, a Guidepoint TMT moderator, while negotiating an engagement rate with an advisor in Guidepoint's network, was informed by an advisor that the

advisor was already working with a competitor the advisor identified as "realtimeadv.com," which had an expert event scheduled for August 11, 2026. *See* **Exhibit 11**. In addition, Ware—ostensibly on behalf of RealTime Advisory—has been contacting former Guidepoint clients. Specifically, Ware sent a former Guidepoint client a contract for services worth [redacted]. **Exhibit 9**. [redacted] was cultivated by Ware during his tenure at Guidepoint, during which time [redacted] founder [redacted] attended dozens of Guidepoint events, including teleconferences, roundtables, and transcript downloads.

To be clear, this evidence of clear breaches is just the tip of the iceberg. The computer forensics protocol captured and covered limited communications and documents concerning RealTime Advisory because—as is now clear—the entity was set-up as a work around ***after*** most devices were collected and imaged and ***after*** Duggal disclosed the nature of Ware and Gohil's conduct in breach of the Stipulated Orders. The only reason Guidepoint has documents revealing RealTime Advisory's operations is because there was a short delay in collecting some of the devices imaged.

### F. Defendants' Counsel Confirms Breaches of the Stipulated Injunction

The August 14, 2026 meet-and-confer began as a conference over Defendants' discovery objections and ended with Defendants' counsel confirming that the real dispute at issue is not about the burden of discovery. Defendants' counsel represented that Defendants regard the Stipulated Injunctions as too onerous, no longer tenable, broader than the governing agreements require, and that predecessor counsel should never have agreed to them. Defendants' counsel further stated:

- "It is Defendants' position that Defendants are entitled to host and produce live content[.]"
- "It is Defendants' position that Defendants are entitled to host and produce live content with individuals who are on Guidepoint's advisor list so long as the contact was

> incidental/procured by means other than viewing the list/based on independent relationships[.]"

*See* **Exhibit 12**, 2026.08.14 E. Paltzik Email to J. Victor. These positions cannot be reconciled with the Stipulated Injunctions.

## III. GOVERNING LAW

A "party may be held in [civil] contempt . . . if it is proven by clear and convincing evidence that the party violated a clear and unambiguous order of the court." *City of New York v. Loc. 28, Sheet Metal Workers' Int'l. Ass'n*, 170 F.3d 279, 282 (2d Cir. 1999). "A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). A party's intent or state of mind does not matter for finding contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act."). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.*

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the

informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id.* (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

## IV. ARGUMENT

Guidepoint satisfies each element required to demonstrate contempt. The Stipulated Injunctions are unambiguous and valid. And, as shown below, Ware and Gohil have not complied with them and have made no diligent effort to do so.

### A. The Orders Are Unambiguous, And Defendants Concede As Much

Defendants cannot legitimately contend that the Stipulated Injunctions are either unclear or ambiguous. To be clear and unambiguous, an injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d at 1352 (quoting *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985)). The Ware and Gohil Stipulated Injunctions do just that. Each identifies, in specific terms, the information Defendants may not use, the work Ware and Gohil may not perform, and the relationships Defendants may not affect. *See* Dkts. 37, 42. Defendants plainly know of them, having negotiated and agreed to each of them.

For example, Paragraph 2 of the Stipulated Injunctions prohibit Ware and Gohil from working in any capacity for Inquire Network and *any company* that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of

primary research content. Paragraph 3 is similarly clear. It prohibits each from soliciting or recruiting any independent contractor or agent of Guidepoint "to accept employment or other engagement with Alan Ware [or Kirang Gohil] or with any other person or company."

Defendants' objections to or disagreements with the Stipulated Injunctions do not render the language of the Stipulated Injunctions vague or ambiguous. *Atl. Recording Corp. v. BCD Music Grp., Inc.*, No. 08 CIV. 5201 (WHP), 2009 WL 1390848, at *8 (S.D.N.Y. May 7, 2009). This is because "it is well established that even if the initial order was overbroad or subject to modification on appeal or reargument, the remedy of the party to whom the order is addressed is to seek such modification, not to violate the order." *Shady Records, Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 64, 70 n.8 (S.D.N.Y. 2004) (citing *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc.*, 445 U.S. 375, 386 (1980)).

