**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, John Elliott, Alex Telo, Olyvia Giordano, Martin Shkreli, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-03684-VEC<br><br>Jury Trial Demanded<br><br>**THIRD AMENDED COMPLAINT** |

## THIRD AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

Plaintiff Guidepoint Global, LLC ("Plaintiff," "Guidepoint," or the "Company"), by and through its undersigned counsel, hereby brings the following Third Amended Complaint against Defendants Alan Ware, Sheetal Duggal, Kirang Gohil, and Christiana (aka Tiana) Eng, John Elliott, Alex Telo, Olyvia Giordano, Martin Shkreli, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc. seeking preliminary injunctive relief, permanent injunctive relief, and monetary damages. For purposes of this Complaint, "Individual Defendants" refers to defendants previously employed or engaged by Guidepoint: Alan Ware, Sheetal Duggal, Kirang Gohil, and Christiana (aka Tiana) Eng, John Elliott, Alex Telo, and Olyvia Giordano.

## PRELIMINARY STATEMENT

1. This case is about the theft of an entire business unit and its assets. When Defendants pitched their new venture to Martin Shkreli, they called it exactly what it was: a "plug and play winning team from Guidepoint." What did Defendants pay for this winning team?

Nothing. Defendants never intended to pay Guidepoint a cent. Shkreli wanted an expert network business, so Defendants took Guidepoint's entire Technology, Media, and Telecommunications ("TMT") team, its established network of more than 2,000 advisors, its library of proprietary research transcripts, its internal financial data and forecasting documents, and its operational infrastructure, and plugged them directly into Inquire Network, Inc.—a competing venture that was, from its very first day of operation, built on assets that belonged to Guidepoint—and DL Software, Inc.

2. Guidepoint is a leading expert network and research services firm that spent years building a specialized TMT research team—recruiting talent, cultivating a proprietary network of over 2,000 industry experts, generating hundreds of hours of proprietary expert-call transcripts, and developing the operational infrastructure that made that team an extremely valuable business unit.

3. In September 2025, Shkreli publicly announced on his YouTube channel his intention to build an expert network to compete with incumbents in Guidepoint's industry. Shkreli told his audience that he was "making an expert system that's like everybody else's," and then described, in detail, a business model similar to Guidepoint's, explaining that a customer could "pay and . . . have a call" with an expert, "pay half as much" to share the transcript, or pay less to read a transcript of a call conducted by Shkreli's own firm.

4. Rather than build an expert network through his own lawful efforts, he devised a simpler plan: raid Guidepoint from the inside. Under the pretense of becoming a paying Guidepoint customer, he solicited and obtained Guidepoint's confidential pricing information—information Guidepoint expressly told him was "restricted" and "cannot be shared outside of" his firm. He then

enlisted two Guidepoint insiders—employee Alan Ware and consultant Sheetal Duggal—who were eager to join his venture and share in the proceeds.

5. What followed was a coordinated, premeditated scheme to strip Guidepoint of its most valuable assets and transplant them into a competing business. Over a seven-week period beginning in March 2026 and lasting through May 2026, nearly the entire TMT team resigned in rapid succession and joined Inquire Network, Inc.—a new venture incorporated by Duggal and financed by Shkreli's company, DL Software, Inc. Before walking out the door, the departing employees and consultants emailed themselves or downloaded thousands of pages of Guidepoint's most sensitive proprietary information, including: more than one hundred confidential expert-call transcripts that constitute the very product Guidepoint sells to clients; a spreadsheet identifying over 2,000 Guidepoint Advisors, complete with Guidepoint's unique internal Advisor identifiers; comprehensive pipeline data capturing Guidepoint's planned research calls, expert candidates, and client-facing strategy; and detailed compensation and performance data for the entire TMT team.

6. Defendants were not subtle about their intentions, and the theft was not by mistake. Ware instructed Gohil to "download some tmt stuff that we may need if the cat gets out of the bag." Duggal sent Shkreli a pitch deck titled, "Founding Team: Plug and Play Winning Team from Guidepoint," openly advertising that the new venture would be staffed by Guidepoint's own people using Guidepoint's own information. The Inquire Network pitch deck's financial projections were even expressly labeled "Guidepoint TMT Financials"—because that is exactly what they were. And Shkreli, upon receiving Guidepoint's demand that one of the departing employees honor his contractual obligations, directed him: "Do not respond."

7. DL Software and its employees received Guidepoint's stolen advisor list, offered to import those advisors into a competing application, and discussed triggering mass registration

emails to Guidepoint's proprietary expert network. DL Software's own conference room appeared as a participant in planning calls for the competing venture, calls that Ware and Eng joined while still employed by Guidepoint.

8. And the dissemination of Guidepoint's information was widespread. According to Christiana Eng, the misappropriated Advisor list had been "shared to whole inquire team," and Inquire had "been using that one."

9. By June 2026, Inquire Network was operational, had completed over 100 expert transcripts in its first month, and had launched research products in the same technology sectors Guidepoint's TMT team covered. Its leadership team consisted entirely of former Guidepoint personnel and independent contractors.

10. Ware, Gohil, Eng, Duggal, Inquire and DL Software all agreed to various versions of Consent Stipulated Injunctions. *See* Dkts. 37, 41, 42, 46, 76.

11. After discovery in this litigation began, it became clear that other former Guidepoint employees—subject to the exact same restrictive covenants—have been working for Inquire or DL in very senior roles and frequently have interacted with Guidepoint's advisors. These include Telo, Elliott, and Giordano, all of whom work for Inquire.

12. Despite agreeing to Consent Stipulated Injunctions, Ware and Gohil appear to have violated them. Duggal testified that, despite the injunctions, Ware and Gohil have resumed coming to the office twice weekly since June 10. Duggal and Ware have spoken nearly daily since June 10, having "conversations about the projects that we think we should be able to do, about things that ***we can do for Inquire*** . . . ." Ware and Gohil have formed a new business (with DL Software's assistance)—called RealTime Advisory, Inc.—that provides expert calls.

13. Guidepoint brings this action to enforce its contractual rights, protect its trade secrets, and obtain the injunctive and monetary relief necessary to remedy Defendants' misconduct. It sues its former employees and consultants who, in breach of their respective contractual and fiduciary obligations, launched Inquire Network and misappropriated Guidepoint's confidential and proprietary information in furtherance of that new venture. It also sues DL Software Inc., which knowingly received Guidepoint's trade secrets and provided the technical infrastructure for the competing venture and Martin Shkreli, DL Software's owner, who spearheaded the theft of Guidepoint's property to enrich himself.

14. The threat is immediate and ongoing. Without this Court's intervention to grant narrow injunctive relief, Inquire Network, DL Software, and the Individual Defendants will capitalize on their unlawful conduct by building a competing entity using Guidepoint's proprietary and confidential information. Guidepoint faces irreparable harm from the exploitation of its own proprietary information by its former employees, who are violating their agreements with Guidepoint in order to compete against it.

## PARTIES

15. Plaintiff Guidepoint Global, LLC is a limited liability company organized under the laws of the State of New York.

16. Defendant Alan Ware is a resident of the state of Connecticut. He was employed by Guidepoint until April 22, 2026. Upon information and belief, Ware resides at 16 Shoreview Lane, Danbury, CT 06811.

17. Defendant Sheetal Duggal is a resident of the state of New York. He was a contractor for Guidepoint until April 14, 2026. Upon information and belief, Duggal resides at 217 W 57th St. #43C New York, NY 10019.

18. Defendant Kirang Gohil is a resident of the state of New Jersey. He was employed by Guidepoint until April 22, 2026. Upon information and belief, Gohil resides at 6 Jacobs Landing Secaucus, NJ 07094.

19. Defendant Christiana (aka Tiana) Eng is a resident of the state of New Jersey. She was employed by Guidepoint until March 31, 2026. Upon information and belief, Eng resides at 17 Woodmere Court Old Bridge, NJ 08857.

20. Defendant Alex Telo is a resident of the state of New York. He was employed by Guidepoint as a TMT Associate until April 22, 2026. Upon information and belief, Telo resides at 421 East 80th Street, New York, NY 10075.

21. Defendant John David Elliott is a resident of the state of Missouri. He was engaged by Guidepoint as a TMT Consultant until April 24, 2026. Upon information and belief, Elliott resides at 4804 Jarboe Street, Kansas City, MO 64112.

22. Defendant Olyvia Giordano is a resident of the state of New York. She was employed by Guidepoint as an Operations Coordinator until May 19, 2026. Upon information and belief, Giordano resides at 85 Herbert Street, Brooklyn, NY 11222.

23. Defendant Martin Shkreli is a resident of the state of New York. Shkreli is a founder of Defendant DL Software, Inc., which financed the competing venture that became Inquire Network. Upon information and belief, Shkreli resides at 245 E 40th Street, Apartment 18 H, New York, NY 10016-1730.

24. Defendant Inquire Network, Inc. is a corporation incorporated under the laws of the state of Delaware with its principal place of business in the state of New York. Inquire Network, Inc.'s registered agent is located at 131 Continental Drive, Suite 305, Newark, Delaware, 19713.

25. Defendant DL Software, Inc. is a corporation incorporated under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in the state of New York. DL Software, Inc.'s registered agent is located at 251 Little Falls Drive, Wilmington, Delaware 19808.

26. Defendant RealTime Advisory, Inc. is a corporation incorporated under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in the state of New York. RealTime Advisory, Inc.'s registered agent is located at 131 Continental Drive, Suite 305, Newark, Delaware, 19713.

## JURISDICTION AND VENUE

27. This Court maintains subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Guidepoint asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA").

28. This Court has supplemental jurisdiction over Guidepoint's pendent state law claims under 28 U.S.C. § 1367. These pendent state law claims derive from a common nucleus of operative facts and are so related to the federal law claims that they form part of the same case or controversy.

29. Venue in this district is appropriate for several reasons. First, in their respective agreements with Guidepoint, the Individual Defendants irrevocably and unconditionally consented to the exclusive jurisdiction of the federal courts in the City of New York for any action arising from the respective agreements. Second, a substantial part of the events or omissions giving rise to these claims occurred in this district. Third, according to its purported website, Inquire Network's sole physical location is within this district and, according to its purported website and LinkedIn profile, DL Software's sole physical location is within this district as well.

## FACTUAL ALLEGATIONS

**A. Plaintiff Guidepoint Global, LLC**

30. Founded in 2003 and headquartered in New York City, Guidepoint is a leading global expert network and research services firm that connects institutional investors, consultants, and corporate clients with industry experts to gain in-depth insights and market intelligence to support strategic, operational, and investment decisions. It serves as an intermediary, connecting professionals seeking industry expertise with advisors possessing specialized knowledge.

31. In a separate business unit from its expert network, the Insights business unit, Guidepoint generates content that it provides to its clients through live teleconferences in which Guidepoint moderators conduct interviews with experts in Guidepoint's network. Guidepoint also offers as a product to its clients a library of transcripts of such teleconferences. Unique among expert networks, Guidepoint's moderators are almost exclusively former buy-side or sell-side analysts who are able to anticipate and develop topics that are important to Guidepoint's institutional clients. For that reason, while some other expert networks also generate content, Guidepoint is known for the high quality of its content, which is largely due to the quality of the moderators who choose the teleconference topics, choose the experts, and conduct the interviews.

32. Guidepoint's business is built on long-standing relationships with its clients, advisors, and moderators, as well as on proprietary systems and processes for sourcing, onboarding, pricing, and servicing those relationships.

33. Guidepoint's competitive position depends on protecting its confidential client information, internal processes, strategies, and industry knowhow from disclosure to competitors.

34. Guidepoint operates globally and provides services to a global client base. Across four continents, it maintains 19 global offices; employs 1,700+ employees; provides services to

more than 5,000 client organizations; and offers access to Guidepoint's experts who have joined its network ("Advisors") spanning more than 300 industries.

35. In the Americas, Guidepoint maintains offices in Hawaii, California, Arizona, Massachusetts, New York, and Toronto.

**B. Guidepoint's Confidentiality Policies and Protection of its Confidential Information and Trade Secrets**

36. Guidepoint entrusts certain employees, particularly senior executives like Ware, with access to confidential, proprietary, and trade secret information essential to its business ("Trade Secrets"). Such Trade Secrets include, but are not limited to:

A. Client-specific pricing, discounting, and contract structures;

B. Client onboarding processes and compliance requirements;

C. Internal training materials and employee metrics and compensation information;

D. Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

E. Financial projections and growth metrics based on Guidepoint's data;

F. Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

G. Knowledge of client identities, preferences, sensitivities, and feedback.

37. Guidepoint maintains policies and contractual protections requiring employees to safeguard this confidential information and prohibiting unauthorized use, disclosure, or retention of such information during and after employment.

38. Access to Guidepoint's Trade Secrets is limited and role-based. Guidepoint does not make its confidential information available to its workforce at large; instead, it restricts access

to non-public systems, documents, and databases to those personnel who have a legitimate business need for it.

