**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, John Elliott, Alex Telo, Olyvia Giordano, Martin Shkreli, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-03684-VEC<br><br>Jury Trial Demanded<br><br>**Declaration of John Campanella** |

**DECLARATION OF JOHN CAMPANELLA**

I, John Campanella, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I currently serve as the Chief Financial Officer for Plaintiff Guidepoint Global, LLC and have been so employed by Guidepoint since September 2011.

2. In this role, I am responsible for overseeing financial management and planning, financial reporting and accounting, and I participate in a committee that oversees information security functions.

3. I submit this declaration in support of Guidepoint's Motion for Temporary Restraining Order. The facts set forth herein are based on my personal knowledge, my review of Guidepoint's business records, and information provided to me by Guidepoint's employees and advisors in the ordinary course of business.

**GUIDEPOINT'S BUSINESS AND COMPETITIVE MARKET ENVIRONMENT**

4. Guidepoint operates in a highly competitive market commonly referred to as the "expert network" or "primary research" industry. Guidepoint and its competitors connect investors, consultants, corporations, and other clients with industry experts for paid consultations, surveys, transcripts, and research insights.

5. Guidepoint's expert network business (the one-on-one expert consultation business) competes primarily on its ability to provide the right expert in the shortest amount of time. To do that, we rely heavily on the size and quality of our existing expert network, the speed with which we can source and recruit additional new experts who are not in our network, and our ability to identify the right experts for our clients' projects. (Once an expert has joined Guidepoint's network, we refer to him or her as an "Advisor" in Guidepoint's network. To become an Advisor, (s)he must agree to Guidepoint's Terms and Conditions (including confidentiality and other compliance provisions) and take Guidepoint's compliance tutorial.)

6. To be able to compete, we train our employees on expert sourcing and recruiting, communicating with experts, understanding our clients' projects, and identifying the expert who is the right fit for their projects.

7. In addition to its expert network business, Guidepoint provides other research products to its clients, including a live teleconference business and a library of transcripts of such teleconferences that we make available to clients for purchase either on a pay-per-view basis or via a subscription. Guidepoint also generates transcripts for purchase from non-live calls that Guidepoint conducts with an Advisor that clients do not attend.

8. While Guidepoint has been offering live teleconferences for twenty-plus years, it is only in the last seven or eight years that Guidepoint began recording those teleconferences and

building a library. At that time, Guidepoint was among the first expert networks to offer live teleconferences and/or transcripts.

9. Starting around 2020, Guidepoint began to see the value of an expert transcript library and decided to devote substantial resources to building its library product.

10. At that time, Guidepoint decided to invest in moderators that would be likely to generate high-quality transcripts. Since the product at that time was expected to be popular among Guidepoint's asset manager client segment, Guidepoint decided to hire moderators who were former sell-side or buy-side analysts. This was based on the premise that our buy-side clients would find value in the topics those moderators selected and that those moderators would ask questions that were of interest to that client segment.

11. Such moderators were seasoned finance professionals and, as such, commanded significantly higher salaries than the average Guidepoint employee, many of whom are hired straight out of college. These elevated salaries are just one example of the investment Guidepoint makes in its library product. Guidepoint also invested heavily in technology associated with the web interface as well as AI search functionality, an editorial staff, an operations staff, compliance support and associates dedicated to this business unit for the purpose of recruiting experts for teleconferences and library transcripts.

12. Although the Guidepoint library was among the first at the time Guidepoint launched it, in recent years a number of competitors and other companies have rolled out expert transcript library products, causing the market to become highly competitive. In order to compete in this market, it is essential that Guidepoint maintain the high quality of its transcripts, which is due to both the quality of its moderators as well as the quality of its experts, both in the network and those recruited for specific teleconferences.

13. To do that, Guidepoint relies in part on its historical information. In setting a schedule for future teleconferences, it is valuable to look at the topics and experts used in prior teleconferences and assess whether there was strong client attendance, any client feedback, and any clients followed up to speak to the expert directly.

14. Guidepoint also relies on the strength of its network and its ability to recruit the right experts quickly to be able to schedule topical teleconferences in real time. Just as with Guidepoint's expert network product, the success of Guidepoint's library product rests heavily on the strength of its expert network and its strong recruiting expertise.

