**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, John Elliott, Alex Telo, Olyvia Giordano, Martin Shkreli, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc.,<br><br>Defendants. | Civ. No.: 1:26-cv-03684-VEC-HJR |

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION BY ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT** .......... 1
**II. FACTUAL BACKGROUND** .......... 3
**A. The TRO Defendants' Roles at Guidepoint** .......... 3
**B. The Purported Trade Secrets** .......... 6
**C. The Employee Defendants' Work for RealTime** .......... 8
**III. LEGAL STANDARDS** .......... 9
**IV. ARGUMENT** .......... 11
**A. Guidepoint is Unlikely to Succeed on the Merits** .......... 11
*1. Trade Secret Misappropriation* .......... 11
*2. Breach of Contract Claims* .......... 12
**B. Guidepoint Will Suffer No Harm Absent Injunctive Relief** .......... 14
**D. Further Forensic Imaging and Expedited Discovery are Unwarranted and Present an Undue Burden** .......... 21
**V. CONCLUSION** .......... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*24 Seven, LLC v. Martinez*,
2021 U.S. Dist. LEXIS 15480 (S.D.N.Y. Jan. 26, 2021)....................................... 11, 17

*Apotheco Pharm. Durham LLC v. Ahmed*,
2024 U.S. Dist. LEXIS 103823 (S.D.N.Y. June 10, 2024)............................ 10, 15, 17, 18

*Art & Cook, Inc. v. Haber*,
416 F. Supp. 3d 191 (E.D.N.Y. 2017) ........................................................................ 18

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) .................................................................................................. 13

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)..................................................................................... 10, 18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)............................................................................ 10, 14, 16, 18

*Geritrex Corp. v. Dermarite Indus., LLC*,
910 F. Supp. 955 (S.D.N.Y. 1996) .............................................................................. 15

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)........................................................................................ 10, 14

*Hubbuch v. J&M Realty Servs. Corp.*,
2025 U.S. Dist. LEXIS 230609 (S.D.N.Y. Nov. 19, 2025) .......................................... 22

*Innoviant Pharmacy, Inc. v. Morganstern*,
390 F. Supp. 2d 179 (N.D.N.Y. 2005)......................................................................... 14

*Kadant, Inc. v. Seeley Mach., Inc.*,
244 F. Supp. 2d 19 (N.D.N.Y. 2003)........................................................................... 12

*Moore v. Consol. Edison Co. of New York*,
409 F.3d 506 (2d Cir. 2005)............................................................................................ 9

*Moreno-Godoy v. Kartagener*,
7 F.4th 78 (2d Cir. 2021) ............................................................................................. 12

*Nat'l Coalition on Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020)............................................................................. 9

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)........................................................................................10, 19

*Schreiber v. Friedman*,
2017 U.S. Dist. LEXIS 228087 (E.D.N.Y. Aug. 15, 2017)......................................................21

*State Farm Mut. Auto. Ins. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024) ..........................................................................................9, 14, 19

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)...............................................................................................20

*United Pool Distribution, Inc. v. Custom Courier Sols., Inc.*,
2024 U.S. Dist. LEXIS 135599 (W.D.N.Y. July 31, 2024)......................................................12

*Webcraft Techs., Inc. v. McCaw*,
674 F. Supp. 1039 (S.D.N.Y. 1987)..............................................................................13, 17, 20

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020)...............................................................................................19

## I. <u>PRELIMINARY STATEMENT</u>

Plaintiff Guidepoint Global, LLC's Application by Order to Show Cause for Temporary Restraining Order and Preliminary Injunction (the "Motion") is largely unnecessary. Defendants Alex Telo, Olyvia Giordano, Christiana (aka Tiana) Eng (collectively, the "Employee Defendants"), and John Elliott (together with the Employee Defendants, the "TRO Defendants") were prepared to consent to the majority of the relief sought by Guidepoint. Rather than negotiate that relief, Guidepoint has filed a motion that attempts to obfuscate by ignoring the relevant facts it has learned in the months since discovery has been ongoing in this action. Guidepoint frontloads its Motion with what it presents as damning quotes from Defendants in this action—many of which are not among the TRO Defendants who are the subject of this Motion—in an effort to paint with an overly broad brush, ignoring that the various Defendants and entities relevant to this action are not all similarly situated. That point is thrown into sharp relief on this Motion, where Guidepoint's CFO proudly tells the Court that Guidepoint invests in its transcripts-based business model by hiring seasoned finance professionals as call moderators, as opposed to the typical college graduates that staff the majority of the rest of Guidepoint's operations. But the Employee Defendants *are* such recent college graduates who do not have the specialized knowledge which would warrant the kind of sweeping injunctive relief sought on this Motion.

