**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Guidepoint Global, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Alan Ware, Sheetal Duggal, Kirang Gohil, Christiana (aka Tiana) Eng, John Elliott, Alex Telo, Olyvia Giordano, Martin Shkreli, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-3684-VEC<br><br>**DECLARATION OF CHRISTIANA (AKA TIANA) ENG** |

I, Christiana (aka Tiana) Eng, of full age, do hereby declare as follows:

1. I am a Defendant in the above-captioned action.

2. I make this Declaration in opposition to Plaintiff Guidepoint Global, LLC's ("Guidepoint") Application by Order to Show Cause for Temporary Restraining Order and Preliminary Injunction (the "Motion").

3. I make this Declaration based upon my personal knowledge of the facts asserted herein.

4. I have fully read the Declaration of Guidepoint CFO John Campanella. I am astonished that a man who, to my recollection, I have never spoken to in my life feels competent to declare under penalty of perjury the details of my experience at Guidepoint.

5. Campanella declares that his declaration is based on his "review of Guidepoint's business records, and information provided to [him] by Guidepoint's employees and advisors in the ordinary course of business." Dkt. 159 ¶ 3. Either his sources of information are inaccurate or he has purposely misrepresented information for litigation benefit.

## I. General Experience at Guidepoint

6. Even before directly addressing me, Campanella distinguished me from the specialized moderators whom Guidepoint puts a premium on with high salaries, distinguishing them from "the average Guidepoint employee, many of whom are hired straight out of college." Dkt. 159 ¶ 11.

7. I graduated college in May of 2019, and began working at Guidepoint a few years later. It was my second job after graduating, and I was at the first for less than a year. My starting salary was approximately $53,000, and my salary when I quit was still far below six-figures.

8. When I started at Guidepoint, there was transparency regarding employee reviews and job trajectory, and promotions were represented as including a raise of $10,000. But after only a year, the documents reflecting review and job trajectory policies were deleted from the employees' shared drives and raises dipped to a fraction of what they had been.

9. On the operations team, bonuses were split evenly regardless of role, title, and job performance. Despite my title of "Operation Team Lead," I was treated as a rank-and-file employee.

10. I had been applying to new jobs for approximately two years prior to leaving Guidepoint.

## II. Job Responsibilities

11. Campanella identifies a laundry list of Guidepoint functions I supposedly "managed" in my role at Guidepoint. Dkt. 159 ¶ 18. By and large, these claims are false.

12. My day-to-day at Guidepoint was generally ministerial, such as starting calls on Zoom, managing attendance of clients on Twilio teleconferences, and inputting the information for newly formed events in the system. On occasion, if a client's compliance team needed more

information from a given advisor, I would forward those questions to be answered by the advisor. I would also assist if a billing issue arose.

13. I am not entirely clear what Campanella means when he claims I "managed Guidepoint's operations systems," Dkt. 159 ¶ 18, but it does not sound like my role, as I had no control over the technology utilized by Guidepoint.

14. I unequivocally reject the claim that I managed "Advisor network data," or that I learned how "Guidepoint sources" or "onboards" advisors. Dkt. 159 ¶ 18. The operations team in general (and certainly my role) was in no way in charge of sourcing, outreach, vetting, scheduling, or onboarding of **any** advisor. These functions were performed by moderators.

15. In fact, when I was on occasion asked how to onboard an advisor, I would send that question either to a moderator or to a research associate because I do not know what the process entails.

16. It is similarly inaccurate to suggest I "learned how Guidepoint . . . prices calls[.]" Dkt. 159 ¶ 18. If I ever had to input such data, I would contact the given moderator associated with the call, because that was, to my knowledge, within their purview.

17. Nor did I learn "how [Guidepoint] packages and delivers research products to institutional clients." Dkt. 159 ¶ 18. Frankly, that structure is entirely unknown to me as I only know that various clients seemingly paid different prices for the same products, and I have no knowledge as to why that was the case—I was not privy to or involved in contract negotiations. Guidepoint's customer relationship management software ("CRM") managed any charges to the client based on their contracts, so it was never necessary for me to know (and consequently I did not inquire into) the details of any given client's contract.

18. As I noted above, I did not learn how Guidepoint "manage[d] compliance." Dkt. 159 ¶ 18. My only engagement with compliance was that if a client reached out with questions for compliance purposes, I copied and pasted the questions provided by the client's compliance team. Each client had their own compliance protocols (that is, questions they needed asked to advisors), meaning that there was no Guidepoint-specific compliance for me to manage or learn.

19. Likewise, Campanella's description of the "information" I was entrusted with access to is not reflective of my work for Guidepoint. Dkt. 159 ¶ 22.

20. Client lists, preferences, and feedback were not relevant to my work in operations. For the same reason I did not access or use any marketing strategies—I never recruited, or attempted to recruit, any client or advisor while working at Guidepoint.

21. The only "training manuals," Dkt. 159 ¶ 22, I have any particular knowledge of were those that I assisted in drafting for the operations team. I did not take any of those with me when I left Guidepoint.

22. Referencing "teleconference operations," Dkt. 159 ¶ 22, is disingenuous stretch to pretend we have more specialized knowledge than we had—operations for teleconferences extended to understanding how to use the Twilio or Zoom platforms.

23. I unequivocally deny Campanella's claim that I "participated in identifying and recruiting Advisors for Guidepoint's teleconferences," nor in any of the other items listed in Campanella's paragraph on this point. Dkt. 159 ¶ 23. My involvement in these calls was, essentially, to press "confirm" regarding the calls and then starting them using the teleconference software at the time arranged by others. It is apparent to me that Guidepoint's strategy on this motion is to throw anything they can think of at the wall and see what sticks.

