USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/8/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUIDEPOINT GLOBAL, LLC,

Plaintiff,

-against-

ALAN WARE, SHEETAL DUGGAL, KIRANG GOHIL, CHRISTIANA (a/k/a TIANA) ENG, INQUIRE NETWORK, INC., DL SOFTWARE, INC., JOHN ELLIOTT, ALEX TELO, OLYVIA GIORDANO, MARTIN SHKRELI, and REALTIME ADVISORY, INC.,

Defendants.

26-CV-03684 (VEC)

MEMORANDUM OPINION AND TEMPORARY RESTRAINING ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiff Guidepoint Global, LLC ("Guidepoint") initiated this lawsuit with the filing of a complaint against Defendant Alan Ware, its former employee, on May 4, 2026. *See* Compl., Dkt. 1. Guidepoint has since amended its complaint three times: on May 11, 2026, to add former employees Sheetal Duggal, Kirang Gohil, and Christiana Eng as defendants, as well as Inquire Network, Inc. ("Inquire"), *see* FAC, Dkt. 10; on June 1, 2026, to add Defendant DL Software, Inc. ("DL Software"), *see* SAC, Dkt. 69; and, most recently, on September 2, 2026, to add as Defendants former employees John Elliott, Alex Telo, and Olyvia Giordano, plus Martin Shkreli and RealTime Advisory, Inc. ("RealTime"), *see* TAC, Dkts. 135 (sealed), 138 (public).

On September 9, 2026, Guidepoint sought a temporary restraining order, Dkt. 156 ("TRO") (sealed), against Defendants Eng, Telo, and Giordano (the "TRO Defendants"). The Court heard oral argument on Guidepoint's TRO application on September 23, 2026. *See* Dkt. 172. For the reasons stated below, Guidepoint's application is GRANTED.

## BACKGROUND

The Court assumes the parties' familiarity with the factual background and procedural history and recites only those facts that are germane to Guidepoint's TRO application.

Guidepoint operates a network that connects institutional investors, consultants, and corporate clients with industry experts. TRO at 5 (citing Campanella Decl., Dkt. 159 ¶¶ 4–5). Guidepoint relies on its network of experts—known as "Advisors"—"to provide the right expert in the shortest amount of time" based on a given client's needs. Campanella Decl. ¶¶ 5–6. The company also provides "other research products to its clients, including a live teleconference business and a library of transcripts of such teleconferences that [Guidepoint] make[s] available to clients for purchase either on a pay-per-view basis or via a subscription." *Id.* ¶ 7.

Defendants Eng, Telo, and Giordano were previously employed by Guidepoint.[1] Each worked in Guidepoint's Technology, Media and Telecommunications ("TMT") group. *Id.* ¶¶ 17–22. Guidepoint describes the TMT group as "a specialized research and content team that produces industry-specific intelligence and curates on-demand content, including generating and maintaining a library of expert transcripts, calls, and data focused on" TMT topics. *Id.* ¶ 17. As members of the TMT team, Eng, Telo, and Giordano were "entrusted with access to Guidepoint's confidential, proprietary, and trade secret information, including information concerning experts in Guidepoint's network, client identities, preferences and feedback, expert recruiting and client sales and marketing strategies, internal training materials, teleconference operations, and client attendance." *Id.* ¶ 22. The TRO Defendants also "participated in the operation of Guidepoint's "Insights" business" by "identifying and recruiting Advisors for

[1] Eng began working with Guidepoint in February 2022 and resigned in March 2026. Campanella Decl. ¶ 18. Telo started with Guidepoint in November 2021 and resigned in April 2026. *Id.* ¶ 19. Giordano worked with Guidepoint from March 2025 until May 2026. *Id.* ¶ 21.

Guidepoint's teleconferences," "scheduling and executi[ng] . . . those calls," and managing how "the resulting content is packaged, priced, and sold to Guidepoint's institutional clients." *Id.* ¶ 23.

As a condition of their employment, the TRO Defendants entered into agreements with Guidepoint in which they agreed, *inter alia*, that they would not: (i) work for a competitor for six months following their separation from Guidepoint; (ii) solicit Guidepoint's advisors, clients, or customers; (iii) interfere with Guidepoint's relationships; or (iv) exfiltrate and improperly use Guidepoint's proprietary information or confidential materials. *See* Dkt. 159-2 ("Eng EA") §§ 4(a)–(c), 5; Dkt. 159-3 ("Telo EA") §§ 4(a)–(c), 5; Dkt. 159-4 ("Giordano EA") §§ 4(a)–(c), 5; *see also* Campanella Decl. ¶¶ 25–29.