### B. Proof Of Ware's And Gohil's Noncompliance Is Clear And Convincing

#### *i. Ware and Gohil Violated the Stipulated Injunctions by Returning to Work for Inquire and DL Software.*

The proof of noncompliance is clear and convincing, and it begins with Ware and Gohil doing exactly what their orders forbid—resuming work with and for Inquire and DL Software. The orders do not merely bar salaried employment, they prohibit Ware and Gohil from working "as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity" for Inquire Network "and any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content." Dkt. 37 ¶ 2; Dkt. 42 ¶ 2. Ware and Gohil violated the Stipulated Injunctions' non-compete paragraph in multiple obvious ways.

*First*, Ware—by Duggal's own admission—consulted with Duggal on plans for Inquire. Duggal confirmed that he and Ware speak daily and discuss "the projects that we think we should

be able to do, about things that we can do for Inquire . . . ." Duggal Dep. 102:5–12. The Stipulated Injunction explicitly prohibits Ware from consulting or advising Inquire Network.

*Second*, Ware returned to the shared DL Software and Inquire office four times in the two weeks after June 10, and he resumed attending alongside Gohil. Once there, Ware was "primarily working with Martin [Shkreli] and Nick [Longo] on projects with DL Software, including financial data products." *Id.* 104:22–107:18. Gohil attended the same office twice a week. *Id*. This was not incidental presence. Duggal testified that Ware and Gohil were using their expertise to make DL Software's financial-data product "more palatable, more compelling, and more attractive" to its investor clients. *Id.* 110:7–19.

DL Software falls within Paragraph 2's scope because it is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content. [redacted]

*Finally*, the creation of RealTime Advisory is merely an attempt to evade the Stipulated Injunction. The entity was and is created and supported financially by Inquire Network and DL Software. For example, it was Inquire Network employees (who were former Guidepoint employees) who drafted, circulated, and discussed the purpose of Realtime Advisory. Tracing the financial relationships, RealTime Advisory appears to be entirely funded by DL Software. They share the same office space, and bank accounts/payment mechanics for services rendered have been set up and are managed by DL Software. And DL Software's co-founder publicly promotes RealTime Advisory's events.

Ware and Gohil's reliance on RealTime Advisory to excuse their contemptuous conduct suffers from several noteworthy flaws. To begin, RealTime Advisory did not exist until June 25, 2026—the day *after* Duggal disclosed Ware and Gohil's post-injunction work. But Ware and Gohil resumed in-office attendance no later than June 10. Second, RealTime Advisory is in the business or intends to enter the business of charging customers fees in exchange for access to an online library of primary research content. According to Ware, he intended to hire a podcast producer for RealTime Advisory, which would be the foundation of the library. *See* **Exhibit 2**, TD_0343866. And based on a PowerPoint entitled "RealTimeAdvisors_Pitch" RealTime Advisory "translates real advisor conversations into ticker-level, tradeable signal." **Exhibit 10**, TD_0343515 at -17. These videos would be distributed via Apple Podcasts, Amazon Audible, and YouTube, among other platforms. In other words, the content generated via these episodes would be available in a library. *Id*. The draft PowerPoint describes it as an advisor-driven, investor-facing market-intelligence business and names Ware, Gohil, and Duggal, alongside Shkreli, as its team. *Id.* at -15.