39. As part of these protections, Guidepoint requires employees to access its internal systems through company-issued devices and restricts access to non-public systems, documents, and databases to authorized personnel only.

40. Guidepoint requires its employees to use multi-factor authentication to access much of its databases and requires its employees to access many of its databases only from Guidepoint-owned and Guidepoint-controlled devices.

41. Moreover, Guidepoint requires its employees and consultants to agree to and acknowledge strict confidentiality policies governing their use of and access to Guidepoint's confidential and trade secret information.

42. Guidepoint further protects its confidential information through written confidentiality and restrictive covenant agreements, which expressly prohibit employees from misusing Guidepoint's proprietary information or using such information to benefit themselves or a competitor.

43. Guidepoint's confidential information derives independent economic value from not being generally known or readily ascertainable by competitors and could be used to unfairly compete against Guidepoint if disclosed.

**C. The Individual Defendants' Employment and Consultancy at Guidepoint**

44. The TMT group is a specialized research and content team that produces industry-specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on TMT topics.

45. Guidepoint hired Ware in March 2023. Ware's original position at Guidepoint was a "Strategist" on Guidepoint's Technology, Media, and Telecommunications ("TMT") team within the Insights business unit.

46. During his tenure, Ware rose through the ranks to Director of Research and Global Head of the TMT team. Ware was among Guidepoint's most senior team members. He oversaw Guidepoint's entire Insights TMT team such that all employees at Guidepoint who generated TMT content reported to Ware.

47. Duggal began working as a Guidepoint consultant on or about August 1, 2023.

48. Gohil began working as a Guidepoint consultant on or about March 9, 2020. He started working as an employee in the role of TMT Strategist, Guidepoint Insights, on or about January 1, 2024.

49. Eng began working as a Guidepoint employee on or about February 14, 2022. By the time she resigned, on or about March 31, 2026, her title was Operations Team Lead.

50. Telo began working as a Guidepoint employee on or about November 29, 2021, in the role of Research Associate, Guidepoint Insights, and, following a June 1, 2024 promotion, held the title of Associate, TMT, Guidepoint Insights, until his resignation on or about April 22, 2026.

51. Elliott began working as a Guidepoint consultant on or about July 29, 2022, and served as a TMT Consultant until his engagement ended on or about April 24, 2026.

52. Giordano began working as a Guidepoint employee on or about March 24, 2025, and held the title of Operations Coordinator, Guidepoint Insights, until her separation on or about May 19, 2026.

53. Content generated by Ware and his TMT team was marketed to clients in all of Guidepoint's client segments, many of which operate nationally or globally.

54. The Individual Defendants were also provided access to Guidepoint's Trade Secrets, including information concerning experts in Guidepoint's network, client identities, preferences and feedback, expert recruiting and client sales and marketing strategies, internal training materials, teleconference operations and client attendance and other non-public strategic intelligence.

**D. Ware, Gohil, Eng, Telo, and Giordano Execute Agreements with Guidepoint**

55. As a condition of their employment or continued employment, Ware, Eng, Gohil, Telo, and Giordano executed Employment Agreements containing identical confidentiality, non-interference, and employee non-solicitation provisions.

56. On or about March 21, 2023, Ware executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("2023 Agreement" attached hereto as **Exhibit 1**).

57. On August 2, 2023, Ware executed an amendment to the 2023 Agreement, acknowledging and reaffirming his post-employment obligations ("Ware Amendment"). Together, the 2023 Agreement and Amendment constitute Ware's Employment Agreement ("Ware Employment Agreement" attached hereto as **Exhibit 2**). Ware and Guidepoint entered into the Amendment to "further define and set forth the terms and conditions of the employment of [Ware] by [Guidepoint]." (*Id.* at 1.)

58. On or about April 1, 2023, Ware signed an Equity Incentive Agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Ware Equity Incentive Agreement" attached hereto as **Exhibit 3**).

59. As a condition of his employment, on or about January 1, 2024, Gohil executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Gohil Employment Agreement" attached hereto as **Exhibit 4**).

60. On or about April 1, 2024, Gohil signed an Equity Incentive Agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Gohil Equity Incentive Agreement" attached hereto as **Exhibit 5**).

61. As a condition of her employment, on or about February 14, 2022, Eng executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint ("Eng 2022 Employment Agreement" attached hereto as **Exhibit 6**).

62. On August 2, 2023, Eng executed an amendment to the Eng 2022 Agreement, acknowledging and reaffirming her post-employment obligations ("Eng Amendment"). Together, the 2023 Agreement and Amendment constitute Eng's Employment Agreement ("Eng Employment Agreement" attached hereto as **Exhibit 7**). Eng and Guidepoint entered into the Amendment to "further define and set forth the terms and conditions of the employment of [Eng] by [Guidepoint]." (*Id.* at 1.)

63. On or about November 29, 2021, Telo executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint, which he later reaffirmed and expanded through a 2023 Amendment dated August 2, 2023 (collectively, the "Telo Employment Agreement," attached hereto as **Exhibit 8**).

64. On or about March 24, 2025, Giordano executed an employment agreement containing confidentiality, non-competition, non-solicitation, and non-interference

covenants in favor of Guidepoint (the "Giordano Employment Agreement," attached hereto as **Exhibit 9**).

65. Section 4(a) of the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement contains a non-competition provision that prohibits Ware, Eng, Gohil, Telo, and Giordano from working or providing services for certain "Competing Businesses" for a limited period of six months following the termination of their employment (the "EA Non-Competition Provision"). The Employment Agreement defined "Competing Businesses" to specifically identify certain entities Guidepoint deemed directly competitive and any "other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content."

66. Section 4(b) of the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement describes Ware's, Eng's, and Gohil's employee non-solicitation obligations (the "EA Employee Non-Solicitation Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee will not, directly or indirectly, solicit or recruit any employee, independent contractor or agent of the Company to resign from the Company or to accept employment or other engagement with Employee or with any other person or company.

67. Section 4(c) of the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement describes their non-interference obligations (the "Non-Interference Provision"). It states that:

> During the Employee's employment and for a two (2) year period thereafter, Employee shall not, directly or indirectly, attempt to interfere with, impair, or adversely affect any contractual relationship or business relationship between the Company and any client, customer, expert, advisor or other person or entity engaged by or doing business with the Company, including without limitation engaging with any business that is a client of the Company and with which Employee had contact through Employee's work at the Company, on any matter that relates to the Company.

68. Section 5 of the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement prohibits them from disclosing, using, or retaining Guidepoint's proprietary information (the "Confidentiality Provision"), both during and after their employment.

69. The "Disclosure and Use" section the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement provides that:

> At all times during Employee's employment **and thereafter**, Employee will (i) hold Proprietary Information in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any Proprietary Information, (iii) **not access or use for personal benefit or for the benefit of anyone other than the Company any Proprietary Information**, and (iv) not copy any documents, records, files or other media containing Proprietary Information **or remove any such documents, records files or media from the premises or control of the Company**, except, in each case, as required in connection with Employee's authorized employment duties to the Company or with the prior express authorization of an officer of the Company.

(emphasis added).

70. The "Assignment and Return" provision in the Ware, Eng, Gohil, Telo, and Giordano's Employment Agreement provides that:

> Employee hereby irrevocably assigns to the Company any rights Employee may have or acquire in such Proprietary Information and recognizes that all Proprietary Information is and will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Employee shall return to the Company all Proprietary Information then in Employee's possession.

(*Id*. § 5(c).)

71. The Ware, Eng, Gohil, Telo, and Giordano Employment Agreement defines "Proprietary Information" as:

> [A]ny and all confidential and/or proprietary knowledge, data or information of the Company and its affiliates (the "Company Group") and/or the Company Group's customers, clients, vendors, employees, agents and contractors. By way of illustration but not limitation, Proprietary Information includes (i) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries,

> developments, designs, techniques and research; (ii) information regarding the Company Group's organization or structure, plans for research and development, new products or services, marketing, advertising, and other business plans, budgets and financial data, licenses, pricing and costs, and suppliers; (iii) the identity of current and prospective clients of the Company Group and the Company Group's current and prospective contracts, policies, standards, procedures and practices; (iv) any and all information regarding the experts contracted by the Company Group, the Company Group's business model incorporating the use of such experts and the technology and trade secrets in connection with the utilization of such business model; and (v) information regarding the skills and compensation of the Company Group's employees. Proprietary Information also shall include any information that is provided to or obtained by the Company Group from third parties and is subject to obligations of confidentiality.

(*Id*. § 5(a).)

72. Ware, Eng, Gohil, Telo, and Giordano also agreed that each:

> carefully considered the nature and extent of these restrictions, and acknowledges that the same are reasonable in time and territory, are designed to eliminate competition that would otherwise be unfair to the Company, do not stifle the inherent skill and experience of Employee, would not operate as a bar to Employee's means of support, are fully required to protect the legitimate interests of the Company, and do not confer a benefit upon the Company disproportionate to the detriment to Employee. Employee further acknowledges that the Company's business is international in scope and that therefore, the global scope of the restrictions imposed by this Agreement is appropriate.

*Id.* at § 4(d).

### E. Duggal and Elliott Execute Consultant Agreements with Guidepoint

73. On or about August 1, 2023, Duggal signed an Independent Consultant Agreement with Guidepoint containing confidentiality provisions in favor of Guidepoint ("Duggal Independent Consultant Agreement" attached hereto as **Exhibit 10**). It states that:

> At all times during the term of this Agreement and thereafter, Consultant will (i) hold the Company's Proprietary Information (defined below) in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any of the Company's Proprietary Information, and (iii) not access, or use for personal benefit, or for the benefit of anyone other than the Company, any of the Company Group's Proprietary Information, or copy any documents, records, files or other media containing Proprietary Information, or remove any such documents, records, files or media from the premises or control of the Company, except, in each case, as

> required in connection with Consultant's authorized duties to the Company, or with the prior express authorization of an officer of the Company. Consultant hereby irrevocably assigns to the Company any rights Consultant may have or acquire in such Proprietary Information and recognizes that all Proprietary Information will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Consultant shall return to the Company all Proprietary Information then in his or her possession.

**Exhibit 10** § 5(a).

74. The Duggal Independent Consultant Agreement's confidentiality provision survives the agreement's termination. *Id.* § 7.

75. On or about July 29, 2022, Elliott signed an Independent Consultant Agreement with Guidepoint containing confidentiality provisions in favor of Guidepoint, in substantially the same form as the Duggal Independent Consultant Agreement ("Elliott Independent Consultant Agreement" attached hereto as **Exhibit 11**).

76. Like the Duggal Independent Consultant Agreement, Section 5 of the Elliott Independent Consultant Agreement prohibits Elliott from disclosing, using, or retaining Guidepoint's Proprietary Information and required him to return all such information upon termination, and that confidentiality obligation survives the agreement's termination pursuant to Section 7.

**F. DL Software**

77. DL Software was co-founded by Martin Shkreli.

78. DL Software "owns and operates the Godel Terminal . . . ." https://www.dl.software/news.

79. According to Godel Terminal's LinkedIn page, "Godel Terminal is a next-generation market data terminal for financial professionals. Godel Terminal provides users with

real time prices, news, data, and networking." (As a reminder, Guidepoint is a leading global expert network firm.)




80. On January 5, 2026, Ware received a LinkedIn invitation to connect from Shkreli.




81. As detailed below, DL Software received Guidepoint's misappropriated Advisor data through Daniel Dietzel, supplied the engineering and infrastructure that powered Inquire

Network's competing platform, and acted in concert with the Individual Defendants and Inquire Network to build a business on assets that belonged to Guidepoint.

82. Dietzel's address is fatcat@dl.software. According to LinkedIn, Dietzel works as an Engineering Lead – Frontend for Godel Terminal. Godel Terminal purports to be "a professional web-based financial terminal software offering comprehensive financial and investment data." Dietzel's actions described herein were, on information and belief, done in furtherance of either DL Software or Inquire Network and on their behalf.

83. DL Software and Inquire Network signed a Letter of Intent on or about March 5, 2026. [redacted] A true and correct copy of an excerpt of the Letter of Intent is attached hereto as **Exhibit 12**, DL_000001-11.

84. DL Software provides the engineering and infrastructure resources that power Inquire Network's platform.

85. Shkreli's ambition to enter the expert network market predates the Individual Defendants' resignations by months. On September 11, 2025, Shkreli posted on his X account that

he was looking to "acquire and/or build [an] expert network," noting an interest in developing a platform similar to Guidepoint.




86. On or about September 20, 2025, Shkreli posted a video to his YouTube channel, "Shkreli Planet," titled "Martin Shkreli Speaks On Expert Networks On Godel Terminal." In it, Shkreli announced that "we're making an expert system that's like everybody else's," explaining that a user could "click a button and request an expert."

87. In the same video, Shkreli described the identical business model Guidepoint uses. He explained that there are "basically two ways"—in fact, three—to "do the expert calls": "you pay and you have a call with them," or "you pay half as much and I show the transcript of the call to everybody," or "I pay and you see a transcript of me and the expert . . . for a lot less." Shkreli stated that this is "kind of the way most the business model works," and that "obviously we can sell that expert services to another client."