15. Given the investment Guidepoint has made in building its expert network and its library product, and the degree to which Guidepoint's relationships with its Advisors and its ability to recruit new Advisors are central to both of those products, Guidepoint requires its employees and consultants to agree to reasonable restrictive covenants to protect Guidepoint's investment and prevent its employees from leveraging information they obtain through their Guidepoint employment to unfairly compete with Guidepoint.

16. Guidepoint's success and market share are attributable to the expensive and time-consuming investment it has made in its expert network and library product, created over many years.

**THE TMT GROUP AND ENG, TELO, ELLIOTT, AND GIORDANO'S EMPLOYMENT AND ENGAGEMENT AT GUIDEPOINT**

17. The TMT group is a specialized research and content team that produces industry-specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on Technology, Media and Telecommunications ("TMT") topics. It is part of Guidepoint's Insights business unit, one of

Guidepoint's most valuable business units. The content generated by the TMT team—proprietary moderated transcripts and expert teleconferences—is a product Guidepoint sells to its institutional clients.

18. Based on Guidepoint's business records, Christiana (aka Tiana) Eng began working as a Guidepoint employee on or about February 14, 2022. By the time she resigned, on or about March 31, 2026, her title was Operations Team Lead. In that role, Eng managed Guidepoint's operations systems, its Advisor network data, its client relationships, and the operational infrastructure of the TMT team's content-generation business. She learned how Guidepoint sources Advisors, how it onboards them, how it prices calls, how it packages and delivers research products to institutional clients, and how it manages compliance.

19. Based on Guidepoint's business records, Alex Telo began working as a Guidepoint employee on or about November 29, 2021, in the role of Research Associate, Guidepoint Insights, and, following a June 1, 2024 promotion, held the title of Associate, TMT, Guidepoint Insights, until his resignation on or about April 22, 2026. In those roles, Telo had access to Guidepoint's proprietary Advisor data, its event and transcript records, and its internal planning information. As an Associate, Telo frequently interacted with Guidepoint Advisors.

20. Based on Guidepoint's business records, John David Elliott began working as a Guidepoint consultant on or about July 29, 2022, and served as a TMT Consultant until his engagement ended on or about April 24, 2026. In that role, Elliott had access to Guidepoint's proprietary research content, including the moderated transcripts described below, its Advisor relationships, and its client-facing operations.

21. Based on Guidepoint's business records, Olyvia Giordano began working as a Guidepoint employee on or about March 24, 2025, and held the title of Operations Coordinator,

Guidepoint Insights, until her separation on or about May 19, 2026. In that role, Giordano had access to Guidepoint's internal operational systems, its Advisor and client relationship data, and the day-to-day functioning of the TMT team, including managing transcripts and coordinating compliance matters with Advisors.

22. Eng, Telo, Elliott, and Giordano each worked within or in direct support of the TMT group and, as a result, were entrusted with access to Guidepoint's confidential, proprietary, and trade secret information, including information concerning experts in Guidepoint's network, client identities, preferences and feedback, expert recruiting and client sales and marketing strategies, internal training materials, teleconference operations, and client attendance.

23. Eng, Telo, and Giordano each participated in the operation of Guidepoint's Insights business: they participated in identifying and recruiting Advisors for Guidepoint's teleconferences, in the scheduling and execution of those calls, and in the process by which the resulting content is packaged, priced, and sold to Guidepoint's institutional clients. As a result, each of them possesses detailed knowledge of how Guidepoint's Insights business operates.

24. Approximately seven members of Guidepoint's TMT team resigned or ended their engagements between March 31, 2026 and May 19, 2026: Eng (Operations Team Lead) on March 31, 2026; Duggal (TMT Consultant) on April 14, 2026; Telo (TMT Associate), Gohil (TMT Strategist), and Ware (Director of Research and Global Head of the TMT team) on April 22, 2026; Elliott (TMT Consultant) on April 24, 2026; and Giordano (Operations Coordinator) on May 19, 2026.

**ENG, TELO, ELLIOTT, AND GIORDANO'S AGREEMENTS WITH GUIDEPOINT**

25. As a condition of their employment or continued employment, Eng, Telo, and Giordano each executed Employment Agreements with Guidepoint. Guidepoint maintains these

agreements, and Elliott's Independent Consultant Agreement, as business records in the ordinary course of business.