Not only would such relief have disastrous effects on these young professionals, but there is no *reason* to impose such relief: Guidepoint has no evidence of any threatened harm, irreparable or otherwise. Guidepoint's Motion elides the fact that nearly all of the evidence adduced on this Motion relates specifically to planning related to operations for Defendant Inquire Network, Inc., a business which was abandoned by the majority of the Defendants in this

case when earlier Stipulated Injunctions and Consent Orders were entered enjoining Defendants Alan Ware and Kirang Gohil from working for Inquire. Ware incorporated newly-added Defendant RealTime Advisory, Inc. to develop a business distinct from both Inquire and Guidepoint so that he could build a startup and comply with his and Gohil's injunctions. Eng, Telo, and Giordano all now work for RealTime, *not* Inquire, whose operations continue without them. Ignoring the fact that RealTime's operations do not implicate either the non-compete provisions in Ware and Gohil's injunctions or the ones in the Employee Defendants' employment agreements, Guidepoint is pursuing a scorched earth litigation strategy, trying to cripple RealTime, a non-competing business. Indeed, Guidepoint is currently litigating this exact issue in its motion seeking contempt against Defendants Alan Ware and Kirang Gohil, a motion premised on demonstrably false claims of violations of the Stipulated Injunctions, including, *inter alia*, seeking to assert breaches with respect to conduct that predated entry of the injunctions and complaining that Ware solicited a Guidepoint client that he assisted in the founding of nearly a decade before he began working for Guidepoint. Rather than wait for the Court's ruling on whether RealTime is, in fact, a competing business, Guidepoint filed the instant Motion seeking overlapping determinations of identical legal issues.

In opposing this Motion, the TRO Defendants do not oppose temporary relief which does not expose them to any prejudice. Thus, with respect to Eng, Telo, and Giordano, the TRO Defendants do not oppose entry of an order enjoining them from working for competing businesses (as defined in their respective employment agreements) and Inquire. It is only to the extent that Guidepoint insists that any injunction cover DL Software and RealTime—entities not competing with Guidepoint, and upon whom Eng, Telo, and Giordano rely on as young professionals to make a living—that the TRO Defendants oppose that relief. Likewise, Eng,

Telo, and Giordano are prepared to consent to relief sought regarding usage of Guidepoint's purported trade secrets[1] (to which Elliott also would consent) as well as non-solicitation and non-interference, but for Guidepoint's refusal to narrowly tailor those provisions to be enforceable under controlling New York law. Notwithstanding that an overly broad provision would not be enforceable against conduct outside the scope of such a provision, Guidepoint has made clear with its motion for contempt that it is prepared to ignore both law and facts (and to materially misrepresent facts to the Court) to try to bury Defendants with litigation. Counsel for Defendants attempted to negotiate Stipulated Injunctions and Consent Orders which would moot this Motion and protect any claimed legitimate interests of Guidepoint without imposing a restraint greater than was needed to protect those interests (which would have the effect of forcing Eng, Telo, and Giordano to become immediately unemployed). Guidepoint refused that offer. *See* Ex. A. As such, this narrowly tailored[2] opposition is necessary.

## II. FACTUAL BACKGROUND

### A. The TRO Defendants' Roles at Guidepoint

Elliott was a consultant at Guidepoint. Dkt. 159 ¶ 20. As is relevant to this motion, the only restrictive covenant contained in his Independent Consultant Agreement with Guidepoint was with respect to confidentiality of proprietary information. Dkt. 159-5 § 5. Eng, Telo, and Giordano (the "Employee Defendants") were employed by Guidepoint. In addition to the confidentiality provisions referenced with respect to Elliott, the Employee Defendants' Employment Agreements contained restrictive covenants regarding non-competition, non-

[1] Defendants do not concede that any materials described in Guidepoint's Motion constitutes trade secrets.

[2] The TRO Defendants having consented to certain relief on a temporary basis and not raising arguments in opposition to such relief does not constitute a concession that Guidepoint is entitled to such relief on the merits.

solicitation of employees, contractors, and agents, and non-interference with business relationships. Dkt. 159-2 § 1, 159-3 § 1, 159-4 §3. The non-competition provision identified that the Employee Defendants could not "provide or perform services for any Competing Business that are the same as or similar in purpose or function" as those provided to Guidepoint, and this prohibition only applies to a "company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content." *Id.* The non-solicitation and non-interference provisions do not provide any limitation providing that these provisions only apply with respect to employees or clients of Guidepoint whom the Employee Defendants had substantive involvement with during the course of their employment. *Id.*

Eng graduated from college in 2019, and when she started at in 2022 Guidepoint was only her second job after graduating, having been at her first job for less than a year. Dkt. 159 ¶ 18; Eng Decl. ¶ 7. Her starting salary was $53,000, and her salary remained well below six-figures when she quit from Guidepoint. *Id.* Telo also graduated from college in 2019 with a degree in pre-kinesthesiology. Telo Decl. ¶ 6. He began working at Guidepoint at the end of 2021. *Id.* ¶ 9. His salary was significantly less than that of other moderators at Guidepoint. *Id.* ¶ 10. Giordano graduated from college in 2020. Giordano Decl. ¶ 6. She worked for approximately four years at a corporate housing company where she worked as an Intern, Guest Experience Coordinator, Sales Support Representative, Account Manager, and Business Development Representative, none of which was translatable experience when she switched to Guidepoint. *Id.* ¶¶ 6–7. Because of her urgent need for a full-time job, she took a $30,000 pay cut when she began working for Guidepoint in March of 2025. *Id.* ¶ 8. All of the Employee

Defendants are in their late twenties with minimal savings. Eng Decl. ¶ 45; Telo Decl. ¶ 31; Giordano Decl. ¶ 22.