24. I never encountered any "role-based" limitations on access to information within Guidepoint's systems. Dkt. 159 ¶ 30. Campanella makes much ado of my transition to "Operations Team Lead" during my time at Guidepoint, *id.* ¶ 18, but I do not believe I experienced any change in my security access to materials between my entry level position and as a "Team Lead" four years later.

## III. <u>Guidepoint's Materials and Business</u>

25. Guidepoint's motion appears to purposely misrepresent mine and others' engagement with materials they claim were taken from Guidepoint.

26. Guidepoint's Motion referenced "an Apollo-generated CSV export" derived from the "TMT+Fintech Advisors 2025" spreadsheet. Dkt. 156 at 16. Aside from the fact that the list of advisors was not a trade secret—it was a list of people *looking* to be hired, who could be publicly found on LinkedIn or elsewhere—the references to Apollo, a third-party vendor, is to a platform which provides contact and other information using publicly available data.

27. Far from using the spreadsheet because of its value, I noted in a communication attached by Guidepoint that it was my understanding that the list "was p[retty] horrible" and that was why Apollo was used to identify contact and other information. Dkt. 160-7 at 4.

28. The Motion's claim that I "deal[] extensively with Advisors" is likewise a disingenuous conclusion. To the contrary, the "Advisor outreach emails" that Guidepoint references were form emails that were indicative of a **<u>non-personal</u>** approach to communication with any expert that would be reached out to.

29. This is in line with what my role was with Inquire, and now with RealTime, which is overseeing operational affairs: getting insurance, finding software, using vendors for workflows, managing technology, and the like. My role does not involve any substantive knowledge or

interaction with any advisors or experts, and no Guidepoint list of advisors would assist with my work.

30. It is shocking that Guidepoint is attempting to cast utilizing third-party vendors like QuickBooks or Ramp—related to financial functions—as somehow reflecting Guidepoint's structure for an "Advisor engagement model." Dkt. 156 at 17. Apparently, Guidepoint is seeking to enjoin me from working in any position that has to pay a contractor.

31. Guidepoint also makes repeated reference to a conversation I had with Nick Longo. Dkt. 160-7. They mention the conversation as proof that this spreadsheet was shared with the Inquire team. They conveniently ignore the fact that the entire thrust of the conversation was that the file was *not* to be used. *Id.* at 4 ("Does it say when it was last opened in [Microsoft] 365? **Don't open it but try to check**" . . . "Well- the thing is his list was p[retty] horrible" . . . "**Still can't open it**") (emphasis added).

32. As I understand my attorneys offered, I am happy to offer to agree not to use any such Guidepoint list because it is utterly irrelevant to my work in operations.

33. Campanella also attempts to mislead this Court as to both the business of the TMT team at Guidepoint and the work of the Defendants in this case.

34. Campanella references clients "submit[ting] the same project to multiple expert networks at the same time," and he speculates as to the irreparable harm of clients being able to "conduct consultations" with a business other than Guidepoint. Dkt. 159 ¶¶ 42–43. This is a reference to a *separate* arm of Guidepoint's business, which arranges 1-on-1 calls between a client and an expert. That was *not* the business of the Insights arm of Guidepoint, which the TMT group at issue in this case is a part of. The Insights, and thus the TMT group, *only* ran events hosted by moderators.

## IV. Work for RealTime Advisory, Inc.

35. I am aware that Guidepoint's Motion claims that I presently work for Inquire, and that through this work, I am involved in using materials owned by Guidepoint to contact Advisors for purposes of scheduling calls on behalf of Inquire clients.

36. Campanella's declaration makes a number of wildly incorrect assumptions about these communications.

37. First, my interrogatories mention that I communicated with given experts for "administrative purposes." Dkt. 160-14 at 11. He nonetheless suggests that I was involved in "outreach" with these experts. Dkt. 159 ¶ 63. I had no substantive engagement with any of these individuals.

38. Next, Campanella bemoans that "Each engagement that Inquire Network or RealTime Advisory has conducted with a Guidepoint Advisor — using contact information and relationships that belong to Guidepoint — represents a use of Guidepoint's proprietary information that cannot be undone." Dkt. 159 ¶ 65. Even assuming, for the sake of argument, that Campanella is correct that any such information is proprietary, he has precisely identified that *no use of Guidepoint's proprietary information has taken place*.

39. Based on my discussions with the Defendants in this action—and certainly as to me personally—no one is using any Guidepoint lists for reaching out to any experts. Thus, Campanella appears to concede that no violation occurs when someone reaches out to an individual without knowledge that they are on a Guidepoint list.

40. It cannot escape the Court's notice that although Campanella claims that I reached out to 24 individuals who were on a Guidepoint list, he does not identify that I ever communicated

with (let alone had substantive engagement with) any of those individuals while I was employed at Guidepoint.

41. Although I previously worked with Inquire under the direction of Sheetal Duggal, as of the date of this Declaration (and for approximately two months beforehand), I perform work exclusively for RealTime under the direction of Alan Ware.

42. In my present work with RealTime (and for my prior work for Inquire), my role has never entailed finding experts to conduct moderated calls.

43. As the head of operations for RealTime, I have done extensive research to attempt to build out the structure and workflows of a successful business based on *industry* standards, not Guidepoint standards. We are not trying to replicate Guidepoint because we are not trying to compete with Guidepoint..

44. I can confirm that no part of RealTime's business is premised on the building or selling access to a library of primary research materials.

45. My current work for RealTime, which I am paid through DL Software's payroll, is my sole source of income. As an unmarried woman paying rent in New York City, less than a decade out of college and with minimal savings, it is not an exaggeration to say that an injunction which barred me from working for DL Software or RealTime would be catastrophic.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2026

______________________________
Christiana (aka Tiana) Eng