Notwithstanding their contractual obligations, Guidepoint alleges that, from March 2026 through May 2026, Defendants engaged in "a coordinated, premeditated scheme to strip Guidepoint of its most valuable assets and transplant them into a competing business,"—Inquire Network, Inc. — "a new venture incorporated by Duggal and financed by Shkreli's company, DL Software, Inc." TAC ¶ 5. Guidepoint claims that Defendants absconded with "thousands of pages of [its] most sensitive proprietary information, including: more than one hundred confidential expert-call transcripts and that constitute the very product Guidepoint sells to clients; a spreadsheet identifying over 2,000 Guidepoint Advisors, complete with Guidepoint's unique internal Advisory identifiers; comprehensive pipeline data capturing Guidepoint's planned research calls, expert candidates, and client-facing strategy; and detailed compensation and performance data for the entire TMT team." *Id.* The evidence bears this out. *See* TRO at 9–14 (collecting evidence). Inquire's main objective "was to replicate Guidepoint" by "operat[ing] a lower-tier expert call and transcript corpus/business," "create[ing] and maintain[ing] a transcript/corpus asset," and "resell[ing] transcripts/corpus products." TRO at 8 (quoting Ex. 16,

Dkt. 160-11). Indeed, Inquire's business model is virtually identical to Guidepoint's. *See* TRO at 7–9 (discussing Inquire and collecting evidence).

Between May 13 and June 3, 2026, Defendants Ware, Eng, Gohil, Duggal, Inquire, and DL Software entered into consent orders and stipulated injunctions, permitting Guidepoint to engage in expedited discovery and restricting Defendants' ability to leverage Guidepoint's claimed trade secrets for their new business venture. *See* Dkts. 37 (Ware), 41 (Eng), 42 (Gohil), 46 (Duggal and Inquire), 76 (DL Software). On June 4, 2026, the Court entered an order and stipulated protocol permitting Guidepoint to perform a forensic inspection of Defendants' devices so that it could determine whether Defendants had, in fact, misused Guidepoint's proprietary information to establish Inquire and, if so, the scope of any such misappropriation. *See* Dkt. 79.

On September 9, 2026, Guidepoint returned to the Court with an application for a temporary restraining order against Eng, Telo, and Giordano, alleging that the TRO Defendants have continued to use Guidepoint's trade secrets, including by "performing the same or similar roles and functions for competitive entities," and are "actively engaged in soliciting Guidepoint's expert advisors who have joined Guidepoint's network [] and customers." TRO at 1. In particular, Guidepoint alleges that Defendants have endeavored to circumvent their stipulated injunctions by establishing RealTime Advisory, Inc., as another, non-enjoined venture to compete with Guidepoint. TAC ¶ 12, 153, 178–186. According to Guidepoint, the court-ordered forensic examinations have revealed: "RealTime Advisory was founded, owned, or operated by" Defendants, "each of whom was personally bound by the [employment] agreements at issue and who caused RealTime Advisory to be established using DL Software's infrastructure as a vehicle to continue their competing activities after entry of the Consent Stipulated Injunctions"; RealTime Advisory engaged Defendants "to provide expert network research

services—the very services they were prohibited from providing to any competing business under their respective agreements"; and RealTime Advisory "accept[s] client revenue generated through the exploitation of Guidepoint's misappropriated trade secrets and proprietary advisor and client relationships." *Id.* ¶ 310.

Further still, Guidepoint contends that "Inquire Network, DL Software, and RealTime Advisory are functionally the same." TRO at 7. "They share employees, office space, and infrastructure," and "DL [Software] pays for all of the rent, utilities, and shared services" between the entities. *Id.* (citing Ex. 16, Dkt. 160-11 § 8.2). There is also a fair amount of evidence that DL Software's and Inquire's employees work closely with (or directly for) RealTime. *Id.* (collecting evidence). Guidepoint asserts that each entity is "a direct competitor of Guidepoint," as "[e]ach is attempting to replicate Guidepoint's business model by charging customers fees in exchange for access to an online library of primary [expert] content." *Id.* at 8.