Courts have rejected parties' attempts to escape an injunction's constraints by forming other entities. In *IME Watchdog, Inc. v. Gelardi*, the court entered a TRO that enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 246 (E.D.N.Y. 2024). To escape their obligations under the TRO and continue competitive activity, defendants directed a friend to create a separate entity that would "operat[e] the same way" as the defendants' enjoined business. *Id.* at 247. The court did not permit defendants to "circumvent the [c]ourt's TRO." *Id.* It held them in contempt, concluding that such conduct was in direct violation of the TRO and awarded plaintiffs attorneys' fees and compensatory damages. *Id.* at 249. Other courts have likewise rejected a party's attempt to avoid compliance by forming a new entity. *See, e.g.*, *Forschner Grp., Inc. v. New Trends, Vrolixs J.-C.*, No. CIV. A. No. B-89-531(JAC), 1994 WL 708129, at *7 (D. Conn. Aug. 10, 1994) ("A corporation cannot avoid the operation of an injunction by reconstituting itself under another name."); *see also People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 70 (2d Cir. 1996) (parties "may not circumvent a valid court order merely by making superficial changes in the organization's name or form, and in appropriate circumstances a court is authorized to enforce its order against a successor of the enjoined organization"). This is because "An injunction would be of little value if its proscriptions could be evaded by the expedient of forming another entity to carry on the enjoined activity." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1354 (Fed. Cir. 1998).

Regardless of whether Gohil or Ware were and are employed by, consulting with, or advising DL or Inquire, the Stipulated Injunctions proscribe working "in any other capacity" for the prohibited businesses. Ware and Gohil violated and are violating the Stipulated Injunctions'

terms through their ongoing engagement with and for Inquire and DL Software and separately their work for RealTime Advisory, a shell entity stood up to create a false layer of separation between Inquire Network and DL Software, entities unambiguously covered by the non-compete restrictions within the Stipulated Injunctions.

*ii. Defendants Violated the Non-Solicit and Non-Interference Paragraphs*

Ware and Gohil's new venture is already reaching into Guidepoint's advisor and client network, and doing so violates two sets of provisions at once. The Ware and Gohil Stipulated Injunctions independently bar them from "directly or indirectly attempting to interfere with, impair, or adversely affect any contractual relationship or business relationship between Guidepoint and any . . . client, customer, expert, advisor or other person or entity engaged by or doing business with Guidepoint." Dkt. 37 ¶ 4; Dkt. 42 ¶ 4. It further prohibits each from soliciting Guidepoint's independent contractors to accept engagement with another company. *Id.* ¶ 3.

*Realtime Advisory has Solicited a Guidepoint Advisor.* On or about August 7, 2026, a Guidepoint moderator learned, while negotiating a rate with an advisor in Guidepoint's network, that the advisor was already working with a competitor the advisor identified as "realtimeadv.com." *See* **Exhibit 11**, 2026.08.07 A. Menzies Email to B. Bandsma. According to this advisor, the advisor did a call with Realtime Advisors. *Id.* This same advisor was engaged by Guidepoint in 2025 to provide advisor services for the TMT group. Declaration of Rutwik Ghodadra ¶ 7. And his name and contact information appeared in the TMT+Fintech Advisors 2025 Excel spreadsheet that Gohil exfiltrated. *See* Compl. ¶¶ 98–99. Engaging Guidepoint's advisors to staff a competing venture is precisely the interference the Ware and Gohil Stipulated Injunctions forbid.

*RealTime Advisory Has Solicited a Former Guidepoint Client.* Ware and Gohil's interference extends to former Guidepoint clients. On June 22, Ware emailed a contract to [redacted]. **Exhibit 9**, TD_0343854. Over the next two days, Ware negotiated the contract with [redacted] including payment, which Ware said was [redacted]. *Id.* In his original email to [redacted], Ware mentioned [redacted] and said [redacted] told Ware to send [redacted] the contract. *Id.* [redacted] founded [redacted] [redacted] received complimentary access to Guidepoint's products during Ware's tenure as a Guidepoint employee. R. Ghodadra Decl. ¶ 5. Guidepoint provided [redacted] with complimentary access to Guidepoint's Insights portal, including teleconferences and roundtables—at Ware's direction. *Id.* [redacted] first received access in March 2024, which continued through Ware's separation from Guidepoint. *Id.* While [redacted] had access, Guidepoint records reflect that he participated in or accessed 65 events, including teleconferences, roundtables, and transcript downloads. *Id.* In other words, the very same individual Ware cultivated while at Guidepoint (and permitted complimentary access to Guidepoint materials) is now being solicited as a RealTime Advisory client at [redacted]—the very relationship Ware cultivated at Guidepoint's expense. Although [redacted] enjoyed complimentary access to Guidepoint's product, Ware now charges [redacted] a premium at RealTime Advisory.