88. In an October 2, 2025 video titled, "Martin Shkreli: 'Gödel Terminal Is Worth Hundreds of Millions of Dollars,'" Shkreli told viewers that his "company's now worth hundreds

of millions of dollars" and that he hoped "by next year, we'll be a billion dollar company." He added that he had "two or three very large hedge funds that are interested." *See* https://youtu.be/EFi5jyx2jKQ?si=D5yzJcYjwj6iN4zM

89. In or about late 2025, Shkreli and a Guidepoint employee interacted, during which Shkreli purported to be a prospective client. A Guidepoint business-development representative met with Shkreli and sent him Guidepoint's pricing sheet. Guidepoint's representative expressly advised Shkreli that "insights from Guidepoint experts are contractually restricted and cannot be shared outside of" his firm.

89. Shkreli put what he learned to immediate use. On November 8, 2025, Duggal sent Shkreli a text message stating: "Hey man, I put this together. Might help frame the pitch. Still a work in progress and I am sure you can offer a lot of key insights." Attached was a draft pitch deck for an entity called "NewCo," which upon information and belief, ultimately became Inquire.

**9173592949, Martin Shkreli**

<9173592949> ▶ 11/8/2025, 1:28 PM

Hey man, I put this together. Might help frame the pitch. Still a work in progress and I am sure you can offer a lot of key insights

*Attachment: ~_Library_SMS_Attachments_cc_12_8A743195-3FA2-40E4-B2E8-B60FA0A1F3B8_NewCo 11 08 25.pdf (528 KB)*

Receipts • Martin Shkreli <6466838875> [R:11/8/2025, 1:45 PM]

(TD_0384894-95.)

90. Less than a week later, on November 13, 2025, Duggal sent Shkreli another text message: "Great chatting. Updated deck with figures from Guidepoint," attaching a revised deck. The deck included a page titled, "Founding Team: Plug and Play Winning Team from Guidepoint," openly touting that the new venture would take key Guidepoint employees with it.

[redacted]

(TD_0384979).

91. On or about January 21, 2026, while still engaged as a Guidepoint consultant, Duggal transmitted the updated pitch deck for the competing venture to DL Software. Using his personal email account, Duggal sent an email to Dietzel, copying Shkreli, other DL Software personnel, and Ware and Gohil, stating: "the name of the Company will be Inquire. Please find updated deck." (TD_0342934-71.) Attached was the Inquire Network pitch deck.




92. The deck Duggal transmitted was built using Guidepoint's confidential and proprietary information. It contains a "Financial Forecasts" page that expressly memorializes its source as "Guidepoint TMT Financials" and reproduces Guidepoint's confidential TMT financial and performance data.

93. No public source contains this information, and Guidepoint closely guards its financial information. The subscription counts, per-unit pricing, event volumes, and revenue and EBITDA figures reflected on this slide are Guidepoint's confidential business information, known only to Guidepoint and the Individual Defendants who exfiltrated it. The only way Defendants could have populated this slide was by using Guidepoint's confidential information.

94. The deck likewise reproduces Guidepoint's confidential internal performance metrics, including a slide charting Guidepoint's Consultation Unit growth ("TMT Insights grew 120% since 2022") and a slide reproducing Guidepoint's event RSVP growth data.

95. Shkreli did not merely inspire this venture; he directed it. In a February 27, 2026 text exchange, one of the Individual Defendants wrote that they should "build the library martin wants"—referring, upon information and belief, to the library of Guidepoint expert-call transcripts they exfiltrated. (TD_0376814-16.)

96. Shkreli knew that Guidepoint conditions access to its expert content and network on contractual confidentiality obligations, having been so advised when he solicited Guidepoint as a purported client. He further knew, or had every reason to know, that Ware, Gohil, Duggal, and the other Individual Defendants were bound by confidentiality, non-competition, non-solicitation, and non-interference obligations to Guidepoint.

97. Shkreli's direction extended to obstructing Guidepoint's efforts to stop him. On or about May 6, 2026, after Guidepoint sent Telo a letter reminding him of his ongoing contractual obligations, his duty to preserve information, and demanding a response, Telo forwarded that letter to Shkreli. Shkreli responded by directing Telo not to comply, writing: "Do not respond. They should not be sending you any kind of letter and we can get a lawyer to respond (in a very nasty way) on your behalf." **Exhibit 13**, TD_0001518.

| | |
|---|---|
| **From:** | Martin Shkreli <martin@dl.software> |
| **Sent:** | Thur 5/7/2026 3:08:46 AM (UTC) |
| **To:** | Alex Telo <alextelo4@gmail.com> |
| **Subject:** | Re: Guidepoint Global, LLC v. Alan Ware – Reminder of Ongoing Contractual Obligations, Duty to Preserve Information, and Demand for Response |

Do not respond. They should not be sending you any kind of letter and we can get a lawyer to respond (in a very nasty way) on your behalf.

On Wed, May 6, 2026 at 9:36 PM Alex Telo <alextelo4@gmail.com> wrote:

### G. Ware Emails Himself Guidepoint's Confidential, Proprietary, and Trade Secret Information to Compete With Guidepoint And Directs Gohil To Exfiltrate Data

98. Ware also improperly emailed himself Guidepoint's proprietary, confidential, and Trade Secret information. Ware did so because he was planning and preparing to compete with Guidepoint.

99. Beginning in November 2025, Ware began emailing Guidepoint documents to his personal email address.

100. On November 12, 2025, Ware forwarded an email from Alex Telo, a TMT team member, from his work email to his personal email. Telo had sent Ware an email that day with the subject line "PDFs."

**From:** Alan Ware <aware@guidepoint.com>
**Sent:** Wednesday, November 12, 2025 3:57 PM EST
**To:** Alan Ware <ajwareny@gmail.com>
**Subject:** Fw: PDFs
**Attachments:** Jared August.pdf, Andrew August.pdf

Get Outlook for iOS
**From:** Alex Telo <atelo@guidepoint.com>
**Sent:** Wednesday, November 12, 2025 3:52:13 PM
**To:** Alan Ware <aware@guidepoint.com>
**Subject:** PDFs

**Alex Telo** | Associate - TMT, Guidepoint Insights p: +1 212 842 6663

**Alex Telo** | Associate - TMT, Guidepoint Insights
p: +1 212 842 6663

101. Attached to the email were two of Guidepoint's transcripts of meetings Ware moderated with two subject matter experts in August 2025. The documents are both stamped "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

102. Several days later, on November 18, 2025, Ware forwarded an email from Rahul Motwani, a Research Associate on the TMT team, from his work email to his personal email address. Motwani had sent Ware an email that day with a transcript of a meeting Guidepoint

moderated with a subject matter expert from September 4, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

103. On December 8, 2025, Ware texted Gohil and Duggal, instructing Gohil to "download some tmt stuff that we may need if the cat gets out of the bag." In the same exchange, Duggal cautioned that he would tell others "it's confidential for now," and Ware confirmed he was "[s]ending to personal email." (TD_0363063-69.)

104. On January 6, 2026, Ware forwarded another email from Telo to his personal email address. Telo had sent Ware an email that day with a Guidepoint call transcript with an expert, this one dated October 14, 2025. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

| | |
|---|---|
| **From:** | Alan Ware <aware@guidepoint.com> |
| **Sent:** | Tuesday, January 6, 2026 4:36 PM EST |
| **To:** | Alan Ware <ajwareny@gmail.com> |
| **Subject:** | Fw: Sid Oct Call |
| **Attachments:** | 6c08c2fc-fe65-43e6-a4a5-a03611f0b48e.pdf |

Get Outlook for iOS
**From:** Alex Telo <atelo@guidepoint.com>
**Sent:** Tuesday, January 6, 2026 4:02:08 PM
**To:** Alan Ware <aware@guidepoint.com>
**Subject:** Sid Oct Call

**Alex Telo** | Associate - TMT, Guidepoint Insights p: +1 212 842 6663

**Alex Telo** | Associate - TMT, Guidepoint Insights
p: +1 212 842 6663

105. On January 13, 2026, Ware forwarded another email to his personal email address. Telo had sent Ware an email that day with a transcript, also dated October 14, 2025, from a call Ware had with a Guidepoint industry consultant. The document had the same "CONFIDENTIAL"

and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

106. On January 31, 2026, Ware forwarded to his personal email an Excel spreadsheet that included TMT team members' individual performance metrics and salaries ("Team Metrics"). This Excel spreadsheet listed the (1) salary; (2) bonus amount; (3) key performance metrics for the entire TMT group; and (4) revenue/financial data from the TMT group.

107. On February 9, 2026, Ware forwarded to himself another email with two more transcripts, dated November 6 and 7, 2025, and from calls Ware moderated with industry experts. Both documents had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

108. On April 15, 2026, Ware forwarded himself another email with a transcript, dated January 9, 2026, and from a call Ware moderated with an expert. The document had the same "CONFIDENTIAL" and "THIS TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES" stamps.

109. No legitimate business reason existed for Ware to email to his personal email address these transcripts, which Guidepoint considers proprietary.

110. No legitimate business reason existed for Ware to email to his personal email address the TMT group members' compensation structure and TMT team revenue metrics.

111. Ware forwarded himself this information to use the confidential, proprietary, and Trade Secret information they contain to compete with Guidepoint at Inquire Network.

112. On April 18, 2026—a Saturday—Ware emailed to his personal email address four attachments that identified names of attendees at certain dinners Guidepoint hosted for a particular client months or years prior. These lists contain the names of both experts and clients that could

be helpful to Ware in starting a new business. Ware had no legitimate reason to email himself these four attachments shortly before he separated from employment.

113. Two minutes later that same day—Saturday, April 18—Ware emailed himself Guidepoint's New Hire Orientation-2023. The document is labelled "Confidential & Proprietary." It includes a stamp that states: "This document is for the private and confidential use of the addressee exclusively. This document may not be circulated, published or in any other manner distributed without the express written consent of Guidepoint Global, LLC." As this occurred less than a week before his departure from Guidepoint, Ware had no legitimate purpose in emailing a Guidepoint new hire.

114. The best evidence of Defendants' misconduct is their contemporaneous communications. Ware and Gohil continued to assemble Guidepoint's advisor data for the venture well into the new year. In a January 2026 text exchange, Ware asked Gohil whether he was "100% sure" he "got the advisor stuff from last year." Gohil confirmed that he had and sent Ware a link to a folder containing that Guidepoint advisor information. (TD_0363224-26.)

115. On March 27, 2026—before the resignations became effective—Ware emailed Gohil and asked him to provide Daniel Dietzel "with access to the file of Advisors we have[.]" A true and correct copy of the email is attached hereto as **Exhibit 14,** TD_0341665. Ware sent this email to Gohil, Eng, and Dietzel.

116. The "file" of Advisors—with the filename "TMT+Fintech Advisors 2025.xlsx"—did not belong to the Individual Defendants: it belonged to Guidepoint. The file contained a list of more than 2,000 Advisors that were recruited by Guidepoint and are experts in Guidepoint's proprietary network. The file contains a column with numbers associated with each Advisor. Those numbers are unique expert identifiers that Guidepoint has assigned to each Advisor in its network

that confirm this list belongs to Guidepoint and was created from proprietary Guidepoint data. The filename itself references "TMT"—Guidepoint's internal designation for the very team the Individual Defendants were staffed on. And the file contains unique AdvisorID numbers Guidepoint assigns to each Advisor. The presence of these identifiers in a file transmitted by individuals who Dietzel knew were currently employed at Guidepoint confirmed that the file originated from Guidepoint's internal systems—not from any publicly available source.

117. Mr. Dietzel has a role with both entities because Inquire Network has an email address for fatcat as well.

118. On April 6, 2026, Eng apparently organized a call from her tiana@inquire.network email address. Ware appears to have joined using his Guidepoint account (aware@guidepoint.com). Dietzel appears to have joined from fatcat@inquire.network. The call lasted approximately 12 minutes.