26. On or about February 14, 2022, Eng executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint. A true and correct copy of the agreement is attached as Exhibit 1. On August 2, 2023, Eng executed an amendment to that agreement, acknowledging and reaffirming her post-employment obligations. A true and correct copy of the agreement is attached as Exhibit 2.

27. On or about November 29, 2021, Telo executed an employment agreement containing confidentiality, non-competition, and non-solicitation covenants in favor of Guidepoint, which he later reaffirmed and expanded through a 2023 Amendment dated August 2, 2023. A true and correct copy of the Telo Employment Agreement is attached as Exhibit 3.

28. On or about March 24, 2025, Giordano executed an employment agreement containing confidentiality, non-competition, non-solicitation, and non-interference covenants in favor of Guidepoint. A true and correct copy of the Giordano Agreement is attached as Exhibit 4.

29. On or about July 29, 2022, Elliott signed an Independent Consultant Agreement with Guidepoint containing confidentiality provisions in favor of Guidepoint. A true and correct copy of the Elliott Independent Consultant Agreement is attached as Exhibit 5.

**GUIDEPOINT'S MEASURES TO PROTECT ITS CONFIDENTIAL AND TRADE SECRET INFORMATION**

30. Access to Guidepoint's confidential and trade secret information is limited and role-based. Guidepoint does not make its confidential information available to its workforce at large; instead, it restricts access to non-public systems, documents, and databases to those personnel who have a legitimate business need for it.

31. Guidepoint takes the following steps, among others, to protect its confidential and trade secret information: (a) requiring employees and consultants to access its internal systems through company-issued devices and restricting access to non-public systems, documents, and databases to authorized personnel only; (b) requiring employees and consultants to use multi-factor authentication to access its databases; (c) requiring employees and consultants to agree to and acknowledge strict confidentiality policies governing their use of and access to Guidepoint's confidential and trade secret information; and (d) requiring employees and consultants to sign written confidentiality and restrictive covenant agreements, which expressly prohibit them from misusing Guidepoint's proprietary information or using such information to benefit themselves or a competitor.

**THE NATURE AND VALUE OF THE MISAPPROPRIATED INFORMATION**

32. I have reviewed the following Guidepoint documents, each of which was taken, downloaded, or removed from Guidepoint's control by one or more of Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana Eng, Alex Telo, John Elliott, and Olyvia Giordano (the "Individual Defendants"), each of whom worked with or for Guidepoint's TMT group: (a) the Advisor list titled "TMT+Fintech Advisors 2025.xlsx"; (b) certain of the transcripts of moderated calls between Guidepoint moderators and Guidepoint Advisors; (c) the event and billing spreadsheet titled "export (93).csv"; (d) the event and Advisor data spreadsheet titled "export (1).xlsx"; and (e) the "TMT Pipeline Sheet."

33. I am aware that, on or about March 29, 2026, Kirang Gohil, Alan Ware, and Christiana Eng shared a file with a third party, Daniel Dietzel, titled "TMT+Fintech Advisors 2025.xlsx," (which contains approximately 2,055 rows of names of Guidepoint's Advisors, some of which are listed multiple times).

34. Eng was not authorized to retain TMT+Fintech Advisors 2025.xlsx following her separation from Guidepoint on or about March 31, 2026. Guidepoint's business records reflect no business purpose for which Eng would have retained that file after her separation, or for which she would have provided it to any person or entity other than Guidepoint.

35. TMT+Fintech Advisors 2025.xlsx contains Guidepoint's confidential and trade secret information. Specifically, it includes a list of more than 2,000 Guidepoint Advisors' names and their phone numbers, emails addresses, and current and former companies. One column in this spreadsheet identifies "AdvisorID." These numbers are unique identifiers that Guidepoint assigns each Advisor. The first AdvisorID in the spreadsheet — 74611 — corresponds to the record for the same Advisor in Guidepoint's internal database.

36. This confirms that the file was generated from Guidepoint's own systems. It is not a list that could have been independently assembled from publicly available sources. Building a comparable list from scratch would require substantial outreach, vetting, and relationship development, as well as the expenditure of resources that Guidepoint estimates in millions of dollars—and any such list would not include the Guidepoint Advisor ID number.