Guidepoint Chief Financial Officer John Campanella submitted a declaration in support of Guidepoint's Motion, a large swath of which is devoted to describing the TRO Defendants' job responsibilities and access to Guidepoint information. Dkt. 159 ¶¶ 17–24. He claims that his declaration is based on his "personal knowledge, [his] review of Guidepoint's business records, and information provided to [him] by Guidepoint's employees and advisors in the ordinary course of business," although he does not identify any of these employees or business records. *Id.* ¶ 3. None of the Employee Defendants believe they have ever spoken to Campanella. Eng Decl. ¶ 5; Telo Decl. ¶ 5; Giordano Decl. ¶ 5. Each of the Employee Defendants thoroughly dissect Campanella's description of their job responsibilities and their engagement or access to various facets of Guidepoint's business, explaining how the majority of his claims are false. Eng Decl. ¶¶ 11–24; Telo Decl. ¶¶ 11–12; Giordano Decl. ¶¶ 10–14. In addition to generally misrepresenting their jobs on this motion, Campanella's declaration is shockingly disingenuous in suggesting that Eng or Giordano's jobs in operations entailed "identifying and recruiting Advisors for Guidepoint's teleconferences." Dkt. 159 ¶ 23. They did not. Eng Decl. ¶¶ 14, 23, 40; Giordano Decl. ¶ 14. Nor, contrary to Campanella's representation did Eng's, Telo's, or Giordano's jobs provide them with any insight into what went into the pricing or contracting of Guidepoint's services, as those functions were handled by others at Guidepoint. Eng Decl. ¶¶ 16–17; Telo Decl. ¶ 12; Giordano Decl. ¶¶ 12–13.

### B. The Purported Trade Secrets

Guidepoint's Motion makes reference to a number of documents it claims are protected as trade secrets which were exfiltrated by Defendants, although Guidepoint did not provide the Court with copies of any of these documents so that the Court can assess that claim.

Campanella discusses in-depth a file known as "TMT+Fintech Advisors 2025.xlsx" (the "Advisor List"). Dkt. 159 ¶¶ 33–43. Specifically, he describes this spreadsheet as a list of over 2,000 experts utilized by Guidepoint along with their contact information. *Id.* ¶ 35. He explains his belief as to why it constitutes a trade secret of Guidepoint, including his belief that to create a comparable list would cost "millions of dollars." *Id.* ¶ 36. However, experts who perform moderated calls in this industry specifically facilitate their public visibility because they are looking to be hired, generally utilizing the business-centric social media platform LinkedIn. Telo Decl. ¶ 14; Eng Decl. ¶ 26. Any such expert can then easily have their contact information cheaply ascertained using a service like ContactOut or Apollo.io. *Id.* Indeed, Guidepoint's Motion makes reference to a conversation Eng had discussing the Adviser List. Dkt. 156 at 16. In that conversation, Eng described that the Adviser List "was p[retty] horrible" and, for that reason, Apollo was utilized to identify contact and other information. Dkt. 160-7 at 4; Eng Decl. ¶ 27. Additionally, experts utilized by Guidepoint are not exclusive to Guidepoint. Telo Decl. ¶¶ 15–16. Guidepoint's own communications with an advisor confirms that point. Dkt. 121-11. Guidepoint Motion repeatedly mischaracterizes a communication between Eng and DL Software COO Nicholas Longo, which they claim shows that the "whole inquire team" had access to the Advisor List. *See, e.g.*, Dkt. 156 at 20. But the thrust of that communication was that no one should be utilizing the Advisor List. Dkt. 160-7; Eng Decl. ¶ 31. Likewise,

Guidepoint transcripts, all at least five months old at this point, do not have commercial value. Telo Decl. ¶¶ 18–21.

Campanella references a "TMT Pipeline Sheet" purportedly downloaded by Defendant Kirang Gohil. Dkt. 159 ¶¶ 60–61. Pointedly, despite access to forensic analysis of Gohil's devices, nowhere in Guidepoint's Motion does Guidepoint claim that Gohil ever shared the Pipeline file with *anyone*. This is a recurring theme—the only file Guidepoint claims was circulated among the various Defendants was the Advisor List; despite receiving hundreds of thousands of documents pursuant to forensic examination so they could trace the flow of documents they claimed were exfiltrated, Guidepoint does not offer any evidence suggesting that the Defendants ever *attempted* to utilize any other document referenced, let alone that the documents were even shared among each other. Even with respect to the Advisor list, the evidence shows that far from threatened use of that list, Defendants have made sure that the list, and any other Guidepoint materials, are not going to be used. Dkt. 160-7; Eng Decl. ¶ 31; Telo Decl. ¶¶ 17, 25–27.