Guidepoint now requests the Court to enjoin the TRO Defendants from (i) "disclosing, publishing, accessing, copying, or otherwise using any Guidepoint Proprietary Information," (ii) providing services to any competing business, including RealTime, that are similar to any services the TRO Defendants previously provided to Guidepoint; (iii) soliciting Guidepoint clients, employees, or Advisors, and (iv) impairing or adversely affecting any contractual relationship or business relationship between Guidepoint and any of its clients, customers, experts, or Advisors. TRO at 2–3. Guidepoint also asks the Court to order Defendant Giordano to make her electronic devices available for computer forensic imaging given evidence that she is violating her employment contract with Guidepoint. *Id.* at 3.

## LEGAL STANDARD

To obtain a TRO, Guidepoint must demonstrate: (1) a likelihood of success on the merits or a substantial question as to the merits; (2) irreparable harm; (3) that the balance of hardships

tips in Guidepoint's favor; and (4) that a temporary restraining order serves the public interest. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010); *see also AIM Int'l Trading, LLC v. Valcucine, SpA.*, 188 F. Supp. 2d 384, 386–87 (S.D.N.Y. 2002) (reciting factors).

## DISCUSSION

### I. Likelihood of Success on the Merits

The Third Amended Complaint, *see* Dkt. 138, includes twelve counts, each against some or all of the Defendants, including: trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* (Count I); common law misappropriation of trade secrets (Count II); various breach of contract claims (Counts III through IX); tortious interference with contract (Count X); breach of fiduciary duty (Count XI); and aiding and abetting breach of fiduciary duty (Count XII). Guidepoint's briefing focuses on trade secret misappropriation and breach of contract, the claims that most justify the requested emergency injunctive relief. At this stage, Guidepoint "need only make a showing that the probability of . . . prevailing" on its claims "is better than fifty percent." *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024) ("The question the Court must consider . . . is whether a reasonable and properly instructed jury is more likely than not to rule for [Guidepoint] following a trial on the merits.").

#### a. The Trade Secret Misappropriation Claims (Counts I and II)

The federal DTSA requires proof that a trade secret was misappropriated either by acquisition of the trade secret through improper means or disclosure or use of the trade secret without consent. *See Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019); *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018); 18 U.S.C. §§ 1831–39. Under New York law, the

requirements are largely the same: "[a] plaintiff claiming misappropriation of a trade secret must prove that: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452 (2018); *see also Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40 (2d Cir. 2019) (summary order). Because the elements are nearly identical, Courts often rely on cases discussing New York law to analyze DTSA claims. *See, e.g.*, *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018); *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 461–62 (S.D.N.Y. 2017); *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

Guidepoint asserts trade secrets claims with respect to its (i) advisor lists and (ii) team metrics and compensation data. *See* TRO at 15. The relevant merits questions, then, are whether Guidepoint's advisor lists and metrics and compensation data constitute "trade secrets," and, if so, whether Guidepoint has made an adequate showing that the TRO Defendants have misappropriated them.

*i. Identification of the Trade Secrets*

Under the DTSA, a "trade secret" includes business information that "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means" and as to which the owner has taken reasonable measures to keep secret. 18 U.S.C. § 1893(3). The party seeking protection must describe the alleged trade secret with adequate specificity to inform the defendants what they are alleged to have misappropriated. *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 270 (S.D.N.Y. 2021) (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008)).

Guidepoint is likely to prevail with its claim that its Advisor lists are "trade secrets" under the DTSA and New York law. Guidepoint's expert network is at the heart of its business. *See* Campanella Decl. ¶¶ 14–16, 40–43. Its revenue depends on its ability "to provide the right expert [to a client] in the shortest amount of time," which itself depends on "the size and quality of [its] expert network, the speed with which [Guidepoint] can source and recruit additional new experts who are not in [its] network, and [its] ability to identify the right experts for [its] clients' projects." *Id.* ¶ 5. To compete effectively, "Guidepoint has invested substantial resources in sourcing, evaluating, and onboarding . . . advisors across more than 300 industries." TRO at 16.