***

Defendants violated the Stipulated Injunction in several ways. And the evidence showing their violations—from a co-defendant's testimony and Defendants' own production—is clear and convincing.

### C. Defendants Made No Diligent Effort to Comply

The final element—diligence—confirms that this is contempt, not a good-faith misunderstanding. The Defendants "have [not] been reasonably diligent and energetic in attempting to accomplish what was ordered." *Powell v. Ward*, 487 F. Supp. 917, 933 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981) (quoting *Aspira of N.Y. v. Board of Education of City of N. Y.*, 423 F. Supp. 647, 653–54 (S.D.N.Y. 1976)). Courts have found that a defendant is "'not reasonably diligent' when he or she ignores the order or takes only superficial actions that 'strain both the language and intent of the order.'" *Medina v. Buther*, No. 15-CV-1955(LAP), 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (quoting *Powell*, 487 F. Supp. at 933–34). A diligent party that believed an order was unclear or too broad would have sought clarification or modification before acting. *See Nat'l Research Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979) ("[T]he alleged ambiguity of an order is no excuse. If an order is ambiguous . . . then a clarification should be sought [b]efore acts are performed in the ambiguous area.").

Defendants did the opposite. They acted first, announced only when challenged that they considered the orders untenable, and then refused to produce the discovery that would reveal what they had done. That is not a diligent effort to comply. It is self-help, and it is exactly the conduct civil contempt seeks to remedy.

### D. The Court Should Hold In Contempt Those In Active Concert With Ware And Gohil

Ware and Gohil did not act alone. As demonstrated above, other parties assisted and facilitated their contemptuous conduct. Those acting in active concert or participation with Ware and Gohil should likewise be found in contempt. "Every injunction issued by a district court automatically forbids others . . . from assisting in a violation of the injunction." *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013). Rule 65(d)(2) provides that an

injunction "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described" in paragraphs (A) or (B). The purpose of this language is to prevent a court from "bind[ing] the world at large through a broadly worded injunction," *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129 (2d Cir. 1979), while preventing defendants from "nullify[ing] a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). "[A]n injunction may bind a non-party who acts on behalf of, or in concert with, a named party." *Forschner Grp., Inc. v. New Trends, Vrolixs J.-C.*, No. CIV. A. No. B-89-531(JAC), 1994 WL 708129, at *7 (D. Conn. Aug. 10, 1994). In order to find one in contempt for being in active concert with a contemnor, the rule requires that they have actual notice and acts in concert with the party. *People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 71 (2d Cir. 1996) ("Thus, by acting in concert with [the enjoined party] and with notice of the 1992 Injunction, the remaining Respondents were also so bound."). Both elements are satisfied.

Here, the other parties in this case—Duggal, Inquire, and DL Software—obtained notice of the Stipulated Injunctions entered against Ware and Gohil as their counsel received them. Indeed, all Defendants in this case share the same counsel. *See Stephens v. Props.*, No. 11-CV-2575 (JG), 2014 WL 11460469, at *2 (E.D.N.Y. Feb. 4, 2014), *aff'd sub nom.*, 589 F. App'x 37 (2d Cir. 2015) ("the prevailing rule is that a party represented by counsel is deemed to have received any notice provided to counsel"). And Duggal confirmed his knowledge of Ware and Gohil's Stipulated Injunction. Duggal Dep. 101:2–10 (mentioning the TRO as a reason he stopped communicating with Ware).

For substantially the same reasons discussed above, Inquire, Duggal, and DL Software have acted in concert with them. Inquire employees created PowerPoints for RealTime Advisory, Duggal worked in concert with Ware to discuss Inquire business, and he is affiliated with RealTime Advisory. *See* **Exhibit 13** (identifying Duggal as an analyst). And DL Software supplied the financial and operational support to create RealTime Advisory and facilitate payments. Each entity and person acted to benefit and assist Gohil and Ware in violating the Stipulated Injunctions. Accordingly, they were in active concert with them and should be held in contempt.