119. On April 20, 2026, Eng organized another video call. Upon information and belief, Ware joined using his Guidepoint credentials. Dietzel seems to have joined from his inquire.network address. A conference room identified as "DL Conference Room" also joined the call. This call lasted approximately 25 minutes.

| | |
|---|---|
| **Subject:** | Meeting (RecurringMeeting)/Thread Id: 19:meeting_NjEyMmYwNjgtM2I4MS00ODVlLThkOWMtMWJhMWM4ZGNl M2My@thread.v2/Communication Id: 9dd0a183-ffda-4852-8b25-4ee3eb4a255a/Daniel Dietzel,Alan Ware,d21c50bb9bdc97f0,DL Conference Room |
| **Start:** | Monday, April 20, 2026 12:02 PM EDT |
| **End:** | Monday, April 20, 2026 12:27 PM EDT |
| **Show Time As:** | Busy |
| **Organizer:** | Christiana Eng |
| **Attendees:** | Daniel Dietzel, Alan Ware, d21c50bb9bdc97f0, DL Conference Room |

Start Time (UTC): 4/20/2026 4:02:53 PM
End Time (UTC): 4/20/2026 4:27:59 PM
Duration: 00:25:05.7790946

[4/20/2026 4:03:42 PM (UTC)] fatcat@inquire.network joined.
[4/20/2026 4:05:41 PM (UTC)] fatcat@inquire.network left.
[4/20/2026 4:02:53 PM (UTC)] aware@guidepoint.com joined.
[4/20/2026 4:03:39 PM (UTC)] aware@guidepoint.com left.
[4/20/2026 4:06:08 PM (UTC)] fatcat@inquire.network joined.
[4/20/2026 4:27:54 PM (UTC)] fatcat@inquire.network left.
[4/20/2026 4:05:23 PM (UTC)] d21c50bb9bdc97f0 joined.
[4/20/2026 4:27:51 PM (UTC)] d21c50bb9bdc97f0 left.
[4/20/2026 4:03:44 PM (UTC)] DL Conference Room joined.
[4/20/2026 4:27:59 PM (UTC)] DL Conference Room left.

120. Ware attended both calls while he remained a Guidepoint employee, using Guidepoint-issued credentials, to advance the interests of a competing venture. DL Software provided its own conference room for the April 20th call. And Dietzel—presumably using the email "fatcat@inquire.network"—participated in both calls under inquire.network credentials.

121. Dietzel's response discussed the need to import advisors and alluded to the ability to correct errors, "once they are in the app." He offered to import Guidepoint's 2,000+ Advisors into an application and warned that "adding them will trigger a registration email for them." Defendants have, and are continuing to use Guidepoint's stolen trade secret information to launch a competitive business application that is directly soliciting Guidepoint's Advisors and customers.

122. After Dietzel informed Gohil and Ware that "adding them [presumably the list of Advisors] will trigger a registration email for them," Ware responded as follows:

**From:** Alan Ware <ajwareny@gmail.com>
**Sent:** Monday, March 30, 2026 11:23 AM EDT
**To:** Daniel Dietzel <fatcat@dl.software>
**CC:** Kirang Gohil <kirang.gohil@gmail.com>; Tiana Eng <teng@guidepoint.com>
**Subject:** Re: advisors

Well, cant trigger for awhile then. We will put a few guys on eventually
Sent from my iPhone

**Exhibit 14**, TD_0341665.

123. No legitimate reason existed for Ware and Gohil to exchange work-related information via their personal email addresses. Nor did Ware and Gohil have authorization to share the list of 2000+ Advisors with DL Software.

124. Dietzel and DL Software knew or had reason to know that the advisor file originated from Guidepoint and that Ware and Gohil were under a duty to not disclose Guidepoint information. And DL Software used the file despite this knowledge. The file bore Guidepoint's internal "TMT" team name. It contained over 2,000 Advisors with Guidepoint's unique AdvisorID identifiers. It was sent by individuals Dietzel knew worked at Guidepoint. And Ware's instruction to delay activation signaled that the data could not yet be used openly because of ongoing employment obligations to Guidepoint. No explanation exists for why a file bearing Guidepoint's internal team name and containing Guidepoint's proprietary Advisor data, would be shared with DL Software.

125. On May 22, 2026, Eng exchanged text messages with Nick Longo, who is associated with DL Software and works closely with Shkreli, concerning the Guidepoint Advisor list Gohil had provided. Eng confirmed that Gohil "gave it to Danny," who, upon information and belief, is Daniel Grinberg of DL Software, "who used Apollo to make it better," and that "[w]e've

been using that one." Eng further stated that the list had been "shared to whole inquire team." **Exhibit 15**, TD_0364264-67.

126. DL Software also received Guidepoint's confidential financial and performance data. The financial model underlying Inquire Network's pitch deck is an Excel workbook whose tabs are expressly memorialized as "Guidepoint TMT Financials." That workbook reproduces Guidepoint's confidential internal data, including quarter-by-quarter Consultation Unit and event figures for Guidepoint's TMT group spanning 2021 through 2025, information that is not publicly available and that could only have come from Guidepoint's internal systems.

### H. Duggal Emails Himself Guidepoint's Confidential, Proprietary, and Trade Secret Information

127. Duggal has improperly exfiltrated dozens of Guidepoint's proprietary transcripts to his personal email address, sheetal.duggal@gmail.com. For example, on February 13, 2026, about two months before he separated, Duggal emailed his personal email address ten transcripts of calls with various Advisors regarding a particular company.

| | |
|---|---|
| **From:** | Sheetal Duggal <sduggal@guidepoint.com> |
| **Sent:** | Friday, February 13, 2026 12:30 PM EST |
| **To:** | Sheetal Duggal <sheetal.duggal@gmail.com> |
| **Subject:** | |
| **Attachments:** | Bloom 10.pdf, Bloom 9.pdf, Bloom 8.pdf, Bloom 7.pdf, Bloom 6.pdf, Bloom 5.pdf, Bloom 4.pdf, Bloom 3.pdf, Bloom 2.pdf, Bloom 1.pdf, ded9ec38-6454-4dce-881a-8eb125ee7b7d.txt |

128. About a week prior—on February 6—Duggal emailed five moderated transcripts regarding another particular company to himself. These moderated calls had occurred, in some instances, months prior to February 6.

129. Like each of the transcripts Ware sent to his personal email, the transcripts Duggal sent himself were conspicuously marked "CONFIDENTIAL" and included (in all caps) "THIS

TRANSCRIPT IS PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

130. All told, Duggal emailed to his personal email dozens of confidential transcripts. He has not returned the transcripts.

131. On January 27, 2026, Duggal also sent to his personal email address a spreadsheet—filename "export (93).csv"—containing a list of approximately 207 events that included the Advisor name; the attached clients; the total RSVP; and information about the billing related to that event.

### I. Individual Defendants' Browser and File Activity History Confirm Exfiltration and Breach of Duties of Loyalty

132. The Individual Defendants worked in furtherance of Inquire Network before resigning and while each had access to Guidepoint's proprietary information.

133. For example, Eng repeatedly visited websites associated with Dl.software beginning March 13 and continuing through March 24. She also visited a website associated with Godel Terminal days before her departure:

| | | |
|---|---|---|
| March 23, 2026 12:12:12 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/signup |
| March 23, 2026 12:12:12 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/signup |
| March 23, 2026 12:27:07 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/login |
| March 23, 2026 12:27:08 PM PDT | teng@guidepoint.com | api.godelterminal.com/api/v1/auth/login |

134. Gohil visited inquire.ai's website on at least two occasions, once on March 11 and another time on March 27.

135. In addition, Gohil's file activity reports reveal he downloaded to his personal devices a document called TMT Pipeline Sheet.xlsx—including on April 21, 2026 at 5:21 p.m. EST—the day before his resignation.

| Time (EST) | Operation | Filename | Device Name | DeviceOS | Browser |
|---|---|---|---|---|---|
| 4/21/2026, 8:39:33.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 8:50:41.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:04:11.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:21:43.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/2026, 11:34:46.000 AM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | KirangNewThink | Windows10 | Edge 18.26200 |
| 4/21/202, 5:21:30.000 PM | FileSyncDownloadedFull | TMT Pipeline Sheet.xlsx | Kirang's iPhone | Ios 26.3.1 | Mobile Safari 18.7 |

136. TMT Pipeline Sheet.xlsx is a comprehensive internal Guidepoint working document that tracks, in granular detail, the company's Advisor recruitment and vetting pipeline across multiple business units and strategists, containing the names, LinkedIn profiles, CRM links, contact history, and status of hundreds of current and former employees of major technology companies who were being cultivated as potential expert advisors for Guidepoint's research products. The spreadsheet also contains Guidepoint's internal call scheduling and planning information, including completed and planned client-facing research calls, the Advisors used or being considered for those calls, the specific investment research topics being explored for institutional investor clients, and detailed notes reflecting the strategists' assessments of individual Advisors' knowledge, willingness to participate, and suitability for particular calls.

137. While still employed by Guidepoint, Telo exported Guidepoint's internal event and Advisor data and sent it to his personal email address, alextelo4@gmail.com, along with related materials. (TD_0001789.)

138. The spreadsheet Telo took reflects the core of Guidepoint's proprietary TMT expert-network operations. For thousands of Guidepoint events spanning 2024 through early 2026, it captures, among other things: (a) the identities of Guidepoint's Advisors, together with their companies and job titles; (b) the identities of the Guidepoint clients who requested, attended, or were billed for each event; (c) event identifiers, titles, dates, and status; (d) the sectors, subsectors, geographies, and specific public-company tickers associated with each event; and (e) Guidepoint's internal content-manager and operations-manager assignments.

**J. The Individual Defendants Resign En Masse**

139. Beginning in March 2026, members of Guidepoint's TMT team began resigning in quick succession. Approximately seven members of Guidepoint's TMT team have resigned since March 31, 2026.

140. Eng, the Operations Lead, resigned effective March 31, 2026. In her exit interview, Eng reported she was going to work at a small tech startup (employing approximately 10 people) in operations and administration.

| Name | Position | Date of Separation from Guidepoint |
|---|---|---|
| Eng | Operations Lead | March 31, 2026 |
| Duggal | TMT Consultant | April 14, 2026 |
| Telo | TMT Associate | April 22, 2026 |
| Gohil | TMT Strategist | April 22, 2026 |
| Ware | Director of Research and Global Head of the TMT | April 22, 2026 |
| Elliott | TMT Consultant | April 24, 2026 |
| Giordano | TMT Associate | May 19, 2026 |

141. A member of Guidepoint's legal department spoke with Ware on or about April 21, 2026. During that conversation, Ware acknowledged that he knew TMT team members had left to join a startup, but he claimed he did not know details about the startup, such as its name or who provided the funding for the startup.

142. Ware resigned from Guidepoint the next day.

143. Ware acknowledged that he was resigning to join the other TMT employees who resigned.

144. The Individual Defendants staggered and choreographed their resignations to conceal their coordination and to cripple Guidepoint. In a March 20, 2026 text exchange, Ware and Duggal planned the sequence of their departures, with Ware proposing "[m]aybe i leave first before kirang now," and Duggal agreeing, "Yeah I think you should leave first really." Duggal advised Ware to "[c]ollect two weeks[ and q]uit April 1," observing that "when you quit, GP insights is really crippled."

145. The two also discussed spacing their exits to obscure their joint venture, with Ware suggesting "I quit[, y]ou quit following week" and then "later on we band together," and Duggal acknowledging that this approach was "harder to create [a] trail." Ware made his motive explicit, stating: "Lol. Indont [sic] care about money. I care about trying not to get sued[.]" (TD_0361076-90.)

146. Ware also described the staggered departures as a deliberate strategy. In a text message, Ware explained that although the "[b]iz is still stuck in legal," the group was "already working on systems," and that having "10 people leave over course of a few months is the plan." These resignations were not a coincidence but a coordinated plan to strip Guidepoint's TMT team over time. (TD_0370662-66.)

147. Shortly after he resigned, Ware updated his LinkedIn profile, which now cryptically states: "[s]omething new is coming soon....."

148. It also shows that Ware is the co-founder of "Stealth Startup."

149. At least one other former TMT team member, Gohil, also changed his LinkedIn to show "Stealth Mode"—which is affiliated with "Stealth Startup"—as his current employer.

150. While still employed by Guidepoint and after he resigned, Ware solicited the Guidepoint TMT team members he supervised to leave Guidepoint and join him at Inquire Network.

151. On or about February 11, 2026—two months before he resigned—Ware asked Guidepoint's AI chatbot "**what percentage of firms sue for non-solicitation**." (emphasis added).

152. Eng confirmed as much in her own words. Through text, Eng described the venture as "basically the tmt team (Alan Kirang Sheetal) who are secretly creating their own company." Eng texted that "we're gonna go two at a time" because "we all signed non competes and non solicits . . . ." (TD_0348049-60.)

153. Inquire Network, DL Software, and RealTime Advisory offer services similar to the services Guidepoint offers and, Ware and Gohil were employed by or provide services to those entities.

### K. Duggal Incorporates Inquire Network, and It Is Launched

154. The certificate of incorporation for Inquire Network was filed on April 6, 2026.

155. The Certificate of Incorporation is signed by the incorporator: Duggal.

156. According to Inquire Network's website—https://inquiregroup.ai/#comparison—it is an "AI-Native Investment Research Built for Decision Speed." It purports to offer the ability to

"Turn industry specialist engagements and management conversations into structured decision-grade intelligence."