37. Guidepoint generates revenue by connecting clients to the Advisors in its network.

38. As a result, it is critical to Guidepoint's business that this information remain confidential and not be shared with competitors or third parties because it would allow those parties to use Guidepoint's own Advisors, which it spent substantial resources assembling, to undermine Guidepoint's business and its relationships with its clients.

39. This information is only available on Guidepoint's CRM system, which is password-protected and can only be accessed by employees or consultants who executed and agreed to stringent confidentiality restrictions on the use and dissemination of Guidepoint's

information. To access information in CRM, such employees or consultants must log in to the Guidepoint system using password protected credentials and multi-factor authentication.

40. Guidepoint has spent tens of millions of dollars and thousands of hours recruiting and cultivating relationships with Advisors, building a network of Advisors, and generating information related to each Advisor in a usable format in Guidepoint's CRM system.

41. Guidepoint's Advisor relationships are themselves a protected business asset. Guidepoint invests substantial resources in sourcing, vetting, onboarding, and maintaining relationships with its Advisors across more than 300 industries, and it maintains the identity of and contact information for those Advisors as confidential. If a competitor were to use Guidepoint's Advisor information to contact those Advisors, schedule them for paid calls, and set their compensation, Guidepoint would lose the benefit of that investment and would have no reliable way to measure what it lost.

42. If a competitor were able to utilize or obtain this information, the impact on Guidepoint would be devastating since Guidepoint's network of Advisors is the foundation for both the expert network product as well as the library product. Guidepoint prides itself on the quality of its network and would be at a huge disadvantage if any competitor were to obtain and use that same network. Due to the competitive nature of our industry, it is quite common for clients to submit the same project to multiple expert networks at the same time. A key differentiator for Guidepoint is the size and breadth of its network, which permits it to propose suitable experts quickly. If a competitor were to have access to that same network, Guidepoint would lose its competitive advantage.

43. This harm would also be irreparable because it would be nearly impossible to identify which client opportunities had been lost due to the competitor's use of the misappropriated

list of Guidepoint Advisors. As noted, clients often submit projects to multiple vendors and Guidepoint won't be told if the client conducts consultations with someone else or if another expert network offers them the same expert.

44. I am also aware that certain Defendants, including Messrs. Ware, Duggal, and Telo emailed dozens of transcripts of moderated calls with Guidepoint's Advisors to their personal email accounts. Guidepoint considers these transcripts proprietary: They have actual commercial value in that Guidepoint offers them for sale to clients as part of the library.

45. These transcripts are only accessible by clients who have a contract with Guidepoint or employees or contractors who are under an agreement with Guidepoint. In all cases, the individuals who access them are under an obligation to treat them as proprietary to Guidepoint and not share them with third parties.

46. The transcripts are not publicly available.

47. By way of background, Guidepoint considers the transcripts in its library to be an extremely valuable asset. The library is Guidepoint's fastest-growing product, and it provides a meaningful revenue stream. It also is central to Guidepoint's success since our clients have now incorporated the review of expert transcripts into their research workflow. As such, it is essential that Guidepoint's clients, who pay to review library transcripts, do not come to understand that the transcripts can be viewed by or made available to anyone who has not paid for them, as that belief would undermine the product as a whole and the product's value. In other words, the public dissemination of these transcripts would artificially suppress the transcripts' value.

48. Guidepoint has hundreds of clients who have agreements with Guidepoint to purchase or obtain access to live teleconferences and/or library transcripts.

49. It took Guidepoint thousands of manhours and millions of dollars to secure, organize, and facilitate the interviews captured within its library of transcripts.

50. If a competitor, start-up, or industry-adjacent participant was able to provide products or services from these transcripts it could severely impact Guidepoint's position within the market, which Guidepoint has spent tens of millions of dollars establishing through investment, time, and effort.

51. The continued use of these transcripts would also cause irreparable harm because it would be difficult to quantify the specific impact each individual transcript (or their cumulative use) would have in diverting business away from Guidepoint.

52. I am also aware that Mr. Ware emailed himself a spreadsheet with the filename AW Mod Comp.xlsx, which contains information about the moderators on the TMT team, and breaks down by moderator the revenue generated by the teleconferences each moderator held. This includes the total number of RSVPs; the total number of events; and total revenue for the group. It also contains compensation information for certain TMT Team Members.