Throughout Guidepoint's Third Amended Complaint, it alleges that various Defendants "exfiltrated" or otherwise took Guidepoint materials prior to quitting. *See, e.g.*, Dkt. 138 ¶¶ 98, 130. Guidepoint specifically relied on these allegations in supporting its request for forensic examination of Defendants' devices. Dkt. 18 at 20. However, neither in the Third Amended Complaint nor in the Motion does Guidepoint claim that Giordano exfiltrated any Guidepoint materials to her personal devices or accounts. Giordano explicitly denies that she did. Giordano Decl. ¶ 16.

### C. The Employee Defendants' Work for RealTime

Guidepoint's Motion is premised on the assumption that the Employee Defendants work for a Competing Business, as defined by their Employment Agreements. Dkt. 159-2 § 1, 159-3 § 1, 159-4 §3. Originally, the Employee Defendants worked for Defendant Inquire Network, Inc. Eng Decl. ¶ 41; Telo Decl. ¶¶ 22–23; Giordano Decl. ¶ 17. Inquire is intended to become a new-age AI-native investment research and advisory platform providing recommendations to financial institutions and investors, utilizing artificial intelligence to synthesize inputs including expert call transcripts and analyst experience. Dkt. 167 ¶ 7, 167-1.

However, at the inception of this case, Stipulated Injunctions and Consent Orders were entered against, *inter alia*, Defendants Alan Ware and Kirang Gohil, which enjoined their working for Inquire. Dkts. 37 ¶ 2, 42 ¶ 2. Ware and Gohil's compliance with the Injunctions was immediate; the two of them ceased working for Inquire upon entry of the Injunctions, and they did not return to DL Software's offices for approximately a month after the Injunctions were entered. Dkt. 119 at 9–10; Dkt. 168 ¶ 10. Ware decided to pursue a new venture which would not violate his injunction. On June 25, 2026, Ware incorporated, RealTime Advisory, Inc., Dkt. 112-7, a business which provides research, advisory, and consulting services to businesses, including but not limited to financial services firms and corporations, and which does **not** (nor does it intend to) charge customers fees in exchange for access to an online library of primary research content. Dkt. 168 ¶¶ 13–14. This business model is entirely distinct from Guidepoint's, both because it does center around (or even include) a library of transcripts of expert calls sold to clients and because Guidepoint explicitly does *not* offer investment recommendations to its clients. Telo Decl. ¶ 24. RealTime only has one client, and Ware was involved in the founding of said entity. Dkt. 168 ¶¶ 41–45.

Guidepoint's Motion seeks to draw connections between Inquire, DL, and RealTime,[3] to argue that these entities are actually all "functionally the same," but all they can reasonably point to is the fact that those entities share the same offices. Dkt. 156 at 13. Guidepoint makes reference to a Letter of Intent—not a fully executed contract—between Inquire and DL Software, attempting to demonstrate an intent for both entities to sell access to transcripts. *Id.* at 14. But as attested to by DL Software's COO, the entity which was formed on April 8, 2026, pursuant to said letter of intent, Generate Network, Inc., has not been functional since commencement of this litigation just one month later and there are no plans for it to resume development or operations, nor does it intend to create a primary research library. Dkt. 170 ¶¶ 11–14.

Subsequent to the incorporation of RealTime, Employee Defendants all stopped working for Inquire in July and began working for RealTime. Eng Decl. ¶ 41; Telo Decl. ¶¶ 23–27; Giordano Decl. ¶¶ 17–18. Neither Eng nor Giordano work provides the same services they provided to Guidepoint. Eng Decl. ¶ 43; Giordano Decl. ¶ 20. Employee Defendants have never utilized any Guidepoint materials in their work for RealTime. Eng Decl. ¶ 39; Telo Decl. ¶¶ 25–28; Giordano Decl. ¶ 19. Inquire still is an ongoing business run by Defendant Sheetal Duggal, and Elliott is an analyst for Inquire. Dkt. 167 ¶ 16.

## III. <u>LEGAL STANDARDS</u>

"When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint." *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020). It is axiomatic that a "preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *State*

---

[3] These issues are more fulsomely briefed in Guidepoint's currently pending motion seeking to hold Ware and Gohil in contempt based on their working for RealTime. *See* Dkts. 107 *et seq.*

*Farm Mut. Auto. Ins. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (quoting *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotations omitted). "To obtain preliminary injunctive relief, a party must show: '(1) a likelihood of success on the merits . . .; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.'" *Apotheco Pharm. Durham LLC v. Ahmed*, No. 24-CV-03619 (MMG), 2024 U.S. Dist. LEXIS 103823, at *8 (S.D.N.Y. June 10, 2024) (quoting *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)). "The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *State Farm*, 120 F.4th at 80 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)) (internal quotations omitted). "This requirement must therefore be satisfied before the other requirements for an injunction can be considered." *Id.*

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations omitted). "Additionally, courts must consider 'the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.'" *Apotheco*, 2024 U.S. Dist. LEXIS 103823, at *8 (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)). "Failure to demonstrate any of the above factors is **fatal** to the request for relief." *Id.* (emphasis added).