Naturally, Guidepoint keeps its Advisor lists under lock-and-key. Information about its expansive expert network is not publicly available, nor is it readily ascertainable from any public source. *See* Campanella Decl. ¶¶ 30, 38–42. Among other security measures, employees—including the TRO Defendants—are permitted to access the advisor lists only on Guidepoint's internal systems, and they are contractually bound by strict confidentiality policies that govern the use and dissemination of such lists. *Id.* ¶¶ 25–31; *see also, e.g.*, *Catalyst Advisors L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 675 (S.D.N.Y. 2022) ("Generally speaking, [reasonable] measures can include the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." (internal quotation marks omitted)). Moreover, Guidepoint's Chief Financial Officer has confirmed that "[i]f a competitor were able to utilize or obtain this information, the impact on Guidepoint would be devastating since Guidepoint's network of Advisors is the foundation for" its core service offerings. Campanella Decl. ¶ 42. This Court has previously granted an injunction under nearly identical circumstances. *See, e.g.*, *Expert Connect, LLC v. Fowler*, No. 18-CV-4828 (LGS), 2019 WL

13388548, at *2 (S.D.N.Y. Aug. 15, 2019) (enjoining defendant from disclosing plaintiff's "expert lists from ExpertConnect's database," including "industry consultants or subject matter experts registered or listed in ExpertConnect's database").

Guidepoint will also likely prevail on its claim that its team metrics and compensation data are protectible trade secrets. As with its Advisor lists, "Guidepoint considers compensation information confidential . . . because it shows the metrics by which Guidepoint tracks [employee] success." Campanella Decl. ¶ 54. The "proprietary compilation of information," including salary figures or billing numbers, can constitute a trade secret "so long as the integrated combination provides a competitive advantage not readily ascertainable by others." *Mid-Hudson Anesthesiologists, P.C. v. St. Luke's Cornwall*, No. 24-CV-4740 (NSR), 2026 WL 734947, at *10 (S.D.N.Y. Mar. 16, 2026) (slip op.) (citing *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990), and *Town & Country Linen Corp.*, 556 F. Supp. at 276–77). Such is the case here. Access to the metrics and compensation data "would help a competitor know which [employees] generate the most revenue for Guidepoint." Campanella Decl. ¶ 54. Indeed, a reasonable inference would be that Defendants absconded with much of this information "to avoid the potentially painstaking effort" (and substantial investment of time and resources) of researching, compiling, and collating the metrics and compensation data—or Advisor lists—themselves. *loanDepot.com, LLC v. CrossCountry Mortg.*, LLC, No. 22-CV-5971 (LGS), 2023 WL 3884032, at *7 (S.D.N.Y. June 8, 2023). It is also not clear that replication of Guidepoint's proprietary metrics and compensation information would be technically possible given that, like its Advisor lists, Guidepoint has taken numerous steps to prevent the disclosure of such data, including by restricting access to company personnel on non-public systems and by subjecting employees to confidentiality agreements. *See* TRO at 17–18.

In short, Guidepoint has made a sufficient showing that its Advisor lists and team metrics and compensation data derive economic value by remaining confidential and that it has taken reasonable measures to ensure the confidentiality of each. These materials are thus likely to constitute trade secrets under the DTSA and New York law.

*ii. Misappropriation of the Trade Secrets*

The DTSA defines misappropriation as (1) the acquisition of a trade secret by a person who knew or had reason to know that the trade secret was acquired by improper means; or (2) the disclosure or use of a trade secret without express or implied consent by a person who acquired it through improper means. 18 U.S.C. § 1839(5). "Improper means" under the DTSA includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy and espionage through electronic or other means, but does not include reverse engineering, independent derivation or any other lawful means of acquisition. *Id.* § 1839(6). "The statute therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 493 (S.D.N.Y. 2024) (quoting *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 389 (S.D.N.Y. 2023)).

Guidepoint has adequately demonstrated that the TRO Defendants have misappropriated Guidepoint's trade-secret information. None of the TRO Defendants can seriously dispute that each was subject to a contractual agreement that prohibited him or her from, among other things, sharing Guidepoint's confidential, proprietary, and trade secret information with third parties and for purposes beyond the employee's job duties. *See* Eng EA §§ 4(a)–(c), 5; Telo EA §§ 4(a)–(c), 5; Giordano EA §§ 4(a)–(c), 5; *see also* Campanella Decl. ¶¶ 25–29. Notwithstanding those obligations, there is compelling evidence that Defendants have accessed, and continue to access, without authorization and in violation of their employment agreements, the company's trade-

secret information[2] in an apparent bid to launch directly competitive business ventures. *See* TRO at 18–19. This appears to be a textbook example of misappropriation. *See, e.g.*, *Better Holdco, Inc.*, 666 F. Supp. at 290 (holding that breach of contractual confidentiality provisions constitutes improper means); *AUA Private Equity Partners, LLC v. Soto*, No. 17-CV-8035 (GHW), 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (same); *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020) (same).