### E. The Court should Impose Contempt Remedies To Coerce Future Compliance and Remedy Past Non-Compliance

District courts enjoy broad discretion to design a remedy that will bring about compliance. *See Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982). "Civil contempt sanctions may serve dual purposes, namely 'to secure future compliance with court orders and to compensate the party that has been wronged.'" *Cordius Trust v. Kummerfeld*, 2009 WL 3416235, at *6 (S.D.N.Y. Oct. 23, 2009) (quoting *Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems*, 369 F.3d 645, 657 (2d Cir. 2004). "It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014).

Guidepoint's requested remedies are straightforward and two-fold: First, Guidepoint asks that the Court find that Defendants' conduct—including the incorporation and operation of RealTime Advisory—violates the Stipulated Injunctions and order them to cease the ongoing misconduct. This includes ceasing operating RealTime Advisory and any affiliation by Ware and Gohil with DL Software and Inquire Network. And the Court should find that those acting in active concert with Ware and Gohil—including Duggal, Inquire, and DL Software—are in contempt.

Second, Guidepoint requests that the Court award Guidepoint its reasonable attorneys' fees, including fees and costs Guidepoint incurred related to the investigation of Defendants' contempt. "It is well settled in this Circuit that costs, including reasonable attorneys' fees, may be awarded to the party who prosecutes a contempt motion as an appropriate compensatory sanction for contumacious behavior." *N.Y. State Nat. Org. for Women v. Terry*, 952 F. Supp. 1033, 1043 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998). A court may award attorneys' fees to a party that successfully prosecuted a contempt motion, particularly if the conduct was willful. *Id.* Here, it was. Ware and Gohil could have easily complied with the Stipulated Injunctions by ceasing coming to the office and not interacting with Duggal about Inquire-related business. Indeed, for a period of time, Ware and Gohil did appear to comply. But things changed on June 10. They returned to Inquire and DL Software's shared office space and worked with DL and its executives. This conduct evinces not only the absence of diligent compliance, but also a callous and willful disregard of the Stipulated Injunctions, necessitating an award of attorneys' fees. *See, e.g.*, *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) ("a district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt."). Guidepoint incurred these expenses because Defendants resumed disputed conduct and forced Guidepoint to seek enforcement of orders Defendants had agreed to follow. This Court held investigative efforts are fully compensable, even when they precede the motion itself. *See Aquavit Pharmacueticals, Inc. v. U-Bio Med, Inc.*, No. 19-CV-3351(VEC)(RWL), 2021 WL 4312579, at *29 (S.D.N.Y. July 16, 2021), *report and recommendation adopted as modified sub nom.* 2021 WL 3862054 (S.D.N.Y. Aug. 30, 2021) (discussing that fees for monitoring and "policing" a contemnor's conduct were "directly related to investigation of Defendants' contempt" and "should not be deducted"); *see also Kosowski v.*

*Nassau Cnty.*, 350 F.R.D. 346, 355 (E.D.N.Y. 2025) (awarding fees for all "work caused by [the] violations," including work "to determine whether [the contemnor's] belated . . . production" was complete). Guidepoint bore these costs for one reason and one reason only: Defendants resumed the conduct they had promised to stop, forcing Guidepoint to expend substantial resources enforcing orders that should have needed no enforcement at all.

## V. CONCLUSION

Guidepoint respectfully requests that the Court hold in contempt Ware and Gohil, as well as Duggal, Inquire Network and DL Software, who acted in active concert with them, restrain the disputed conduct, and award Guidepoint its reasonable fees and costs caused by the violations, together with such other and further relief as the Court deems just and proper.

Dated: August 20, 2026

Respectfully submitted,

*/s/ Justin K. Victor*

Jason D. Burns
Daniel Filor
Shira M. Poliak
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9294
Jason.Burns@gtlaw.com
Filord@gtlaw.com
Shira.Poliak@gtlaw.com

Justin K. Victor (*phv*)
Jacob R. Dean (*phv*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
(678) 553-2100
Victorj@gtlaw.com
Deanj@gtlaw.com

*Counsel for Plaintiff Guidepoint Global, LLC*