157. It even attempts to explain what differentiates it from "expert networks"—such as Guidepoint.



A New Layer of Intelligence

From static reports and fragmented calls to real-time, AI-native intelligence

| | Traditional Research | Expert Networks | INQUIRE |
|---|---|---|---|
| Speed | Slow, cycle-based | Fast, ad hoc | Real-time |
| Depth | Deep but static | Shallow | Deep + dynamic |
| Source | Assessments | Experts | Analysts + AI |
| Output | Reports | Calls / transcripts | Decision-ready synthesis |
| Continuity | Periodic | One-off | Continuous intelligence |
| AI Integration | None | Minimal | Core engine |

158. Inquire Network's website boasts that "All expert calls, meetings, and interactions live in one system, fully captured, transcribed, and structured for retrieval."

159. It promotes its services to: Investment Professionals (for hedge funds, long-only investors, and private capital); Strategic & Corporate Leaders (for executives and strategy teams shaping market direction); and Decision Teams (for cross-functional teams responsible for action). By June 2026, Inquire Network was operational and was actively producing the same type of content that Guidepoint produces. In a June 2026 investor pitch deck, Inquire Network represented that it had completed "100+" expert transcripts "in the first month of operation," that it had launched a recurring expert-session product it calls "Quick Hits," and that it was building a

"proprietary transcript corpus" across the same technology sectors covered by Guidepoint's TMT group. The same deck identifies Inquire Network's team as consisting almost entirely of former Guidepoint personnel, including Duggal (identified as "Founder & President"), Eng (identified as "Chief Operating Officer"), Giordano, Elliott, and Telo, along with additional former Guidepoint employees who resigned as part of the scheme described herein. A true and correct copy of the deck is attached hereto as **Exhibit 16**, TD_0344001-17.




160. The deck touted how quickly Inquire made progress.

[redacted]

161. Inquire Network's own vendors confirm that it offers the same services as Guidepoint. In April 2026, Eng, using an inquire.network email address, engaged ACA Group, a third-party compliance consultant, to help Inquire Network start up a compliance program, implement a review process for material non-public information, and identify a chief compliance officer, with a stated decision deadline of May 1, 2026. ACA's written summary of Inquire Network's business, based on those discussions, states that Inquire Network "plans to host 100–150 research calls per month" and "seeks to record, transcribe, summarize, and generate insights for each of its calls," and that Inquire Network's platform "will eventually include research call transcripts and AI-condensed summaries." That is a similar expert-call-and-transcript model that Guidepoint employs. An individual identified in the correspondence as "Allen," upon information and belief Ware, participated in the calls with ACA.

**L. Forensic Discovery Confirms Breach Of Fiduciary Duty; Breach Of Restrictive Covenants; And Misappropriation**

162. Discovery produced as part of a forensic inspection has confirmed and substantiated Guidepoint's allegations.

163. For example, on December 8, 2025, months before any resignation, Ware instructed Gohil by text message to "download some tmt stuff that we may need if the cat gets out of the bag."

164. That same day, Duggal reassured Ware that even if Guidepoint discovered the exfiltration, "I'd tell them it's confidential for now," and Ware confirmed he was "[s]ending to personal email."

165. On November 10, 2025, Ware texted Duggal that he had "emailed you the numbers so between kirang and what i sent [we] can cherry pick stuff," directing that they "[a]dd some pics of kirang and me with dylan and us at sac and we good to go."

166. On February 11, 2026, Duggal texted that the group could "just sabotage it once we launch," reflecting the Individual Defendants' intent to undermine Guidepoint from within.

167. Ware's forensic data confirms he improperly solicited Guidepoint employees. For example, in a March 20, 2026 text exchange with Duggal, while still employed by Guidepoint, Ware discussed recruiting his subordinates to the venture, stating that "Alex is for sure" and confirming "Elliott is in" and that they could "hire Elliot as a consultant." In a separate message, Ware acknowledged that he had "non compete and no[n] Solicit issues," but boasted that "we now got 8 people from GP lol. Shhhhh." Even more telling, Ware communicated to another Guidepoint employee that he brought the TMT team "out of" Guidepoint. (TD_0367304-08.)


>>>>> Alan Ware <9175387150> 4/30/2026, 3:12 PM
>>>>> We have 8. New firm. I spun my team out of guidepoint. Confidential fyi i have non compete non solicite working through
AW

168. The Individual Defendants' own contemporaneous messages confirm both their intent to compete and their consciousness that they were building the venture on Guidepoint's time and systems. On December 1, 2025, while still engaged by Guidepoint, Ware and Duggal exchanged text messages about their planning for the new venture. When Ware asked whether it was "a big deal to have this convo on a work teams," Duggal responded: "It is a big deal. Guidepoint can claim rights to the company," and directed: "No more Guidepoint email. They get aggressive in litigating us, they can say they own this as you built it in Guidepoint." **Exhibit 17**, TD_0360867-74.

169. In the same exchange, the two discussed targeting individuals for the venture, with Duggal proposing that they "come up with a list" "[o]f people we want to target" and then "ask Allen to vet the list," and Ware responding that he "want[ed] double coverage." Duggal also asked Ware for Guidepoint's internal performance figures, requesting the "final nums last month for GP TMT" and "overall," which Ware undertook to obtain from a Guidepoint employee. These messages confirm that the Individual Defendants deliberately moved their planning off Guidepoint's systems to evade detection while continuing to exploit Guidepoint's confidential information for the competing venture.

**M. The Individual Defendants' Misconduct**

170. Each of the Individual Defendants betrayed Guidepoint. Each one took or is using Guidepoint's confidential information, broke the promises in their agreements, or performed both, all in service of building a competitor on Guidepoint's back. The Individual Defendants' own words, their own files, and their own file logs tell the story.

171. Ware led the charge. Ware misappropriated Guidepoint's trade secrets and breached every restrictive covenant he signed. He funneled Guidepoint's confidential transcripts,

its team's compensation data, and its client-dinner lists to his personal email; he directed the theft of Guidepoint's 2,000-plus Advisor file to DL Software; and he recruited the very team he supervised to walk out the door with him. For example, on December 8, 2025, Ware told Gohil to "download some tmt stuff that we may need if the cat gets out of the bag."

172. Gohil did the downloading. Gohil misappropriated Guidepoint's trade secrets and breached both his Employment Agreement and his Equity Incentive Agreement. He handed Guidepoint's proprietary network to a competitor and carried its confidential playbook out the door. For example, Gohil delivered Guidepoint's file of more than 2,000 Advisors, complete with Guidepoint's unique internal identifiers, to DL Software's engineer to be loaded into a competing application, an import that would "trigger a registration email" to Guidepoint's own experts. He then downloaded Guidepoint's internal "TMT Pipeline Sheet.xlsx" to his personal iPhone the day before he resigned.

173. Duggal incorporated the competitor. Duggal misappropriated Guidepoint's trade secrets and breached his Independent Consultant Agreement. He stole the very product Guidepoint sells and repackaged Guidepoint's business for a competitor he incorporated. For example, Duggal emailed himself dozens of Guidepoint's confidential expert-call transcripts, each stamped "PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES," and then built the competing venture's pitch on Guidepoint's own numbers.

174. Eng put the scheme in writing. Eng misappropriated Guidepoint's trade secrets and breached her Employment Agreement. She was the first to leave, she set up the new company's operations while the rest of the team followed, and she put the scheme in writing. For example, Eng described the venture as "basically the tmt team (Alan Kirang Sheetal) who are secretly

creating their own company," and later confirmed that Guidepoint's stolen Advisor list had been "shared to whole inquire team."

175. Telo fed the theft from the inside. Telo misappropriated Guidepoint's trade secrets and breached his Employment Agreement. He stole Guidepoint's operational core and fed the exfiltration effort from the inside. For example, while still on Guidepoint's payroll, Telo exported Guidepoint's internal event and Advisor data, spanning thousands of Guidepoint events, to his personal Gmail, and supplied Ware with the confidential transcripts Ware kept for himself. He had lined up his new job before he left, executing an employment agreement with Inquire Network as an "Analyst" roughly a week before resigning.

176. Giordano followed the team. Giordano breached her Employment Agreement and took Guidepoint's confidential information to a direct competitor. While still on Guidepoint's payroll, she committed to Inquire and stepped into the same operational role there. For example, before her separation, Giordano executed an employment agreement with Inquire Network to serve as "Operations Associate, Client Success," reporting to Eng.

177. Elliott completed the roster. Elliott breached his Independent Consultant Agreement and joined the competing venture built on Guidepoint's information. For example, Elliott is listed as an "Analyst" on Inquire Network's own team roster in its June 2026 investor deck, and Ware confirmed by text that the group could "hire Elliot as a consultant."

**N. Defendants Incorporate RealTime Advisory, Inc. After Agreeing To Consent Stipulated Injunctions**

178. Confronted with Guidepoint's evidence, several Defendants agreed to Consent Orders and Stipulated Injunctions, entered by this Court, that barred the very conduct at the heart of this case. Ware, Gohil, Eng, Duggal, Inquire Network, and DL Software each consented to an injunction. *See* Dkts. 37, 41-42, 46, 76.

179. Each enjoined Defendant was prohibited from using, copying, disclosing, or examining any of Guidepoint's confidential, proprietary, or trade secret information, including Guidepoint's transcripts of moderated calls, its lists of advisors, and its Pipeline Sheet. *See, e.g.*, Dkt. 37 ¶ 1; Dkt. 41 ¶ 1; Dkt. 46 ¶ 1; Dkt. 76 ¶ 1.

180. Ware's injunction (which matches Gohil's) enjoined him from "working as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity, for Inquire Network" or for any other company "in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content." Dkt. 37 ¶ 2. Ware and Gohil were separately enjoined from soliciting any Guidepoint employee, expert, or advisor, and from interfering with any Guidepoint client, expert, or advisor relationship. *Id.* ¶¶ 3-4. Eng agreed to the same prohibition on soliciting Guidepoint's employees, experts, and advisors. Dkt. 41 ¶ 2.

181. Rather than comply, Ware, Duggal, and Gohil looked for a workaround. Barred from working for Inquire, they simply stood up a second competing venture to carry on the same business under a new name: RealTime Advisory, Inc.

182. Duggal testified that, notwithstanding the injunctions, Ware and Gohil resumed coming into the office twice a week beginning June 10, 2026. Duggal further testified that he and Ware have spoken nearly every day since June 10, holding "conversations about the projects that we think we should be able to do, about things that we can do for Inquire . . . ."

183. DL Software and Shkreli helped the Individual Defendants launch this second competing venture as part of the same scheme. A related pitch deck for a venture styled "Real Time Advisors" lists Shkreli as a team member alongside Ware, Gohil, and Duggal.

184. On June 24, 2026, Ware, writing from an alan@realtimeadv.com address, negotiated a research-services engagement with a prospective client, stating that "[t]he minimum fee for clients is [redacted] and that [redacted] In a contemporaneous email to Longo and Shkreli (martin@dl.software), Ware directed that they "set up the entity RealTime Advisory and have an ability to accept payment," and noted that Eng was "in contact with" a bank prime regarding soft-dollar arrangements. (TD_0343854.)

185. In addition, RealTime Advisory utilized DL Software's infrastructure to receive payments.

186. According to its website, RealTime Advisory is "a small yet well-connected advisory firm delivering fast, incisive analysis of breaking news across the technology, media, and telecommunications (TMT) markets," staffed by "industry execs close to the action" and "[b]uilt for investment firms and corporations." It offers "Continuous Coverage" of a small number of markets and "Event-Driven Analysis" of breaking news. That is the same TMT expert-call business Guidepoint operates, and the same TMT team, now led by Ware and Gohil, running it. *See https://realtimeadv.com/about/.*

**O. Guidepoint Faces Irreparable Harm Absent Injunctive Relief**

187. Guidepoint has invested substantial time, money, and resources in developing its Insights business unit, including the TMT group, the policies and procedures attendant to that business, its relationships with experts and its strategies in recruiting new experts and its client relationships.

188. Defendants are already competing for Guidepoint's clients using the same personnel and information.

189. The Individual Defendants possess intimate knowledge of Guidepoint's most sensitive Trade Secret information, including sensitive client information and operational business strategies.

190. The Individual Defendants' continued unauthorized possession of Guidepoint's trade secrets creates an ongoing risk that those secrets will be disclosed to or exploited by Inquire Network.

191. The Individual Defendants have and will disclose Guidepoint's Trade Secrets to Inquire Network, giving it an unfair competitive advantage against Guidepoint.

192. Monetary damages alone are insufficient to remedy the ongoing and future harm caused by Defendants' misconduct.

193. Ware, Eng, Gohil, Telo, and Giordano agreed and acknowledged that violations of the restrictive covenant and confidentiality provisions of their respective Employment Agreements would irreparably injure Guidepoint. (*See* Ex. 2; Ex. 4; Ex. 7; Ex. 9 at § 10.) For that reason, Guidepoint "**shall be entitled to an injunction restraining** [Ware, Eng, Gohil, Telo, and Giordano] from any **actual or threatened breach**" of those Sections without the need for a bond. (*Id*.) (emphases added).

194. Unless restrained by this Court, the Individual Defendants will continue to benefit from their breaches, Inquire Network will reap unfair benefits by having access to Guidepoint's trade secrets, and Guidepoint will suffer loss of longstanding business and clientele, client goodwill, competitive advantage, and the value and benefit of its hard-earned and protected Trade Secrets.