53. Guidepoint is a private company: It does not disclose revenue figures to anyone without a business purpose to receive the information and a confidentiality obligation to keep it confidential. All the information in this document concerning Guidepoint revenue and how that revenue was generated is proprietary to Guidepoint.

54. Guidepoint considers compensation information confidential. Moreover, the data associated with each TMT Team Member is also confidential because it shows the metrics by which Guidepoint tracks TMT Team Members' success. Access to this data would help a competitor know which TMT Team Members generate the most revenue for Guidepoint.

55. I am also aware that Mr. Duggal emailed to his personal email address a spreadsheet with the filename "export (93).csv." This document contains valuable information concerning Guidepoint's TMT business. For example, it lists each event organized by the TMT team and includes information about the number of client RSVPs, the number of transcripts sent following the moderated call, the advisor's name and biographical information, and the CUs billed. This is the number of Consultation Units generated by each event. Subscription clients usually subscribe to a fixed number of Consultation Units that they may spend on various Guidepoint products or services. Depending on a client's contract, certain events may cost 1 CU, 2 CUs, or a half CU. This column identifies how much Guidepoint was paid (in CUs) for each event. (Said differently, CUs is a proxy for revenue earned from the event and the collective client interest in the topic.) Knowing the interest of the client in the topics is valuable for a future revenue state. This file contains information that is extremely confidential because it reveals historical business conducted by the TMT team and key metrics to ascertain the success of each event and the Advisors who participated in those events. This is not just proprietary to Guidepoint's business as a confidential internal document, but also a good starting point for a competitor to build a pipeline of competing events.

56. I am also aware that, while still employed by Guidepoint, Telo exported Guidepoint's internal event in the "export (1).xlsx" spreadsheet and Advisor data and sent it to his personal email address, along with related materials. Telo was not authorized to export that data or to send it to his personal email address, and he had no legitimate business purpose for doing so.

57. The "export (1).xlsx" spreadsheet Telo exported reflects the core of Guidepoint's proprietary TMT expert-network operations. For thousands of Guidepoint events spanning 2024 through early 2026, it captures, among other things: (a) the identities of Guidepoint's Advisors,

together with their companies and job titles; (b) event identifiers, titles, dates, and status; (c) the sectors, subsectors, geographies, and specific public-company tickers associated with each event; and (d) Guidepoint's internal content-manager and operations-manager assignments

58. That "export (1).xlsx" spreadsheet also includes detailed information about the success of thousands of Guidepoint events, including which clients RSVP'ed and how many CUs that client billed.

59. That combination of information in "export (1).xlsx" is not available from any public source. It reveals which Advisors Guidepoint uses, which topics generate client demand, and how Guidepoint staffs and executes its events. In the hands of a competitor, it is a ready-made blueprint for identifying Guidepoint's most valuable Advisors, targeting Guidepoint's clients, and building a competing pipeline of events without incurring any of the cost Guidepoint incurred to develop it.

60. I am aware that, on or about April 21, 2026, Mr. Gohil downloaded to his personal iPhone an Excel spreadsheet with the filename TMT Pipeline Sheet.

61. The TMT Pipeline Sheet reflects Guidepoint's forward-looking teleconference strategy as well as historical information—specifically, it provides a list of specific research topics that Guidepoint has scheduled for teleconferences, both prospectively and historically, and the Advisors that have been identified for each teleconference. This document, in the hands of a competitor, is not merely descriptive of where Guidepoint stands today. It is a roadmap into where Guidepoint is going and how it plans to get there.

**THE INDIVIDUAL DEFENDANTS' INTERROGATORY RESPONSES CONFIRM USE OF GUIDEPOINT'S MISAPPROPRIATED ADVISOR DATA**

62. I have reviewed the Individual Defendants' Joint Responses and Amended Joint Responses to Guidepoint's Second Set of Interrogatories, served on August 31 and supplemented

on September 1, 2026, respectively (the "Interrogatory Responses"). In particular, I have reviewed the responses to Interrogatory No. 15, in which each Individual Defendant was asked to identify every customer or advisor they worked with or for in connection with any Covered Entity from the effective date of the consent order to the present. Based on my review of information provided to me by Guidepoint's employees and advisors in connection with those Interrogatory Responses, I am able to offer the following observations.