## IV. ARGUMENT

### A. Guidepoint is Unlikely to Succeed on the Merits

Before even addressing questions of Guidepoint's harm or a balancing on the merits, Guidepoint's application should be denied because it cannot demonstrate a likelihood of prevailing on its claims.

#### 1. *Trade Secret Misappropriation*

Guidepoint cannot establish it is likely to succeed on its claims under the Defend Trade Secrets Act ("DTSA") because it has not established that any materials taken by the Employee Defendants constitute trade secrets.[4] Judge Broderick granted a motion to dismiss with respect to a case with substantially similar facts. With respect to names of clients (or, in this case, advisers), Judge Broderick recognized that:

> Whether just the names of clients listed in the allegedly protected documents constitute trade secrets is not a complex question. [T]he sine qua non of whether a customer list constitutes a trade secret lies in whether the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, or, by contrast, the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money.

*24 Seven, LLC v. Martinez*, No. 19-CV-7320 (VSB), 2021 U.S. Dist. LEXIS 15480 at *19 (S.D.N.Y. Jan. 26, 2021) (internal quotation marks omitted). In this case, as described *supra*, Guidepoint's advisors specifically facilitate their own visibility on social media to enable themselves to be hired. Likewise, Judge Broderick noted that with respect "to the contact information and customer preferences in the Report and account lists, the pleadings also do not demonstrate that this information rises to the level of a trade secret," including because that

[4] In fact, Guidepoint does not even plausibly claim Giordano misappropriated any Guidepoint materials—they merely claim she was an employee of Inquire with access to the Advisor List. Dkt. 156 at 20.

information was "widely available online." *Id.* at *20 (internal citation omitted). Here, too, Defendants were able to actually *improve* on the Advisor Lists utilizing Apollo.io to find contact information for the advisors in question. And, regardless, anyone can reach out to an advisor directly on LinkedIn, negating a finding that the information at issue could constitute a trade secret. *Id.* at *21–22 (citing *Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 36 (N.D.N.Y. 2003)) (denying trade secret protection to contacts information where customer companies' general contact information was readily available and "follow-up questions to the company in general would reveal the specific names, e-mail addresses, or phone numbers of individuals involved in the purchasing process").

Nor do transcripts constitute trade secrets. "As a general matter, stale or obsolete information of this sort cannot even form the basis for a trade secret claim, as it has no economic value." *United Pool Distribution, Inc. v. Custom Courier Sols., Inc.*, No. 22-CV-6314-FPG, 2024 U.S. Dist. LEXIS 135599 at *8 (W.D.N.Y. July 31, 2024). By their very nature, such transcripts are stale within days of being produced.

Having failed to identify any trade secrets misappropriated, Guidepoint's claim must fail.

*2. Breach of Contract Claims*

Guidepoint also cannot establish a likelihood of success on its breach of contract claims. "To prevail on a breach-of-contract claim in New York, a plaintiff must prove: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (internal quotation marks omitted).

Initially, the non-solicitation and non-interference clauses in the Employee Defendants' Employment Agreements are unenforceable because they do not limit breaches of those

provisions to solicitation or interference with people or entities with whom the Employee Defendants substantively engaged with during their employment at Guidepoint. These provisions are "too broad to comport with the public policies of New York," which policies "oppos[e] excessive restriction on an employee's ability after employment to continue to earn her livelihood in her field," where "the restriction covers solicitation of any customer of [the Employer] regardless whether the employee had any contact with or even knowledge of that customer's dealings with [the Employer]." *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987). New York courts do not enforce such broad restrictive covenants, as they are restraints which are greater than needed to protect an employer's legitimate interests. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392 (1999) ("Extending the anti-competitive covenant to BDO's clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive accounting services would, therefore, violate the first prong of the common-law rule: it would constitute a restraint 'greater than is needed to protect' these legitimate interests."). For the same reason, Guidepoint cannot establish an actual breach of these provisions—it has not identified in its Motion who the Employee Defendants purportedly solicited or interfered with and, simultaneously, identified how the Employee Defendants engaged with those individuals during their employment at Guidepoint.

As described *supra*, Guidepoint cannot establish a breach of the Employment Agreements' confidentiality provisions because the material purportedly exfiltrated does not constitute Guidepoint's trade secrets. Nor can Guidepoint establish a breach of the non-competition provisions. As Guidepoint notes, there are two limiting factors present in the non-competition provisions. Dkt. 156 at 26. The first is that only providing similar services as those provided to Guidepoint are prohibited. However, Eng and Giordano are *not* providing

similar services as they provided to Guidepoint. The second factor is that the services must be provided to a "Competing Business," defined as a "company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content." But aside from Guidepoint's *ipse dixit*, it cannot establish that RealTime fits that description—because it does not. RealTime does not provide access to a library of primary research material, and it does what Guidepoint explicitly does not—provides advisory services.