In sum, the Court is persuaded that Guidepoint is likely to succeed on the merits of its trade secret misappropriation claims.

b. <u>The Breach of Contract Claims (Counts III through IX)</u>

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

Neither party disputes that contracts (with non-solicit, non-interference, and confidentiality provisions) exist between Guidepoint and each of the TRO Defendants. The TRO Defendants argue, however, that "the non-solicitation and non-interference clauses in [the TRO Defendants'] Employment Agreements are unenforceable because they do not limit breaches of those provisions to solicitation or interference with people or entities with whom the [TRO Defendants] substantively engaged with during their employment at Guidepoint," TRO Opp., Dkt. 174 at 13, and thus are "too broad to comport with the public policies of New York" that "oppos[e] excessive restriction on an employee's ability after employment to continue to earn [a] livelihood in [their] field," *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1047 (S.D.N.Y.

---

2 The TRO Defendants appear to concede that they have used Guidepoint's information and argue only that the purportedly stolen materials do not constitute "trade secrets." *See* TRO Opp., Dkt. 174, at 11–12. For the reasons stated previously, the Court finds Guidepoint is likely to succeed in defeating that argument.

1987). The TRO Defendants also argue that Guidepoint has not "identified . . . who the [TRO Defendants] purportedly solicited or interfered with," and, thus, Guidepoint cannot establish that the TRO Defendants actually breached their non-solicit and non-interference obligations. TRO Opp. at 13.

These arguments are not persuasive. If the Court were to limit application of the contractual non-solicit and non-interference requirements to individuals with whom the TRO Defendants previously liaised, the protections afforded by the contract would be nonexistent. Here, there is uncontroverted evidence that the TRO Defendants "took confidential and trade secret information concerning *all* Guidepoint TMT advisors"—*i.e.*, "thousands of Advisors." TRO Reply, Dkt. 183 at 9 (emphasis added). Indeed, it is the identity and proprietary metrics associated with the Advisors that Guidepoint seeks to protect, not the TRO Defendants' individual relationships with any given expert. And it is the former, not the latter, that is valuable to the TRO Defendants—which is probably why "Defendants' interrogatory responses confirm that the majority of the advisors with whom they have interacted [on behalf of Inquire and RealTime] are Guidepoint advisors listed on the very same list Defendants stole." TRO Reply at 10 (citing Campanella Decl. ¶ 64 and Ex. 9, Dkt. 160-14 at 11) (emphases omitted).[3] Evidence tending to show that the TRO Defendants have used, and are using, "confidential [Guidepoint] information to attract . . . [experts] with whom [they] had not had a relationship while employed" is sufficient to justify the relief Guidepoint seeks. *BDO Siedman v. Hirschberg*, 93 N.Y.2d 382, 392 n.2 (1999). That Defendants are indiscriminately leveraging

[3] Guidepoint also points to evidence that "Eng communicated with advisors identified on Guidepoint's proprietary TMT Advisor spreadsheet that Defendants stole and incorporated into DL's system[] and helped them join Inquire." TRO Reply at 12 (citing Ex. 60, Dkt. 184-21; Ex. 61, Dkt. 184-22; Ex. 62, Dkt. 184-23). "Once they began working at Inquire, they both contacted Guidepoint advisors with whom they had worked at Guidepoint to solicit them to continue working with them at their new venture." *Id.* (citing Ex. 29, Dkt. 160-24).