195. In addition to the irreparable harm Guidepoint faces, Guidepoint faces significant damages in an amount that likely will exceed more than $10 million but that is impossible to quantify presently.

**COUNT I**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836(b))**
**(Against Ware, Duggal, Gohil, Eng, Elliott, Telo, Giordano, Shkreli, Inquire Network, and DL Software)**

196. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

197. The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836.

198. Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

199. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

200. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

201. Guidepoint has an advantage over its competitors based, in part, on the Trade Secrets it has developed and implemented in its business efforts.

202. Guidepoint owns and possesses certain confidential, proprietary, and trade secret information as alleged above. Guidepoint has made reasonable efforts under the circumstances to preserve the confidentiality of its Trade Secrets.

203. As described with more particularity above, Guidepoint's Trade Secrets include:

A. Client-specific pricing, discounting, and contract structures;

B. Client onboarding processes and compliance requirements;

C. Internal training materials and employee metrics and compensation information;

D. Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

E. Financial projections and growth metrics based on Guidepoint's data;

F. Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

G. Knowledge of client identities, preferences, sensitivities, and feedback.

204. Guidepoint's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who can obtain economic value from their disclosure or use. Accordingly, the above-described Trade Secrets constitute "trade secrets" under the DTSA.

205. Guidepoint's former and current employees are under a duty to keep its trade secrets secret and not use or disclose such information except for the benefit of Guidepoint. In taking Guidepoint's Trade Secrets from Guidepoint—namely the Team Metrics, Transcripts, and Advisor lists—the Individual Defendants improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy.

206. The Team Metrics contain Guidepoint's confidential, proprietary, and Trade Secret information about employees' salaries; performance metrics; bonus structures; and compensation plans.

207. The transcripts contain Guidepoint's proprietary and Trade Secret information of interviews with subject-matter experts and constitute the very product that Guidepoint sells to its clients.

208. The Advisor list and pipeline spreadsheet contain Guidepoint's proprietary and Trade Secret information because it includes the names of Guidepoint's Advisors and data regarding their qualifications and services.

209. The Defendants violated the DTSA by misappropriating Guidepoint's Trade Secrets used in, or intended for use in, interstate or foreign commerce.

210. The Individual Defendants misappropriated Guidepoint's Trade Secrets by emailing confidential, proprietary Trade Secret information to their personal email address before they resigned, without authorization by Guidepoint, and to compete with Guidepoint and to use the information in ways that Guidepoint policies prohibited.

211. Inquire Network misappropriated Guidepoint's Trade Secrets because it acquired Guidepoint's Trade Secrets without authorization or knew or should have known they were acquired by improper means.

212. DL Software misappropriated Guidepoint's Trade Secrets because it knew or had reason to know the information was acquired by improper means and contained Guidepoint's Trade Secrets. The file bore Guidepoint's internal "TMT" team designation in its filename and contained Guidepoint's proprietary information. It was transmitted by individuals Dietzel knew or should have known to be Guidepoint employees. And Ware's instruction to delay activation signaled that the data was subject to ongoing confidentiality restrictions. DL Software, through Dietzel, obtained the data and offered to import this stolen data into an application and discussed triggering registration emails to Guidepoint's Advisors. DL Software thus acquired and used Guidepoint's trade secrets knowing or having reason to know they were obtained through a breach of duty to maintain secrecy.

213. Shkreli likewise misappropriated Guidepoint's Trade Secrets. Shkreli acquired, disclosed, and used Guidepoint's Trade Secrets, including Guidepoint's confidential TMT financial and performance data and its Advisor information, knowing or with reason to know that those Trade Secrets were derived from or through the Individual Defendants, who owed

Guidepoint a duty to maintain their secrecy, and that they had been acquired under circumstances giving rise to a duty to limit their use. Shkreli used and disclosed that information by incorporating Guidepoint's confidential figures, expressly identified by the Individual Defendants "figures from Guidepoint" and "Guidepoint TMT Financials," into the pitch decks he received and circulated to raise capital for, and recruit personnel to, the competing venture, and by receiving and directing the exploitation of Guidepoint's misappropriated Advisor data through DL Software. Shkreli further acquired Guidepoint's Trade Secrets by improper means, including by inducing the Individual Defendants to breach their duties to maintain the secrecy of Guidepoint's Trade Secrets. Shkreli did so for his own benefit and the benefit of the competing venture, and to Guidepoint's detriment, without Guidepoint's express or implied consent.

214. The Defendants have used or intend to use Guidepoint's Trade Secrets for their own benefit and to Guidepoint's detriment without the express or implied consent of Guidepoint.

215. Defendants' misappropriation was willful and malicious.

216. Defendants' willfulness is confirmed by their own words, including Ware's December 8, 2025 instruction to "download some tmt stuff that we may need if the cat gets out of the bag."

217. As a direct result of Defendants' misappropriation of Guidepoint's Trade Secrets, Guidepoint has suffered and, if Defendants' conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law. Guidepoint has suffered and continues to suffer damages that will be proven at trial.

218. The DTSA specifically authorizes courts to award injunctive relief to prevent the actual or threatened misappropriation of trade secrets. Guidepoint seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret

information and to protect other legitimate business interests. Guidepoint's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

219. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

**COUNT II**
**Common Law Misappropriation of Trade Secrets**
**(Against Ware, Duggal, Gohil, Eng, Elliott, Telo, Giordano, Shkreli, Inquire Network, and DL Software)**

220. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

221. Under New York law, a claim for misappropriation of trade secrets requires a plaintiff to demonstrate: (1) that it possessed a trade secret, and (2) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or a duty, or as a result of discovery by improper means.

222. New York courts assess whether information constitutes a trade secret by reference to the following factors: (i) the extent to which the information is known outside of the business; (ii) the extent to which it is known by employees and others involved in the business; (iii) the extent of measures taken by the business to guard the secrecy of the information; (iv) the value of the information to the business and to its competitors; (v) the amount of effort or money expended by the business in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others.

223. Guidepoint owns and possesses certain confidential, proprietary, and trade secret information as alleged above (the "Trade Secrets"). As described with more particularity above, Guidepoint's Trade Secrets include:

A. Client-specific pricing, discounting, and contract structures;

B. Client onboarding processes and compliance requirements;

C. Internal training materials and employee metrics and compensation information;

D. Information regarding experts within Guidepoint's network as well as strategies for recruiting new experts;

E. Financial projections and growth metrics based on Guidepoint's data;

F. Operations policies and procedures applicable to Guidepoint's content generation and its teleconference and library business; and

G. Knowledge of client identities, preferences, sensitivities, and feedback.

224. Guidepoint's Trade Secrets, including the Team Metrics, the Transcripts, the Advisor list, the TMT Pipeline Sheet, the spreadsheet of Guidepoint's internal event and Advisor data, and Guidepoint's confidential TMT financial and performance data, are not known outside of Guidepoint's business and are known within Guidepoint only by employees and contractors with a legitimate need to access them.

225. Guidepoint has made reasonable efforts under the circumstances to guard the secrecy of its Trade Secrets, including by requiring employees and consultants to execute confidentiality agreements; by adopting policies prohibiting the unauthorized use, disclosure, or retention of confidential information; by restricting access to non-public systems, documents, and databases to authorized personnel; by requiring the use of company-issued devices and multi-factor authentication; and by conspicuously marking its materials "CONFIDENTIAL" and with legends stating, for example, that its transcripts are "PROPERTY OF GUIDEPOINT AND MAY NOT BE SHARED WITH ANY THIRD PARTIES."

226. Guidepoint's Trade Secrets derive independent economic value, both to Guidepoint and to its competitors, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from their disclosure or use. Guidepoint invested substantial time, money, and resources in developing this information over many years, and it could not be properly acquired or duplicated by others without a comparable investment.

227. Accordingly, the above-described Trade Secrets constitute trade secrets under New York common law.

228. Guidepoint's former and current employees and consultants, including the Individual Defendants, occupied a relationship of trust and confidence with Guidepoint and were under contractual and common law duties to keep Guidepoint's Trade Secrets secret and not to use or disclose such information except for the benefit of Guidepoint.

229. The Individual Defendants misappropriated Guidepoint's Trade Secrets by emailing, downloading, exporting, and otherwise removing the Team Metrics, the Transcripts, the Advisor list, the TMT Pipeline Sheet, and other confidential materials to their personal accounts and devices without authorization, under circumstances giving rise to a breach of a duty to maintain secrecy, and by thereafter using and disclosing that information in breach of their agreements and their duties of confidentiality and loyalty, and for the benefit of Inquire Network.

230. Duggal, Shkreli, and the other Individual Defendants further misappropriated Guidepoint's Trade Secrets by incorporating Guidepoint's confidential TMT financial and performance data—expressly identified in Defendants' own materials as "figures from Guidepoint" and "Guidepoint TMT Financials"—into pitch materials for the competing venture,

and by transmitting and circulating those materials to DL Software and others in order to raise capital for, and recruit personnel to, that venture.

231. Inquire Network misappropriated Guidepoint's Trade Secrets because it acquired, used, and disclosed those Trade Secrets without authorization, and knew or should have known that they were acquired by improper means and through persons under a duty to maintain their secrecy.

232. DL Software misappropriated Guidepoint's Trade Secrets because it acquired and used those Trade Secrets, including the Advisor list, with knowledge or reason to know that they were Guidepoint's confidential information and had been obtained through a breach of a duty to maintain secrecy. The file bore Guidepoint's internal "TMT" team designation in its filename; contained more than 2,000 Advisors bearing Guidepoint's unique AdvisorID identifiers; and was transmitted by individuals Dietzel knew or should have known to be Guidepoint employees. Ware's instruction to delay activation further signaled that the data was subject to ongoing confidentiality restrictions. DL Software, nonetheless obtained the data, offered to import it into an application, and discussed triggering registration emails to Guidepoint's Advisors.

233. Shkreli likewise misappropriated Guidepoint's Trade Secrets by acquiring Guidepoint's confidential pricing information through improper means, namely by soliciting it under the false pretense of becoming a Guidepoint customer after being expressly advised that the information was "restricted" and "cannot be shared outside of" his firm, and by using and disclosing Guidepoint's confidential financial and performance data in the pitch materials prepared and circulated for the competing venture, with knowledge or reason to know that the information was Guidepoint's Trade Secret information and had been derived from persons who owed Guidepoint a duty to maintain its secrecy.

234. The Defendants have used, disclosed, or threaten to use and disclose Guidepoint's Trade Secrets for their own benefit and to Guidepoint's detriment, without Guidepoint's express or implied consent.

235. Defendants' misappropriation was willful and malicious.

236. Defendants' misappropriation was also knowing and deliberate, as reflected in their own communications, including Eng's May 22, 2026 admission that the misappropriated Advisor list was "shared to whole inquire team" and that "[w]e've been using that one."

237. As a direct and proximate result of Defendants' misappropriation of Guidepoint's Trade Secrets, Guidepoint has suffered and, if Defendants' conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law, as well as damages that will be proven at trial.

238. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT III
**Breach of Contract (Employment Agreement's Confidentiality Provision (§ 5))**
**(Against Ware, Gohil, Eng, Telo, and Giordano)**

239. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

240. Ware, Eng, Gohil, Telo, and Giordano continue to be bound by their respective employment agreements, for which they received adequate consideration.

241. The operative employment agreements include multiple restrictive covenants, including the Non-Competition Provision, Non-Solicitation Provision, Non-Interference Provision, and Confidentiality Provision.

242. The operative employment agreements for Ware, Eng, Gohil, Telo, and Giordano contain identical confidentiality provisions that state:

> At all times during Employee's employment and thereafter, Employee will (i) hold Proprietary Information in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any Proprietary Information, (iii) not access or use for personal benefit or for the benefit of anyone other than the Company any Proprietary Information, and (iv) not copy any documents, records, files or other media containing Proprietary Information or remove any such documents, records files or media from the premises or control of the Company, except, in each case, as required in connection with Employee's authorized employment duties to the Company or with the prior express authorization of an officer of the Company.

243. Ware violated the Confidentiality Provision by forwarding and not returning upon separation the Team Metrics and seven Transcripts to his personal email address.

244. Ware was not authorized to forward the Team Metrics and Transcripts to his personal email address, nor did he have a legitimate business purpose for doing so.

245. Gohil and Eng violated the Confidentiality Provision by, among other things, sharing with a non-party an Excel file listing more than 2,000 Advisors.

246. Telo violated the Confidentiality Provision by exporting and forwarding to his personal email address, and not returning upon separation, the spreadsheet containing Guidepoint's internal event and advisor data.

247. The Individual Defendants have worked in tandem to exfiltrate Guidepoint's proprietary information to use collectively in furtherance of the new startup.

248. The actions of Ware, Eng, Gohil, Telo, and Giordano violated § 5(c) of their respective Employment Agreements, which required them to return Guidepoint's Proprietary Information in their possession upon termination of their employment. To date, Ware, Gohil, Eng, Telo, and Giordano have not returned any of the Guidepoint documents.