63. In her response to Interrogatory No. 15, Christiana Eng identifies by name a substantial list of advisors with whom she communicated in connection with Inquire Network, Inc. and, separately, in connection with RealTime Advisory, Inc. Eng identifies these individuals as advisors she communicated with for administrative purposes, including outreach, scheduling, and coordinating calls. Based on information provided to me, many of the advisors identified by Eng in her Interrogatory Response also appear by name in the TMT+Fintech Advisors 2025.xlsx file — the same file that Gohil, Ware, and Eng shared with Daniel Dietzel of DL Software on or about March 29, 2026, and which I have previously described as containing Guidepoint's confidential and trade secret information, including the names, phone numbers, email addresses, and unique Guidepoint AdvisorIDs of more than 2,000 Advisors in Guidepoint's proprietary network.

64. Specifically, based on information provided to me, approximately 24 of the 28 advisors identified by Eng in her Interrogatory Response as having been contacted in connection with Inquire Network and/or RealTime Advisory also appear in the TMT+Fintech Advisors 2025.xlsx file.

65. Each engagement that Inquire Network or RealTime Advisory has conducted with a Guidepoint Advisor — using contact information and relationships that belong to Guidepoint — represents a use of Guidepoint's proprietary information that cannot be undone. The value of

Guidepoint's Advisor network lies not only in the identities of the Advisors themselves, but in the exclusive relationships Guidepoint has developed with those individuals over years of investment. Every interaction that Eng and her colleagues have had with these Advisors on behalf of a competing venture erodes those relationships and the competitive advantage they represent, in ways that are ongoing and that will be difficult if not impossible to quantify with precision at trial.

**IRREPARABLE HARM AND THE INADEQUACY OF MONETARY DAMAGES**

66. Eng, Telo, and Giordano each occupied a position of trust at Guidepoint and each had access to a different piece of Guidepoint's business—its Advisor network, its transcripts and event data, its client relationships, and its operational and compliance infrastructure. Together, they possess the knowledge and the materials necessary to replicate the TMT group's function at a competitor.

67. The Advisor list, the proprietary transcripts, the TMT pipeline sheet, and the Team Metrics together constitute a complete blueprint for replicating the TMT group's function at a competing firm—identifying who Guidepoint's Advisors are, what content Guidepoint has produced, how Guidepoint evaluates and compensates its team, and which Advisors Guidepoint is in the process of scheduling for future use.

68. The transcripts also present a distinct and particularly serious form of irreversible harm: the permanent loss of their exclusivity. Guidepoint's transcript library has commercial value precisely because it is available only through Guidepoint. Once those transcripts have been used to build a competing product, their exclusive character is destroyed. No damages award can restore the status quo ante in which those transcripts were Guidepoint's alone. The harm is not only to past revenues; it is to the ongoing and future value of a product that Guidepoint has spent years developing.

69. With respect to the TMT pipeline sheet, the harm is similarly difficult to quantify and impossible to reverse. If Inquire Network, Inc. or any competitor uses Guidepoint's pipeline data to schedule these teleconferences before Guidepoint can do so, Guidepoint will lose the anticipated benefit of its investment in such planning. Those lost opportunities will be invisible—Guidepoint will not know that a client attended that same teleconference through Inquire Network rather than Guidepoint as a direct consequence of Guidepoint's stolen pipeline data. The harm will be real but unprovable in the manner required to support a damages award.

70. The harm to Guidepoint's workforce is likewise not fully compensable in damages. The TMT group was a specialized, cohesive research team developed over years through hiring, training, and collaboration. Most members of the TMT group resigned within a month. Guidepoint cannot simply replace that team by posting job listings. The institutional knowledge, the established working relationships among team members, and the accumulated expertise that the group developed collectively cannot be replicated overnight or purchased at a quantifiable price. The cost of rebuilding is not the same as the value of what was lost.

71. The harm Guidepoint faces from the use of that information is ongoing and compounds daily. Each Advisor contacted, each call scheduled, and each transcript generated using Guidepoint's information represents an opportunity Guidepoint may lose without ever learning that it lost it.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 09/09/2026

DocuSigned by:
John Campanella
999C8D9CF594484...
John Campanella