Finally, even if Guidepoint could establish the enforceability of the provisions at issue, or that Employee Defendants breached those provisions, its breach of contract claim is deficient because Guidepoint cannot establish any damages associated with its claims of breach. Guidepoint's own evidence in support of its motion for contempt evidences that experts frequently provide moderated call services to a wide spectrum of firms; they are not the exclusive property of Guidepoint. Likewise, Guidepoint points to no evidence that any confidential information was commercially used.

### B. <u>Guidepoint Will Suffer No Harm Absent Injunctive Relief</u>

As discussed *supra*, "[t]he irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *State Farm*, 120 F.4th at 80 (quoting *Faiveley*, 559 F.3d at 118) (internal quotations omitted). As detailed further below, Guidepoint has failed to "demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent." *Grand River*, 481 F.3d at 66 (internal quotations omitted), and thus, its Motion must be denied.

As a threshold matter, Guidepoint's argument that courts "in certain circumstances have found it appropriate to presume the existence" of irreparable harm, Dkt. 156 at 32 (citing *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 188 (N.D.N.Y. 2005)), relies on

a misrepresentation of the applicable law in the present case. Specifically, the Second Circuit has held more recently that this "reading is not correct." *Faiveley*, 559 F.3d at 119. "A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Id*. "[W]here there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that the plaintiff may suffer is loss of sales to a competing product . . . which should be fully compensable by money damages." *Id*. (quoting *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996)). While Defendants dispute Guidepoint's claim that they have misappropriated any of its trade secrets for any purpose—to the extent Guidepoint can prove otherwise (it cannot), it certainly has not demonstrated the intent of any Defendant to further disseminate the information or materials at issue. Indeed, receiving hundreds of thousands of documents in forensic discovery, the most it has produced is that the discussion among the Defendants was that any Guidepoint files *should not even be opened*. Thus, Guidepoint is not entitled to any presumption of irreparable harm. *See Apotheco*, 2024 U.S.P.Q.2d at *12–13 ("Even assuming for purposes of this motion that the documents and information taken by [defendant] constitute trade secrets, [plaintiff] has failed to put forward any evidence that [defendant] has imminent plans to disseminate those documents and the information contained within them. In fact, the evidence [plaintiff] has offered to the Court are emails sent from [defendant's] Apotheco account to himself at his personal email account. Such documents may constitute evidence that [defendant] has intentions to use this information for his own pecuniary gain, but they do not establish an intent to distribute the trade secrets to others or take other action to diminish their value more broadly."). *See also id*. ("Because the movant seeking a

preliminary injunction must show that the harm is imminent, not remote or speculative, the vague risk that [defendant] could disseminate the information if he wishes does not satisfy their burden.").

In support of its claim of irreparable harm, Guidepoint first alleges that "Eng, Telo, and Giordano expressly acknowledged that Guidepoint "would be irreparably injured by [their] violation of Sections 4, 5, 6, or 7 of their employment agreements." Dkt. 156 at 32 (citations omitted). However, Guidepoint's argument fails to recognize that any purported breach on the part of Eng, Telo, and/or Giordano has not actively placed Guidepoint at risk of a serious, irreversible injury. Notably, at no point in its Motion does Guidepoint allege a real danger that Defendants will actually "disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley*, 559 F.3d at 119. Ostensibly, this is because it cannot reasonably make such an allegation, as it would not comport with the facts in this case. Simply put, in view of the evidence currently before the Court, Guidepoint cannot allege in good faith that Defendants' work for RealTime represents any type of threat. As stated in her Declaration, in her capacity as head of operations for RealTime, Eng has overseen "extensive research to attempt to build out the structure and workflows of a successful business based on industry standards, not Guidepoint standards. **We are not trying to replicate Guidepoint because we are not trying to compete with Guidepoint.**" *Id.* ¶ 43 (emphasis added). Accordingly, "no part of RealTime's business is premised on the building or selling access to a library of primary research materials." *Id.* ¶ 44.