Guidepoint's trade secrets counsels in favor of broader—not narrower—non-solicitation protections. Guidepoint is likely to succeed on the merits regarding the TRO Defendants' breach of their non-solicitation and non-interference provisions.[4]

Regarding the non-compete provisions, the TRO Defendants argue that RealTime is not a "Competing Business" as defined by the employment agreements because it "does not provide access to a library of primary research material, and it does what Guidepoint explicitly does not—provides advisory services." TRO Opp. at 13–14. But the "advisory services" that RealTime provides appear to be nothing more than repackaged analytics and summaries based on conversations with industry experts—some of whom are also Advisors in Guidepoint's expert network. *See* Hearing Tr. at 38:2–20. When pressed by the Court to explain what RealTime does *differently* than Guidepoint, counsel vaguely asserted that "[t]he gist" of RealTime's business is "general advisory services" or "anything that the research require[s]." *Id.* at 17:17–18:16. This is, for all intents and purposes, a meaningless distinction. There is also evidence that RealTime is recording calls with experts (*i.e.*, what Guidepoint does) to "offer topic summaries and monthly reports," instead of, *e.g.*, a "library" of content (*i.e.*, as Guidepoint does). *Id.* at 38:12–19. The Court agrees with Guidepoint that this is mere "wordsmithing"—RealTime is providing a virtually identical service[5] under "a different name." *Id.* at 42:7–12.

---

[4] To be clear, Guidepoint has also marshaled sufficient evidence to demonstrate that the TRO Defendants are breaching their contractual non-solicit and non-interference obligations in their work for RealTime. *See* TRO Reply at 11–12.

[5] As best the Court can tell, RealTime attempts to differentiate itself by focusing client interaction with its internal "analysts," *see, e.g.*, Ex. 55, Dkt. 184-16 at 6, whereas Guidepoint links clients directly with its Advisor network. But simply adding a middleman does not change the crux of RealTime's business, which is to provide industry reports based on expert insights—*i.e.*, exactly what Guidepoint provides its clients. Additional evidence that RealTime is using AI to summarize its expert conversations for clients tends to demonstrate that the company's business is encroaching further into Guidepoint's domain.

Moreover, it does not appear that RealTime, DL Software, and Inquire engage in any of the corporate formalities one would expect of truly separate business units, and the TRO Defendants do not dispute that DL Software and Inquire Network are covered by the non-compete agreement as directly competing entities. *See id.* at 37:9–18 (noting that RealTime does not have a bank account, is completely funded by DL Software, and that DL Software pays the advisors that are helping to generate RealTime's research analytics). It is also clear that the TRO Defendants have reprised their Guidepoint roles at RealTime. TRO Reply at 8–9. Again, Defendants have offered no meaningful rebuttal to any of these points.

In sum, the Court can discern no functional difference between the businesses of Guidepoint and Realtime business (or between RealTime, DL Software, and Inquire Network, for that matter). Guidepoint is likely to succeed on the merits of its claim that the TRO Defendants breached their non-compete agreements.

## II. Irreparable Harm

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction [or temporary restraining order]." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)). It is an "injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995). "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters,* 903 F.2d at 907 (citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir. 1989)). The movant is required to establish not a mere possibility of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original).

The likelihood that Guidepoint's trade secret information or other proprietary data will be distributed further or otherwise used to assist RealTime, Inquire, or DL Software is sufficient to constitute irreparable harm.[6] The TRO Defendants seem to agree, given that each of their contracts expressly acknowledged that Guidepoint would be irreparably injured if they violated their confidentiality obligations. *See* TRO at 26–27. And a "movant's demonstration of irreparable harm is strengthened significantly where the employee has previously acknowledged . . . that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur." *Iannucci v. Segal Co., Inc.*, No. 06 Civ. 4720 (PKL), 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999)).

Further still, "[t]he disclosure of . . . confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (quoting *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000)). Indeed, "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984). It is axiomatic that Guidepoint will be harmed if its proprietary data falls into the wrong hands,[7] given the importance of the information to Guidepoint's overall business. Such harm is also virtually impossible to remedy through money damages. *See Ticor Title Ins. Co. v*. Cohen, 173 F.3d 63, 69 (2d Cir. 1999).

---

[6] The TRO Defendants argue that there is no risk of irreparable harm to Guidepoint because there is no evidence that the TRO Defendants intend to further disseminate the trade secrets that they stole from Guidepoint. TRO Opp. at 14–16. This fundamentally misconstrues the nature of the threatened harm. Guidepoint is likely not concerned that the TRO Defendants will imminently print its Advisor list on the side of a blimp to fly above New York City. It is profoundly concerned, though, that the TRO Defendants will continue to *use Guidepoint's trade secrets for precisely the reason they took it in the first place*: to "communicate with [A]dvisors, vendors, and colleagues" with the aim of establishing a directly competitive business. TRO Reply at 13–14.