249. The actions of Ware, Eng, Gohil, Telo, and Giordano violated § 5(b) of the Employment Agreement, which prohibits them from accessing or using Guidepoint's Proprietary Information for personal benefit or for the benefit of a company other than Guidepoint and from

copying or removing documents containing Guidepoint's Proprietary Information from Guidepoint's control. Ware, Eng, Gohil, Telo, and Giordano removed the Team Metrics and Transcripts and a list of Advisors from Guidepoint's control.

250. Upon information and belief, Ware, Eng, Gohil, Telo, and Giordano are using Guidepoint's Proprietary Information in furtherance of Inquire Network.

251. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT IV**
**Breach of Contract (Employment Agreement's Non-Compete Provision (§ 4(a))**
**(Against Ware, Eng, Gohil, Telo, and Giordano)**

252. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

253. Ware, Eng, Gohil, Telo, and Giordano continue to be bound by their respective employment agreements, for which they received adequate consideration.

254. Section 4(a) of the employment agreement included a reasonable non-competition provision that prohibited Ware, Eng, Gohil, Telo, and Giordano from providing services for any Competing Business for a period of six months following their resignation. Competing Business is defined to include a number of specific companies and "any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content."

255. Eng has an email address associated with Inquire Network, tiana@inquire.network.

256. Eng—using her inquire.network email address—invited Ware to a call on or about April 20, and Ware works for Inquire Network, as confirmed by the Letter of Intent, Inquire's own pitch materials, and Duggal's sworn testimony. In addition, Ware reported that he was resigning from Guidepoint to join the other TMT employees at a startup.

257. Gohil has facilitated the exchange of information to inquire.network and dl.software and works for Inquire Network.

258. Inquire Network is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content.




https://inquiregroup.ai/

259. On or about April 15, 2026, approximately one week before his April 22, 2026 separation from Guidepoint, Telo executed an employment agreement with Inquire Network to serve as an "Analyst," reporting to Duggal as President.

260. On or about May 1, 2026, before her May 19, 2026 separation from Guidepoint, Giordano executed an employment agreement with Inquire Network to serve as an "Operations Associate, Client Success," reporting to Eng as Chief Operating Officer.

261. By executing employment agreements with, and agreeing to provide services to, Inquire Network within six months of their respective separations from Guidepoint, Ware, Eng, Gohil, Telo, and Giordano each breached the EA Non-Competition Provision set forth in Section 4(a) of their Employment Agreements.

262. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

**<u>COUNT V</u>**

**Breach of Contract (Employment Agreement's Non-Interference Provision (§ 4(c))**
**(Against Ware, Eng, Gohil, Telo, and Giordano)**

263. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

264. Ware, Eng, Gohil, Telo, and Giordano continue to be bound by their respective employment agreements, for which they received adequate consideration.

265. Section 4(c) of the employment agreement included a reasonable non-interference provision that prohibited Ware, Eng, Gohil, Telo, and Giordano from attempting to interfere with, impairing, or adversely affecting any contractual relationship or business relationship between Guidepoint and any client, customer, expert, Advisor or other person or entity engaged by or doing business with Guidepoint, including without limitation engaging with any business that is a client of Guidepoint and with which Ware, Eng, Gohil, Telo, and Giordano had contact through their work at Guidepoint, on any matter that relates to Guidepoint.

266. Ware, Eng, Gohil, Telo, and Giordano have breached this provision by, among other things, providing a list of 2,000+ Advisors to Dietzel, a third party that would trigger a registration for them. Ware memorialized his commitment to breaching this provision by writing to Mr. Dietzel that "We will put a few guys on eventually."

267. Some of the Individual Defendants took client information, too, which raises the specter the Individual Defendants will use the information exfiltrated to communicate with Guidepoint clients on behalf of the new venture.

268. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT VI**
**Breach of Contract (Employment Agreement's Employee Non-Solicit (§ 4(b))**
**(Against Ware, Eng, Gohil, Telo, and Giordano)**

269. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

270. Ware, Eng, Gohil, Telo, and Giordano continue to be bound by their respective employment agreements, for which they received adequate consideration.

271. Section 4(b) of the employment agreement included a reasonable employee non-solicitation provision prohibiting each from soliciting or recruiting any employee, independent contractor or agent of Guidepoint to resign from Guidepoint or to accept employment or other engagement with Ware, Eng, Gohil, Telo, and Giordano or with any other person or company.

272. Upon information and belief, Ware, Eng, Gohil, Telo, and Giordano violated the Employment Agreement Non-Solicitation Provision by soliciting Guidepoint's TMT team members to leave Guidepoint and work for Inquire Network instead. Ware, Eng, Gohil, Telo, and Giordano's conduct violated § 4(b) of the Employment Agreement because they solicited and recruited Guidepoint employees "to resign from the Company or to accept employment or other engagement with Employee or with any other person or company."

273. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT VII**
**Breach of Contract (Equity Incentive Agreement's Confidentiality Provision (§ 6(b))**
**(Against Ware and Gohil)**

274. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

275. Ware and Gohil continue to be bound by their Equity Incentive Agreements, for which they received adequate consideration.

276. Section 6(b) of the Equity Incentive Agreement included a reasonable confidentiality provision that provided that Ware and Gohil would "hold in strictest confidence and will not disclose, use, lecture upon or publish in any manner whatsoever any of the Company Group's Proprietary Information."

277. The Equity Incentive Agreement defined Proprietary Information to include the following items: customer, client and vendor lists; customer, client and vendor data and information; customer, client and vendor referral bases; financial and sales information; service/product costing and profit margin information; planning, advertising and marketing information; Company Group research and development; pending projects and proposals; scientific information, production know how, production data, or proprietary production processes (including, without limitation, product formulas); technical data and technical prototypes; and vendor pricing and products. Id. § 6(e)(iv).

278. Ware violated the Equity Incentive Agreement's Confidentiality Provision by forwarding and not returning upon separation the Team Metrics and seven Transcripts to his personal email address.

279. Ware was not authorized to forward the Team Metrics and Transcripts to his personal email address, nor did he have a legitimate business purpose for doing so.

280. Gohil violated the Equity Incentive Agreement's Confidentiality Provision by, among other things, sharing with a non-party an Excel file of more than 2,000 Advisors.

281. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT VIII**
**Breach of Contract (Equity Incentive Agreement's Non-Competition Provision (§ 6(a)))**
**(Against Ware and Gohil)**

282. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

283. Ware and Gohil continue to be bound by their Equity Incentive Agreements, for which they received adequate consideration.

284. Section 6(a) of the Equity Incentive Agreement includes a reasonable non-competition provision:

> Employee acknowledges that the Company Group's relationship with its customers, clients, consultants, vendors, employees and other Persons are valuable business assets, and that there is a significant likelihood that if Employee directly or indirectly competes with the Company Group from time to time, it would result in the unauthorized use or disclosure of Proprietary Information or interfere with the Company Group's relationship with its customers, clients, consultants, vendors, employees, and other Persons. Accordingly, during the period of Employee's employment with the Company Group, and for a period of two (2) years following the termination of Employee's employment with the Company Group for any reason whatsoever, Employee shall not anywhere in the world where the Company Group does business: (i) directly or indirectly, either through any form of direct or indirect ownership (other than owning an investment of not more than 5%), or as a director, officer, principal, agent, employee, independent contractor, employer, advisor, consultant, shareholder, partner, member or in any other capacity, either for Employee's benefit or the benefit of any other person or entity, be employed by or otherwise engage in or be interested or involved in a Competitive Business; or (ii) use in or disclose to any Competitive Business any Work Product.

285. "'Competitive Business' means any business in competition with the Company Group from time to time (or by which the Company Group is proposing to operate) including, without limitation, any entity which charges customers fees for providing research by a firm that employs or contracts a Network of Experts anywhere the Company Group has operations, customers or such Experts." § 6(e)(i).

286. Eng—using her inquire.network email address—invited Ware to a call on or about April 20, showing that Ware also works for inquire.network.

287. Gohil has facilitated the exchange of information to inquire.network and dl.software and works for Inquire Network.

288. Inquire Network offers expert calls and expert conversations and is, therefore, a Competitive Business. RealTime Advisory offers expert calls and expert conversations and is, therefore, a Competitive Business.

289. Gohil and Ware have breached Section 6(a) of the Equity Incentive Agreement by providing services to and working for Inquire Network and RealTime Advisory.

290. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT IX**
**Breach of Contract (Consultant Agreement)**
**(Against Duggal and Elliott)**

291. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

292. Duggal and Elliott continue to be bound by their Independent Consultant Agreements, for which they received adequate consideration.

293. The Consultant Agreement includes a Confidentiality Provision, which states:

> At all times during the term of this Agreement and thereafter, Consultant will (i) hold the Company's Proprietary Information (defined below) in strictest confidence, (ii) not disclose, communicate, lecture upon or publish any of the Company's Proprietary Information, and (iii) not access, or use for personal benefit, or for the benefit of anyone other than the Company, any of the Company Group's Proprietary Information, or copy any documents, records, files or other media containing Proprietary Information, or remove any such documents, records, files or media from the premises or control of the Company, except, in each case, as required in connection with Consultant's authorized duties to the Company, or with the prior express authorization of an officer of the Company. Consultant hereby irrevocably assigns to the Company any rights Consultant may have or acquire in such Proprietary Information and recognizes that all Proprietary Information will be the sole property of the Company and its assigns. Upon the termination of this Agreement, or at any time upon request, Consultant shall return to the Company all Proprietary Information then in his or her possession.

294. The Consultant Agreement defines "Proprietary Information" as:

> any and all confidential and/or proprietary knowledge, data or information of the Company Group. By way of illustration but not limitation, "Proprietary Information" includes (i) any and all information contained in or related to the Company's CRM platform, trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, techniques and research; (ii) information regarding the Company's organization or structure, plans for research and development, new products, marketing, selling, advertising, and

> other business plans, budgets and financial data, licenses, pricing and costs, and suppliers; (iii) the identity of current and prospective clients of the Company, and Company's current and prospective contracts, policies, standards, procedures and practices; (iv) any and all information regarding the experts contracted by the Company, the Company's business model incorporating the use of such experts and the technology and trade secrets in connection with the utilization of such business model; and (v) information regarding the skills and compensation of other consultants or employees of the Company. Proprietary Information also shall include any information that is provided to or obtained by the Company Group from third parties and is subject to obligations of confidentiality.

295. Duggal violated the Confidentiality Provision by forwarding to his personal email address and not returning upon separation dozens of proprietary transcripts.

296. Duggal violated the Confidentiality Provision by forwarding to his personal email address and not returning upon separation the spreadsheet containing a list of approximately 207 events that included the Advisor name; the attached clients; the RSVP clients; and information about the billing related to that event.

297. Duggal was not authorized to forward the transcripts and the spreadsheet containing advisors' names and event information to his personal email address. Nor did he have a legitimate business purpose for doing so.

298. Upon information and belief, and consistent with the coordinated exfiltration by the other Individual Defendants alleged above, Elliott accessed, used, copied, and/or retained Guidepoint's Proprietary Information and failed to return it upon separation, in each case for the benefit of Inquire Network and not for any authorized purpose of Guidepoint. Guidepoint's forensic investigation into Elliott's Guidepoint accounts and devices is ongoing, and Guidepoint reserves the right to supplement these allegations as that investigation continues.

299. Elliott was not authorized to access, use, copy, or retain Guidepoint's Proprietary Information for the benefit of Inquire Network or any person other than Guidepoint, nor did he have a legitimate business purpose for doing so.

300. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT X**
**Tortious Interference with Contract**
**(All Defendants)**

301. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

302. Defendants interfered with Guidepoint's contractual relationship with its employees and consultants, including Ware, Gohil, Duggal, Eng, Telo, Elliott, and Giordano.

303. Guidepoint has valid and enforceable Employment and Independent Consultant Agreements with its employees and contractors, which Defendants know because they signed one or both agreements.

304. Upon information and belief, despite this knowledge, the Defendants solicited members of the TMT group away from Guidepoint and to join a competitor, Inquire Network.

305. Upon information and belief, Defendants willfully and intentionally interfered with the agreements of Alan Ware, Kirang Gohil, Alex Telo, Sheetal Duggal, Tiana Eng, John Elliott, and Olyvia Giordano without privilege to do so, by aiding, abetting, and assisting them in breaching their contractual obligations to Guidepoint, including, but not limited to, their obligations to not: (1) disclose Guidepoint's Trade Secret information; (2) work or perform services for a "Competitive Business" for six months following the termination of their employment with Guidepoint; (3) improperly use Guidepoint's Trade Secrets to aid a competitor in its unlawful and anti-competitive activities; (4) solicit Guidepoint's clients; and/or (5) use or disclose Guidepoint's Trade Secrets for their own benefit or outside the scope of their employment with Guidepoint.