Guidepoint's second argument, that it "faces irreparable harm because the Computer Forensic Defendants improperly possess and are poised to disclose Guidepoint's confidential, proprietary information and trade secrets to Inquire Network, DL Software, and RealTime

Advisory—each a competitor," Dkt. 156 at 33, is equally without merit. Guidepoint's claim is belied by the simple fact that in the past approximately five months since any Defendant in this case has been employed by Guidepoint, the only information it has been able to demonstrate that Defendants disclosed is the Advisor List—which the evidence in this case clearly establishes Defendants are not using. As Eng has personally testified, "[b]ased on my discussions with the Defendants in this action—and certainly as to me personally—no one is using any Guidepoint lists for reaching out to any experts." Eng Decl. ¶ 39. Given the highly speculative nature of this argument, it cannot succeed. *See Apotheco*, 2024 U.S. Dist. LEXIS 103823 at *13 (denying Plaintiff's claim of irreparable harm "due to its speculative nature" and holding that while "it is certainly possible—in the course of Ebers Pharmacy's normal business—for [defendant] to issue prescriptions to [plaintiff's] patients or to solicit [plaintiff's] referral sources. But the mere possibility of this is not sufficient for a showing of imminent irreparable harm.").

Third, Guidepoint argues that it "faces irreparable harm due to the loss of client and Advisor relationships, goodwill, and competitive advantage." Dkt. 156 at 33. Here too, Guidepoint's position is not aligned with the established facts in this case. Specifically, Defendants do not have access to any client-focused material whatsoever. *See* Eng Decl. ¶¶17, 20; Telo Decl. ¶¶ 11–12; Giodano Decl. ¶¶ 10, 12–13, 16. Additionally, Guidepoint's purported investment of "tens of millions of dollars and thousands of hours recruiting and cultivating relationships with Advisors, building a network of Advisors, and generating information related to each Advisor," Dkt. 156 at 27-28, is inapposite to the Court's irreparable harm analysis, as these "relationships" are ultimately non-exclusive, and thus, do not rise to the level of a trade secret. *See* Eng. Decl. ¶ 26; Telo Decl. ¶ 13–16. *See also 24 Seven, LLC v. Martinez*, No. 19-CV-7320 (VSB), 2021 U.S. Dist Lexis 15480 (S.D.N.Y. Jan. 26, 2021) ("Here, it is clear from the

record that the lists of candidates and customers are readily obtainable in the industry; therefore, I find that this information **does not constitute a trade secret.**") (emphasis added); *id*. ("The fact that compilation of these lists was an arduous task is not alone sufficient to confer protection under the DTSA."); *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1044-45 (S.D.N.Y. 1987) (a list of prospective customers "put together from easily available sources" does not necessarily amount to a trade secret despite the fact that "considerable work [went] into compilation of the list"); *Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 196 (E.D.N.Y. 2017) ("[T]he fact that the contacts on [the plaintiff's] customer lists are generally known within [the plaintiff's] industry is **fatal**" despite the plaintiff's testimony that it spent "tens if not hundreds of hours" of research compiling these lists) (emphasis added).

Finally, in apparent duplication of its second argument above, Guidepoint asserts in conclusory fashion that it "establishes irreparable harm because the harm it faces—loss of exclusivity of its trade secrets and proprietary information; impairment or loss to client/Advisor relationships and goodwill; and additional lost employees—is extremely difficult to quantify through monetary damages." Dkt. 156 at 34. But as discussed *supra*, Guidepoint fails to establish that it maintains any exclusive trade secret rights in the referenced information at all, and further, to the extent it does—that Employee Defendants will actually "disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets," *Faiveley*, 559 F.3d at 119, or that there is any imminent risk of Employee Defendants impairing client, advisor, or employee relationships. Thus, for the foregoing reasons, Guidepoint fails to establish irreparable harm—a failure that is ultimately "*fatal* to the request for relief." *Apotheco*, 2024 U.S. Dist. LEXIS 103823 at *9 (quotations omitted) (emphasis added). Accordingly, Guidepoint's Motion must be denied in its entirety.

### C. Guidepoint's Attempt to Financially Ruin Three Young Adults Does Not Weigh the Balance of Hardships in Its Favor

As outlined *supra*, a party seeking preliminary injunctive relief must show "that the balance of hardships tips in the plaintiff's favor." *Benihana, Inc.*, 784 F.3d at 895. To determine whether Guidepoint has met this requirement, the Court must "'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *State Farm*, 120 F.4th at 85 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020). "This factor is 'related' to the irreparable harm requirement as 'both . . . consider the harm to the parties' with the relevant harm being that which '(a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction.'" *Id.* (quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted)).

Guidepoint recycles its arguments by stating that the "the balance of hardships and public interest both strongly favor Guidepoint's requested relief" because "[a]bsent injunctive relief, Guidepoint faces a significant threat of irreparable harm arising from Defendants' exploitation of its confidential information and competition with its business." Dkt. 156 at 35. But for the reasons discussed at length *supra*, Guidepoint fails to establish that it faces a significant threat of irreparable harm whatsoever—certainly not at the hands of Employee Defendants. Guidepoint asserts in conclusory fashion that since "Computer Forensic Defendants have repeatedly demonstrated a blatant disregard for their contractual obligations to Guidepoint, injunctive relief will merely stop them from unfair competing against their former employer using the former employer's trade secrets." Dkt. 156 at 35. Yet, in the five months since any Defendant has worked for Guidepoint, it has been unable to produce any tangible evidence to substantiate this claim.