[7] Indeed, it seems that it already has.

**III. Balance of Hardships & Public Interest**

Having found that Guidepoint is likely to succeed on the merits of their claims and that the company is likely to be irreparably harmed absent an injunction, the Court will briefly discuss the final two factors: the balance of the hardships and public interest. Both favor Guidepoint.

As to the former, Guidepoint faces a significant risk of irreparable harm absent a restraining order. It is not clear that an injunction will burden the TRO Defendants whatsoever, other than by preventing them from continuing to misuse or impermissibly distributing Guidepoint's trade secret information. To be sure, the TRO Defendants argue that Guidepoint is attempting to "financially ruin" them, as they are "young adults who are only several years removed from college and attempting to keep up with the modern inflated cost of living." TRO Opp. at 19–20. They assert that the requested relief would "effectively bar Defendants from continuing to be gainfully employed at their current roles, resulting in a cascade of personal economic catastrophe." *Id.* at 20. The Court is not unsympathetic to the TRO Defendants' concerns. Even so, the employment minefield they now find themselves in is one of their own making. And, in any event, the TRO that Guidepoint seeks does not (and cannot) prevent Defendants from working in the expert consulting industry writ large. Any injunctive relief would preclude Defendants only from working for a directly competitive company doing "the same or similar" work that they previously did for Guidepoint. *See* Eng EA § 4(a); Telo EA § 4(a); Giordano EA § 4(a). This includes, of course, working for a competing company founded (i) by Guidepoint's former employees and (ii) using the confidential information that those employees stole from Guidepoint. But to the extent Guidepoint's legacy competitors (Gerson Lehrman Group, Zintro, Maven, AlphaSights, Third Bridge, DeepBench, Tegus, etc.) are hiring,

the TRO Defendants would do well to look for employment there—so long as the roles they seek are unlike the ones they performed at Guidepoint, as permitted by their employment agreements.

The Court also agrees that an injunction would promote the public interest by protecting a business that took reasonable steps to ensure that its proprietary, trade-secret information does not fall into the hands of competitors. It is also in the public interest to hold defendants to their contractual agreements.

## CONCLUSION

For the reasons stated above, Guidepoint's application for a temporary restraining order is GRANTED. It is hereby ORDERED that Defendants Elliott, Telo, and Giordano are ENJOINED from:

(i) disclosing, publishing, accessing, copying, or otherwise using any of Guidepoint's proprietary information;

(ii) providing or performing services to any competing business that are the same as or similar in purpose or function to any services that they provided to Guidepoint. A competing business includes any company that is in the business, or intends to enter the business, of charging customers fees in exchange for access to an online library of primary research content. This includes, but is not limited to, Inquire Network, Inc., DL Software, Inc., and RealTime Advisory, Inc.;

(iii) soliciting any Guidepoint clients, employees, or Advisors; and

(iv) impairing or adversely affecting any contractual relationship or business relationship between Guidepoint and any client, customer, expert, advisor, or other person or entity engaged by or doing business with Guidepoint.

It is FURTHER ORDERED that Guidepoint's request that Defendant Giordano make her electronic devices available for computer forensic imaging is DENIED.[8]

---

[8] Guidepoint requests to image Ms. Giordano's devices on page three of its TRO application, but the remainder of Guidepoint's submission is devoid of any justification for such an examination. If Guidepoint believes that additional relief (beyond the injunction granted herein) is necessary, it may submit an appropriate application to the Court.

It is FURTHER ORDERED that Guidepoint's letter motions to seal materials filed in support of the TRO application, Dkts. 155, 187, and the TRO Defendants' letter motion to seal materials filed in response to the TRO application, Dkt. 182, are GRANTED. The Clerk of Court is respectfully directed to terminate the open motions at Dkts. 155, 182, and 187.

Although Federal Rule of Civil Procedure 65(c) requires that the Court issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," the TRO Defendants have voluntarily waived the bond requirement. *See* TRO at 30 (citing employment contracts). As such, Guidepoint is not required to post bond at this time. *See Int'l Bus. Machines Corp. v. De Freitas Lima*, No. 20-CV-04573 (PMH), 2020 WL 5261336, at *15 (S.D.N.Y. Sept. 3, 2020), *aff'd*, 833 F. App'x 911 (2d Cir. 2021).

**SO ORDERED.**

**Date: October 8, 2026**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**