306. Upon information and belief, Defendants misconduct is independently tortious and unlawful because they induced Alan Ware, Kirang Gohil, Alex Telo, Sheetal Duggal, Tiana Eng, John Elliott, and Olyvia Giordano to breach their obligations under each persons' agreement in order to unfairly compete against Guidepoint. Upon information and belief, Alan Ware, Kirang Gohil, Alex Telo, Sheetal Duggal, Tiana Eng, John Elliott, and Olyvia Giordano all did in fact breach their respective agreements as a result of Defendants' actions.

307. Pursuant to Section 4(f) of Ware, Gohil, Eng, Telo, and Giordano's employment agreement, each was required to notify Inquire Network—their new employer—of their obligations under the employment agreement before accepting or commencing employment.

308. DL Software tortiously interfered with Guidepoint's contractual relationships by knowingly receiving and preparing to exploit Guidepoint's proprietary advisor information in furtherance of a competing venture. DL Software knew or should have known that the Individual Defendants owed contractual obligations to Guidepoint. Dietzel communicated directly with Ware and Gohil about importing Guidepoint's Advisor data into an application. Ware's statement that he "cant trigger for awhile" [sic] put Dietzel and DL Software on notice that the data was subject to restrictions. DL Software nonetheless agreed to import the data and discussed triggering registration emails to Guidepoint's Advisors—conduct that would directly interfere with Guidepoint's contractual relationships.

309. Shkreli tortiously interfered with Guidepoint's contracts with the Individual Defendants. Shkreli knew that Guidepoint conditions access to its expert content and network on contractual confidentiality restrictions, having been so advised when Guidepoint solicited him as a purported personal client, and knew or should have known that the Individual Defendants—whom Shkreli recruited to a competing venture while they remained employed by Guidepoint, and

whom his own pitch decks described as current Guidepoint TMT personnel—were bound by confidentiality, non-competition, non-solicitation, and non-interference covenants. With that knowledge, and without justification, Shkreli intentionally procured and induced the Individual Defendants' breaches, including by conceiving, financing, and directing the competing venture, by soliciting Guidepoint's TMT team to join it, and by directing Telo not to respond to Guidepoint's demand that he honor his obligations while offering to fund a defense of that conduct on the venture's behalf. The Individual Defendants breached their agreements as alleged above, and Guidepoint has been damaged as a result.

310. RealTime Advisory had actual knowledge of Ware's, Gohil's, and Duggal's contractual obligations to Guidepoint because RealTime Advisory was founded, owned, or operated by those same individuals, each of whom was personally bound by the agreements at issue and who caused RealTime Advisory to be established using DL Software's infrastructure as a vehicle to continue their competing activities after entry of the Consent Stipulated Injunctions. Moreover, pursuant to Section 4(f) of the Employment Agreements, Ware and Gohil were each obligated to notify any subsequent employer of their contractual obligations before accepting or commencing employment, and RealTime Advisory, as their new venture, received or is charged with having received that notice. RealTime Advisory intentionally procured breaches of Ware's, Gohil's, and Duggal's contractual obligations to Guidepoint by actively engaging them to provide expert network research services—the very services they were prohibited from providing to any competing business under their respective agreements—entering into service or engagement arrangements with them with full knowledge of those prohibitions, holding itself out to prospective clients as an expert network research firm staffed by those individuals, and accepting client revenue generated through the exploitation of Guidepoint's misappropriated trade secrets and

proprietary advisor and client relationships. RealTime Advisory had no legitimate justification for procuring these breaches, as its sole business purpose, as reflected on its website and in contemporaneous communications among its principals, was to provide the same TMT expert network and research services that Ware, Gohil, and Duggal were contractually prohibited from providing to any competing business following their separation from Guidepoint.

311. The Individual Defendants breached their agreements as alleged above, and Guidepoint has been damaged as a direct and proximate result of RealTime Advisory's tortious interference.

312. Guidepoint has been damaged by the foregoing and is entitled to an award of injunctive relief, damages, and attorneys' fees.

**COUNT XI**
**Breach of Fiduciary Duty**
**(Against Ware, Eng, Gohil, Telo, and Giordano)**

313. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

314. Ware, Eng, Gohil, Telo, and Giordano, as Guidepoint employees, owed a duty to, among other things, put the welfare and best interests of Guidepoint above their own personal or other business interests.

315. Ware, Eng, Gohil, Telo, and Giordano breached their fiduciary duties to Guidepoint by engaging in the actions described herein while still employed by Guidepoint, including accessing and sharing Guidepoint information to retain post-employment and for use at Inquire Network and by providing a list of 2,000+ Advisors.

316. Ware, Eng, Gohil, Telo, and Giordano violated their fiduciary duties by working for and providing services to Inquire Network while being paid by Guidepoint. Ware, Gohil, and

Eng also violated their fiduciary duties by providing Guidepoint's confidential information to Inquire Network and DL Software.

317. These actions constitute a breach of Ware, Eng, Gohil, Telo, and Giordano's fiduciary duties to Guidepoint.

318. Ware, Eng, Gohil, Telo, and Giordano's conduct was intentional, willful, and outrageous, and was undertaken with reckless indifference to the rights of Guidepoint.

319. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT XII**
**Aiding And Abetting Breach of Fiduciary Duty**
**(Against Shkreli, Duggal, Elliott, Inquire Network, and DL Software)**

320. Guidepoint reasserts the foregoing paragraphs as if fully set forth herein.

321. Ware, Gohil, Eng, Telo, and Giordano, as Guidepoint employees, owed a duty to, among other things, put the welfare and best interests of Guidepoint above their own personal or other business interests.

322. Ware, Gohil, Eng, Telo, and Giordano breached their fiduciary duties to Guidepoint by engaging in the actions described herein while still employed by Guidepoint, including accessing and sharing Guidepoint information to retain post-employment and for use at Inquire Network and by providing a list of 2,000+ Advisors.

323. Ware, Gohil, Eng, Telo, and Giordano violated their fiduciary duties by working for and providing services to Inquire Network while being paid by Guidepoint. Ware, Gohil, Eng, Telo, and Giordano also violated their fiduciary duties by providing Guidepoint's confidential information to Inquire Network and DL Software.

324. Ware attended video calls organized by Inquire Network domains on April 6, 2026 and April 20, 2026—using his Guidepoint credentials—while still employed by Guidepoint. Ware thus used Guidepoint resources to advance a competitor's interests during his employment.

325. These actions constitute a breach of Ware's, Gohil's, and Eng's fiduciary duties to Guidepoint.

326. Telo exported Guidepoint's internal event and Advisor data to his personal email account and supplied Ware with the confidential Guidepoint transcripts Ware forwarded to himself.

327. On or about May 1, 2026, more than two weeks before her May 19, 2026 separation from Guidepoint, Giordano executed an employment agreement to work for Inquire Network, as Operations Associate, Client Success," reporting to Eng, and she is identified as a member of Inquire's team in its June 2026 investor materials.

328. These actions constitute a breach of Telo's and Giordano's fiduciary duties to Guidepoint.

329. Inquire Network and DL Software knowingly induced and participated in Ware, Gohil, Eng, Telo, and Giordano's above-described breaches.

330. As an example, Dietzel—with knowledge of Ware's and Gohil's breaches—actively participated and rendered substantial assistance to both Ware and Gohil by ingesting the list of advisors onto either Inquire Network's or DL Software's platform. Dietzel is an employee of DL Software and knew that both Ware and Gohil remained employed by Guidepoint.

331. DL Software and Inquire Network facilitated and participated in these breaches by accepting the advisor list and ingesting them. Dietzel responded to Ware by writing: "Alan let me

know when you want to import these, adding them will trigger a registration email for them. We'll most likely need to push the entire thing live first so it's not behind a cloudflare pages block."

332. DL Software's substantial assistance to the Individual Defendants' breach of fiduciary duty extended well beyond receipt of a single file. DL Software also participated in at least two calls with some of the Individual Defendants—on April 6, 2026 and April 20, 2026—during which, upon information and belief, the parties discussed the buildout of Inquire Network or DL Software's platform and the use of Guidepoint's misappropriated data.

333. Shkreli knowingly participated in and rendered substantial assistance to the Individual Defendants' breaches of their fiduciary duties to Guidepoint. Shkreli conceived, financed, and directed the competing venture; personally prepared and revised its pitch decks using Guidepoint's confidential information; recruited Guidepoint's TMT personnel to the venture while they remained employed by Guidepoint; functioned as a decision-maker on the venture's pricing and platform; and encouraged Telo to disregard Guidepoint's demand that he honor his obligations. Shkreli provided this assistance with knowledge that Ware, Gohil, Eng, and the other Individual Defendants were current Guidepoint personnel who owed duties of loyalty to Guidepoint. Guidepoint has been damaged as a result.

334. Duggal knowingly participated in and rendered substantial assistance to Ware's, Gohil's, Eng's, Telo's, and Giordano's breaches of their fiduciary duties to Guidepoint. While those Individual Defendants remained Guidepoint employees, Duggal incorporated Inquire Network, prepared and transmitted the pitch decks built on Guidepoint's confidential "figures from Guidepoint" and "Guidepoint TMT Financials," coordinated the timing of the resignations with Ware, and served as the venture's President into which Guidepoint's misappropriated information and personnel were transplanted. Duggal did so with knowledge that Ware, Gohil, Eng, Telo, and

Giordano were current Guidepoint personnel who owed Guidepoint duties of loyalty, and his assistance enabled and advanced their breaches. Guidepoint has been damaged as a result.

335. Guidepoint has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## JURY DEMAND

Guidepoint hereby requests and demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Guidepoint respectfully requests that the Court enter judgment in its favor and an order that grants the following relief:

A. Declaring that Ware, Duggal, Gohil, Eng, Elliott, Telo, Giordano, Shkreli, Inquire Network, and DL Software misappropriated Guidepoint's Trade Secrets;

B. Declaring that Ware, Gohil, Eng, Telo, and Giordano breached their Employment Agreement with Guidepoint;

C. Declaring that Ware and Gohil breached their Equity Incentive Unit Agreements with Guidepoint;

D. Declaring that Defendants tortiously interfered with Guidepoint's contracts;

E. Declaring that Ware, Gohil, Eng, Telo, and Giordano violated their fiduciary duty to Guidepoint;

F. Enjoining Ware, Gohil, Eng, Telo, and Giordano, and all those acting in active concert or participation with them, from further breaches of the Employment Agreement, namely an injunction that:

1) Preliminarily and prospectively enjoins Ware, Gohil, Eng, Telo, and Giordano and all persons and/or entities in active concert or participation with them,

from working as an employee, agent, independent contractor, employer, advisor, consultant, shareholder, partner or in any other capacity, for any company identified in § 4(a) of the Employment Agreement and any other company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content.

2) Preliminarily and prospectively enjoins Ware, Gohil, Eng, Telo, and Giordano, and all persons and/or entities acting in active concert or participation with them, from attempting to interfere with, impair, or adversely affect any contractual relationship or business relationship between Guidepoint and any client or expert with which Ware, Gohil, and Eng had contact through Ware, Gohil, and Eng's work at Guidepoint, on any matter that relates to Guidepoint; and

3) Preliminarily and prospectively enjoins Ware, Gohil, Eng, Telo, and Giordano, and all persons and/or entities acting in active concert or participation with them, from disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information.

4) Requires Ware, Gohil, Eng, Telo, and Giordano to immediately account for and return all Guidepoint Proprietary Information.

G. Pursuant to Section 4(g) of the Employment Agreement, extending the time periods stated in Section 4 by the duration of the time of the breach and during which the violation has not been cured;

H. Enjoining Duggal and Elliott, and all those acting in active concert or participation with them, from further breaches of the Independent Consultant Agreement, namely an injunction that:

1) Preliminarily, prospectively, and permanently enjoins Duggal and Elliott, and all persons and/or entities acting in active concert or participation with them, from disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information.

2) Requires Duggal and Elliott to immediately account for and return all Guidepoint Proprietary Information

I. Enjoining Defendants, and all those acting in active concert with them, from misappropriating Guidepoint's Trade Secrets and Proprietary Information;

J. Awarding actual, incidental, compensatory, and consequential damages in an amount to be proven at trial, an amount that Guidepoint estimates will exceed $10 million but that is not capable of quantification at this time;

K. Awarding punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

L. Awarding costs and expenses incurred herein, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) or any other applicable law or contract;

M. Awarding pre-judgment and post-judgment interest; and

N. Awarding all other relief as the Court may deem just, equitable and proper.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Justin K. Victor*
Jason D. Burns
Daniel Filor
Shira M. Poliak
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017

(212) 801-9294
Jason.Burns@gtlaw.com
Filord@gtlaw.com
Shira.Poliak@gtlaw.com

Justin K. Victor (*phv*)
Jacob R. Dean (*phv*)
Fallon Jones (*phv*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
(678) 553-2100
Victorj@gtlaw.com
Deanj@gtlaw.com
fallon.jones@gtlaw.com

*Counsel for Plaintiff Guidepoint Global, LLC*