As young adults who are only several years removed from college and attempting to keep up with the modern inflated cost of living, Employee Defendants can ill-afford to endure the consequences of the requested relief, which if granted, would effectively bar Defendants from continuing to be gainfully employed at their current roles, resulting in a cascade of personal economic catastrophe. *See* Eng Decl. ¶ 45; Telo Decl. ¶ 31; Giordano Decl. ¶ 22. When considering whether to grant requests for injunctive relief, "courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood, **a result strongly disfavored by public policy in New York**." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (emphasis added). After weighing the speculative harm that Guidepoint theorizes it will incur—without any evidentiary backing—against the very real, foreseeable harm that Defendants would experience in the event the Court granted the requested injunctive relief, it is clear that the balance of hardship tips strongly in *Defendants' favor*.

In addition to the explicit request of Guidepoint that this Court bar Employee Defendants from working for DL or RealTime, Guidepoint's preferred language of a non-solicitation injunction against Telo would have the effect of making it so he cannot work *at all* in his field. As noted *supra*, New York public policy "oppos[es] excessive restriction on an employee's ability after employment to continue to earn her livelihood in her field," where "the restriction covers solicitation of any customer of [the Employer] regardless whether the employee had any contact with or even knowledge of that customer's dealings with [the Employer]." *Webcraft*, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987). Guidepoint claims it does not seek to "prevent Eng, Telo, or Giordano from earning a livelihood in any industry, including the expert-network industry." Dkt. 156 at 27. But, hypocritically, Guidepoint also refuses to agree to any injunction

which would not be violated if Telo reached out to an expert on the Advisor List—a list with over 2,000 names on it—even if Telo has no actual knowledge of said expert's presence on the Advisor List. Defendants' counsel outlined how any of Guidepoint's legitimate interests would nonetheless be protected based on the injunctions Telo was willing to consent to and asked Guidepoint's counsel to explain how Guidepoint's interests were not protected; Guidepoint's counsel's response did not deign to offer an explanation. *See generally* Ex. A. Thus, Guidepoint's conception of permitting Telo to earn a livelihood in his industry is to have him walk through a minefield, unaware if any expert he reaches out to might invite a contempt motion from Guidepoint.

Guidepoint's speculative harms—premised on ignoring that RealTime's business model is explicitly aimed at *not* competing with Guidepoint, and which are unsupported by any evidence of usage of Guidepoint's purported trade secrets after the commencement of this case despite receiving significant forensic discovery—do not outweigh the harms that are 100% guaranteed by the injunctions Guidepoint seeks: forcing Employee Defendants' unemployment. As such, this Court should not grant Guidepoint any relief which would have the necessary result of causing such harm.

### D. <u>Further Forensic Imaging and Expedited Discovery are Unwarranted and Present an Undue Burden</u>

Although Guidepoint asks the Court to "requir[e] Defendant Giordano to make her devices available for computer forensic imaging," it does not offer any argument on this point. This is likely because it has no reasonable basis to request such imaging, which would impose additional costs on Defendants as well as an undue burden upon Giordano in seeking to deprive her of her devices. It is Guidepoint's burden to establish why forensic imaging of Giordano's personal devices is warranted. *Schreiber v. Friedman*, No. 15-CV-6861 (CBA) (JO), 2017 U.S.

Dist. LEXIS 228087 at *14–16 (E.D.N.Y. Aug. 15, 2017) (identifying various scenarios when forensic imaging may be warranted but noting courts "order discovery from such sources **if the demanding party shows good cause**") (emphasis added) (internal quotation marks omitted).

As outlined *supra*, Guidepoint has not claimed (nor could it) that Giordano has ever possessed confidential Guidepoint materials on her personal devices. It has not even *attempted* to meet its burden in establishing why such imaging would be warranted.

Likewise, Guidepoint has not provided any argumentation on why it is entitled to expedited discovery. Even courts in the Second Circuit applying a more flexible standard require a showing of good cause in order to be entitled to expedited discovery. *Hubbuch v. J&M Realty Servs. Corp.*, 2025 U.S. Dist. LEXIS 230609 at *4 (S.D.N.Y. Nov. 19, 2025). Given Guidepoint's failure to put forth any arguments as to why such a standard has been met, TRO Defendants cannot respond to nonexistent arguments. The Court has entered a Case Management Plan, Dkt. 95, and Guidepoint has not identified any reason to deviate from that plan.

## V. CONCLUSION

For the foregoing reasons, this Court should deny Guidepoint's Motion in its entirety, and grant Defendants such other and further relief as this Court deems just and proper.

Dated: September 16, 2026

Respectfully submitted,

*/s/ Edward A. Paltzik*
Edward A. Paltzik
Craig L. Uhrich
Erik J. Dykema
Isaac M. Diskind
Avery Horovitz
**TAYLOR DYKEMA PLLC**
914 E. 25th Street
Houston, Texas 77009
(516) 526-0341
edward@taylordykema.com
*Attorneys for Defendants*